# Exhibit 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>CAMP MYSTIC, LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-90621 (CML)<br><br>(Jointly Administered) |
| CAMP MYSTIC, LLC, *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A,<br><br>Defendants. | Adv. Pro. No. 26-03604<br><br>[Re: Docket No. 2] |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) DECLARING THAT THE AUTOMATIC STAY PROHIBITS CERTAIN ACTIONS AGAINST NON-DEBTORS OR (B) PRELIMINARILY ENJOINING SUCH ACTIONS**

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Camp Mystic, LLC (4064), Natural Fountains Properties, Inc. (1414), Mystic Camps Family Partnership, Ltd. (9861), and Mystic Camps Management, LLC (9688). The location of the Debtors' service address for purposes of these Chapter 11 Cases is 2689 Highway 39, Hunt, TX 78024.

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................5

I. The Camp Mystic Tragedy ....................................................................................5

II. The Families' State and Federal Court Litigation....................................................5

III. The Texas Legislature's Investigation and Report ....................................................9

IV. The Bankruptcy Filing and Certain Families' Motion to Lift the Stay.......................11

V. The Committee's Discovery Efforts in the Chapter 11 Cases ....................................13

VI. This Adversary Proceeding, the Debtors' Motion, and the Certain Heaven's 27 Families' Lift-Stay Motion ....................................................................................14

A. The Debtors' Commencement of This Adversary Proceeding and the Certain Heaven's 27 Families' Filing of a Motion To Lift the Automatic Stay ....................................................................................14

B. The Committee's Intervention in the Adversary Proceeding ....................................15

ARGUMENT ....................................................................................................15

I. The Automatic Stay Does Not Extend, and Should Not Be Extended, to the Non-Debtor Individual Defendants....................................................................................18

A. Section 362(a)(1) Does Not Apply to the Individual Defendants..........................18

B. Section 362(a)(3) Does Not Reach the Prepetition Actions Against the Individual Defendants....................................................................................20

i. The Families' Claims Against the Individual Defendants Are Not Estate Claims ....................................................................................20

ii. The Debtors' Purported Insurance Policies Do Not Justify Extension of the Stay to the Individual Defendants.......................22

II. There Are No "Unusual Circumstances" That Justify Entry of an Injunction Extending the Stay Under Section 105(a)....................................................................26

A. There Are No "Unusual Circumstances" Such That, in the Absence of a Stay, the Debtors Will Be Irreparably Harmed....................................................27

i. The Narrow "Identity of Interest" Exception Does Not Apply .....27

ii. The Claims Against the Individual Defendants Are Not Inextricably Interwoven With Those Against the Debtors ............31

iii. The Debtors' Reorganization Efforts Will Not Be Adversely Impacted by the Non-Debtor Actions ...........................................34

B. The Debtors Have Not Satisfied Any of the Other Elements Necessary to Justify Entry of a Preliminary Injunction.............................................................37

i. The Balance of Harms Favors Denying the Injunction .................37

ii. The Public Interest Favors Denying the Injunction .......................38

iii. The Debtors Cannot Demonstrate a Substantial Likelihood of Success on the Merits...................................................................41

III. This Court Lacks Subject Matter Jurisdiction to Enjoin the Unfiled Actions, and Such Relief Would Be Premature .........................................................................42

IV. The Motion Should Independently Be Denied on Threshold Procedural Grounds ...........44

CONCLUSION ..........................................................................................................46

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ....................26, 28

*Alharbi v. Beck*,
62 F. Supp. 3d 202 (D. Mass. 2014) ....................10

*In re Alta Mesa Res., Inc.*,
No. 19-35133, 2022 WL 17984306 (Bankr. S.D. Tex. Dec. 28, 2022)....................31

*Arnold v. Garlock, Inc.*,
278 F.3d 426 (5th Cir. 2001) ....................19

*Balke v. Carmichael*,
No. CV H-19-313, 2019 WL 13191287 (S.D. Tex. July 30, 2019)....................13

*Bellows v. Camp Mystic, LLC*,
No. D-1-GN-25-009963 (Dist. Ct., Travis Cnty., Tex. Nov. 10, 2025) ....................6, 7, 8, 12

*Beran v. World Telemetry, Inc.*,
747 F. Supp. 2d 719 (S.D. Tex. 2010) .................... *passim*

*In re Bidermann Indus. U.S.A., Inc.*,
200 B.R. 779 (Bankr. S.D.N.Y. 1996)....................28, 30, 31

*In re Buccaneer Res., L.L.C.*,
912 F.3d 291 (5th Cir. 2019) ....................21

*CAE Indus. Ltd. v. Aerospace Holdings Co.*,
116 B.R. 31 (S.D.N.Y. 1990)....................30

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004)....................42

*In re Continental Airlines*,
177 B.R. 475 (D. Del. 1993)....................34

*In re Divine Ripe, L.L.C.*,
538 B.R. 300 (Bankr. S.D. Tex. 2015) .................... *passim*

*Duval v. Gleason*,
No. C-90-0242-DLJ, 1990 WL 261364 (N.D. Cal. Oct. 19, 1990) ....................28

*In re Educators Grp. Health Tr.*,
25 F.3d 1281 (5th Cir. 1994) ....................21

*In re Enron Corp.*,
No. 01-16034-AJG, 2005 WL 6237551 (Bankr. S.D. Tex. Dec. 9, 2005) ..............................10

*In re First Cent. Fin. Corp.*,
238 B.R. 9 (Bankr. E.D.N.Y. 1999)....................................................................34, 36

*GATX Aircraft Corp. v. M/V Courtney Leigh*,
768 F.2d 711 (5th Cir. 1985) ..........................................................................19

*Getten v. Nat. Fountains Props., Inc.*,
No. D-1-GN-25-009976 (459th Dist. Ct., Travis Cnty., Tex. May 4, 2026).................. *passim*

*Gold v. Johns-Manville Sales Corp.*,
723 F.2d 1068 (3d Cir. 1983).............................................................................38

*In re Granite Partners, L.P.*,
194 B.R. 318 (Bankr. S.D.N.Y. 1996)................................................................23, 24

*Gray v. Hirsch*,
230 B.R. 239 (S.D.N.Y. 1999)...........................................................................34

*Harrington v. Purdue Pharma L.P.*,
603 U.S. 204 (2024)...................................................................................16, 18, 43

*Holland v. High Power Energy*,
248 B.R. 53 (S.D. W. Va. 2000) .........................................................................28

*Hoover v. Morales*,
164 F.3d 221 (5th Cir. 1998) ...........................................................................26

*In re James*,
300 B.R. 890 (Bankr. W.D. Tex. 2003)...............................................................12

*In re Jefferson Cnty., Ala.*,
491 B.R. 277 (Bankr. N.D. Ala. 2013) ..............................................................32

*In re JJ Arch LLC*,
No. 24-10381 (JPM), 2024 WL 2928033 (Bankr. S.D.N.Y. June 10, 2024) ..........................22

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)........................................................................................17

*In re LTL Management, LLC*,
638 B.R. 291 (Bankr. D.N.J. 2022) ...................................................................36

*Mar. Elec. Co. v. United Jersey Bank*,
959 F.2d 1194 (3d Cir. 1991).............................................................................19

*Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*,
797 F.2d 227 (5th Cir. 1986) ....................16

*McConathy v. Foundation Energy Fund IV-A, L.P.*,
111 F.4th 574 (5th Cir. 2024) ....................19

*Naylor v. Camp Mystic, LLC*,
No. D-1-GN-25-010016 (200th Dist. Ct., Travis Cnty., Tex. Nov. 10, 2025) ....................6, 8, 12

*Nesloney v. Midway Oilfield Constructors, Inc.*,
No. H-18-407, 2018 U.S. Dist. LEXIS 180915 (S.D. Tex. Oct. 22, 2018) ....................33

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*,
564 B.R. 192 (S.D.N.Y. 2016)....................29, 30

*In re OGA Charters, L.L.C.*,
901 F.3d 599 (5th Cir. 2018) ....................25, 26

*In re Panther Mountain Land Dev., LLC*,
686 F.3d 916 (8th Cir. 2012) ....................35, 37

*Peck v. Camp Mystic, LLC*,
No. D-1-GN-25-009983 (261st Dist. Ct., Travis Cnty., Tex. Nov. 10, 2025)....................6, 9, 12

*In re Poirier*,
346 B.R. 585 (Bankr. D. Mass. 2006) ....................10

*In re R.E. Loans LLC*,
2014 WL 465301 (Bankr. N.D. Tex. Feb. 5, 2014)....................21

*Reliant Energy Servs., Inc. v. Enron Canada Corp.*,
349 F.3d 816 (5th Cir. 2003) ....................19, 26, 28

*In re Reliant Expl. Ltd.*,
336 B.R. 286 (Bankr. S.D. Tex. 2005) ....................42

*In re Rodriguez*,
Case No. 21-07005, ECF 144 (Bankr. S.D. Tex. Apr. 27, 2022) ....................45

*In re Roman Catholic Diocese of Rockville Centre*,.
No. 1:20-ap-01226 (Bankr. S.D.N.Y. Nov. 4, 2020)....................43

*In re Roman Cath. Diocese of Rockville Ctr., New York*,
651 B.R. 622 (Bankr. S.D.N.Y. 2023)....................24, 41

*In re S.I. Acquisition, Inc.*,
817 F.2d 1142 (5th Cir. 1987) ....................22

*In re Sahene Constr., LLC*,
No. 23-10096, 2023 WL 3010073 (Bankr. M.D. La. Apr. 19, 2023)....................26, 27, 29, 30

*In re SBMC Healthcare, LLC*,
519 B.R. 172 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017) ....................21

*In re Schimmelpenninck*,
183 F.3d 347 (5th Cir. 1999) ....................22

*In re Serta Simmons Bedding, L.L.C.*,
125 F.4th 555 (5th Cir. 2024) ....................31

*In re Seven Seas Petroleum, Inc.*,
522 F.3d 575 (5th Cir. 2008) ....................21

*In re Sfuzzi, Inc.*,
191 B.R. 664 (Bankr. N.D. Tex. 1996)....................23

*Sterling v. Greater Hou. Transp. Co.*,
No. CV H-20-910, 2021 WL 5155683 (S.D. Tex. Sept. 14, 2021) ....................30, 32

*Steward v. Camp Mystic, LLC*,
No. D-1-GN-26-000758 (200th Dist. Ct., Travis Cnty., Tex. Feb. 4, 2026) .................. *passim*

*In re Thompson*,
No. 22-11921-RMB, 2023 WL 2466435 (Bankr. W.D. Wis. Mar. 10, 2023)....................28

*In re Uni-Marts, LLC*,
404 B.R. 767 (Bankr. D. Del. 2009) ....................37

*United States v. Gluk*,
831 F.3d 608 (5th Cir. 2016) ....................10

*In re W.R. Grace & Co.*,
386 B.R. 17 (Bankr. D. Del. 2008) ....................34

*Wedgeworth v. Fibreboard Corp.*,
706 F.2d 541 (5th Cir. 1983) ....................16, 18

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008)....................27

*In re Xenon Anesthesia of Texas, PLLC*,
510 B.R. 106 (Bankr. S.D. Tex. 2014) ....................20, 29

*In re Zale Corp.*,
62 F.3d 746 (5th Cir. 1995) ....................27

**Statutes**

11 U.S.C. § 105(a) ....................26

11 U.S.C. § 362(a)(1)....................18

11 U.S.C. § 362(a)(3)....................20

11 U.S.C. § 1301(a) ....................18

28 U.S.C. § 157(b)(2)(B) ....................38

28 U.S.C. § 1411(a) ....................38

**Other Authorities**

Fed. R. Evid. 803(8)....................10

Local Rule 9013-1(b)....................44

Local Rule 9013-1(h)....................44

U.S. Const. amend. VII....................38

The Official Committee of Unsecured Creditors (the "Committee") of Camp Mystic, LLC and Camp Mystic, LLC's debtor affiliates in the above-captioned chapter 11 cases (collectively, the "Debtors" in the "Chapter 11 Cases"), by and through its undersigned counsel, hereby submits this objection to the Debtors' *Motion for Entry of an Order (A) Declaring that the Automatic Stay Prohibits Certain Actions Against Non-Debtors or (B) Preliminarily Enjoining Such Actions* (the "Motion") in the above-captioned adversary proceeding (the "Adversary Proceeding").[1] Adversary Proceeding, ECF No. 2. The Committee respectfully requests that this Court deny the relief requested in the Motion.

**INTRODUCTION**

1. Twenty-five children and two young counselors died in the July 4, 2025 flood at Camp Mystic. They were victims of a preventable tragedy that a Texas legislative investigation attributed to the camp's failure to implement basic emergency and evacuation plans despite decades of documented flood warnings, compounded by a series of catastrophically bad decisions by camp personnel on the night of the flood. Their grieving families know them as "Heaven's 27." Certain of those families (the "Families"), who are members of the Committee and its constituency, seek to hold accountable non-debtor officers, managers, and employees whose personal knowledge, personal decisions, personal conduct on the night of the disaster, and personal actions in its aftermath precipitated those deaths and caused emotional distress thereafter (the "Individual Defendants").[2]

---

[1] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the Motion.

[2] The Individual Defendants are Willetta "Tweety" Eastland, George Albritton Eastland (as personal representative of the Estate of Richard "Dick" Eastland), Edward S. Eastland, Mary E. "Mary Liz" Eastland, and William Neely Bonner III.

2. The Debtors' Motion is yet another example of the Debtors attempting to leverage these Chapter 11 Cases as a tool to protect the Eastlands. The Debtors ask that the Court fashion relief sufficient to protect the non-debtor Individual Defendants from litigation concerning their own conduct, even though they themselves have not filed for bankruptcy. The Motion serves the interests of no one other than the non-debtor Individual Defendants and should be denied for several reasons.

3. *First*, the law is clear. In the Fifth Circuit, the "well-established rule" is that the automatic stay "does not apply to proceedings against co-defendants" of a debtor, and the Debtors identify no reason why that rule does not apply here. The claims brought by the Families against the Individual Defendants seek to hold the Individual Defendants liable for their own individual conduct that led to the girls' deaths and individually harmed each of the Families. These claims are not claims *against* the Debtors to which section 362(a)(1) would apply. Nor are they claims *held by* the Debtors to which section 362(a)(3) would apply. The claims against the Individual Defendants are distinct from the claims against the Debtors. The law is clear that the automatic stay does not apply to such claims.

4. *Second*, there is no basis for using section 105(a) to extend the automatic stay to protect the Individual Defendants from continued litigation. Courts have recognized that extending the automatic stay to non-debtors requires "unusual circumstances"—such as an identity of interests or serious threat to the reorganization—and no such circumstances are present here. The Debtors argue that there is an identity of interests because the Individual Defendants may have claims for indemnification against the Debtors, but (unsurprisingly) the mere possibility of a prepetition unsecured indemnification claim against the estate is not the kind of identity of interests recognized in the case law as justifying an extension of the automatic stay. Nor does the mere

possibility of res judicata, collateral estoppel, or evidentiary rulings in the Individual Defendants' cases justify the extraordinary relief of a section 105(a) injunction of claims against non-debtors. Each of these risks is small, remote, subject to defenses by the Debtors, and, ultimately, unlikely to affect the success of the Chapter 11 Cases.

5. Moreover, when considering the balance of the harms from a section 105(a) injunction, any small potential impact that actions against the Individual Defendants may have on the Chapter 11 Cases pales in comparison with the impact on the Families. These Families all lost daughters—many of whom were only seven or eight years old—on the night of the flood. Through their lawsuits against the Individual Defendants, the Families seek to hold non-debtor individuals liable for their decisions before the flood that set the conditions for the tragedy, their catastrophic failures on the night of the flood, and their harmful treatment of the Families in the days and months thereafter. Preventing these Families from discovering what happened to their daughters in their final hours, from pursuing justice against those who caused their daughters' deaths, and from obtaining closure for themselves and their loved ones is a very serious burden that should not be imposed on them without an especially strong justification, which the Debtors have not provided.

6. *Third*, the Debtors' Motion seeks relief beyond what is permissible or appropriate. Not only do the Debtors seek to enjoin the continuation of *existing* actions, but they also ask that the Court enjoin Families who have not yet filed a lawsuit from commencing *future* lawsuits against the non-debtor Individual Defendants "that in any way relate to or arise out of the events of the July 4, 2025 flood with respect to" Camp Mystic—closing courthouse doors to potential plaintiffs whose not-yet-filed claims against the Individual Defendants may become subject to statutes of limitations. The Court does not have jurisdiction to enjoin the filing of future claims by

third parties against third parties. And prohibiting potential plaintiffs from filing lawsuits that are necessary to meet applicable statutes of limitations raises serious due process concerns. At a minimum, the Court should ensure that any order entered by the Court contains sufficient protections of the rights of future plaintiffs with respect to the Individual Defendants.

7. *Finally*, the Motion fails at an evidentiary and procedural level. The Debtors have fallen far short of meeting their evidentiary burden. The Debtors provide no indemnification agreements, no organizational documents, no quantification of alleged harm to the estate, and no evidence supporting any of their claims. Without such evidence, the Debtors cannot meet their burden to establish the extraordinary relief they request. Moreover, the Debtors failed to comply with Local Rules 9013-1(b) and 9013-1(h)—mandatory requirements that every motion include prescribed notice language and a proposed order. These are not mere technical defects. Rather, the Debtors' failures to specifically articulate the relief they seek in a proposed order and to identify the substantive evidence on which they rely have impaired the Families' ability to oppose the Debtors' request for extraordinary relief. The rules exist for a reason, and the Debtors' failure to comply with them should not be excused.

8. At bottom, courts within this Circuit have been clear that the automatic stay does not apply to non-debtors, and that it should only be extended to enjoin cases against non-debtors in unusual and extraordinary circumstances. No such circumstances are present here. Simply put, the Individual Defendants who control the Debtors' estates should not be permitted to use the Debtors' Chapter 11 Cases as a mechanism to extend to themselves the benefits of a bankruptcy case—including the automatic stay—without taking on the burdens of a bankruptcy case—including the marshaling of assets, disclosure obligations, and full transparency. The Motion should be denied in its entirety.

## BACKGROUND

### I. The Camp Mystic Tragedy

9. The background to these Chapter 11 Cases and this Adversary Proceeding is described in the Committee's Motion for an Order Appointing a Chapter 11 Trustee. Chapter 11 Cases, ECF No. 227 ¶¶ 10–45. As explained in that filing and elsewhere, Camp Mystic was a girls' summer camp located on approximately 725 acres of land in Hunt, Texas (Kerr County), at the confluence of the Guadalupe River and Cypress Creek.[3]

10. Since 1939, Camp Mystic has been owned and operated by members of the Eastland family—including several of the Individual Defendants. Dick Eastland and his wife, Tweety, assumed control as executive directors in 1987, jointly running day-to-day operations. By 2020, their sons had assumed leadership roles as well: Edward and his wife Mary Liz were named directors of the Guadalupe River camp, while Britt and his wife Catie directed the newer Cypress Lake camp.

11. Early on the morning of July 4, 2025, a flash flood swept through the camp—claiming the lives of twenty-seven children and counselors. Those girls have come to be known as "Heaven's 27."

### II. The Families' State and Federal Court Litigation

12. In the months following the disaster, several families of the deceased filed wrongful death and negligence actions (the "Prepetition Actions"). These actions assert claims against both the Debtor entities and the Individual Defendants.[4]

---

[3] Unless otherwise noted, the facts described in this subsection are drawn from the Texas Legislature's Report discussed below and attached hereto as Exhibit A.

[4] Original Petition, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (200th Dist. Ct., Travis Cnty., Tex. Feb. 4, 2026), attached hereto as Exhibit B; Second Amended Petition, *Getten v. Nat. Fountains Props., Inc.*, No. D-1-GN-25-009976 (459th Dist. Ct., Travis Cnty., Tex.

13. The claims against the Debtors are grounded in those entities' institutional roles. Camp Mystic, LLC operated the camp; Natural Fountains Properties, Inc. owned the land; and the remaining entity defendants exercised ownership or management functions over the enterprise. *See, e.g.*, Pls.' Original Pet. ¶¶ 53–55, *Peck*; Pls.' Original Pet. ¶¶ 52, 133, *Bellows*. The Families allege that the Debtors breached duties arising from their status as property owners and camp operators—failing to maintain safe premises, to implement adequate flood emergency and evacuation plans, and to train staff on emergency procedures. *See, e.g.*, Pls.' Original Pet. ¶¶ 115–19, *Bellows*; Pls.' Original Pet. ¶¶ 54–55, *Peck*.

14. The claims against the Individual Defendants, however, are distinct. The Families' complaints allege that the Individual Defendants bear direct, personal responsibility for the deaths of their children. The Families assert claims for negligence, gross negligence, premises liability, wrongful death, and intentional infliction of emotional distress against the Individual Defendants in their individual capacities. *See, e.g.*, Pls.' Original Pet. ¶ 139, *Steward*. The operative allegations target conduct spanning decades: the Individual Defendants' long-standing knowledge of the flood risk, their personal decisions that created and perpetuated dangerous conditions at Camp Mystic, their actions on the night of the July 3–4, 2025 flood, and their conduct in the aftermath of the tragedy.

15. The Prepetition Actions allege that the Individual Defendants had unique personal knowledge of Camp Mystic's flood risk—knowledge that distinguishes them from mere corporate

May 4, 2026), attached hereto as Exhibit C; Original Petition, *Bellows v. Camp Mystic, LLC*, No. D-1-GN-25-009963 (Dist. Ct., Travis Cnty., Tex. Nov. 10, 2025), attached hereto as Exhibit D; Original Petition, *Naylor v. Camp Mystic, LLC*, No. D-1-GN-25-010016 (200th Dist. Ct., Travis Cnty., Tex. Nov. 10, 2025), attached hereto as Exhibit E; Original Petition, *Peck v. Camp Mystic, LLC*, No. D-1-GN-25-009983 (261st Dist. Ct., Travis Cnty., Tex. Nov. 10, 2025), attached hereto as Exhibit F.

officers. The *Bellows* plaintiffs, for example, allege that Dick Eastland served on the board of the UGRA and "championed flood warning systems" in the late 1980s and early 1990s. Pls.' Original Pet. ¶¶ 45–47, *Bellows*. The *Steward* complaint alleges that, in his capacity on that board, Dick Eastland "reviewed and voted to approve the Kerr County Hazard Mitigation Plan" less than 45 days before the flood—a plan that reflected the determination that "it is likely that Kerr County . . . will experience a flood event in the next year." Pls.' Original Pet. ¶¶ 180, 182, *Steward*. Despite this specialized knowledge, the complaints allege that the Individual Defendants "chose not to spend money on . . . basic safety measures" such as walkie-talkies for counselors, backup power for intercoms, or training about evacuation procedures. Pls.' Original Pet. ¶ 61, *Bellows*.

16. The Families further allege that this knowledge was paired with decades of personal decisions that created and perpetuated the dangerous conditions at Camp Mystic. For instance, the *Getten* plaintiffs allege that in 1984, "Defendant Tweety Eastland was on the property and . . . forced to evacuate via helicopter to escape the harrowing flood" in that year. Pls.' Second Am. Pet. ¶ 42, *Getten*. Despite this firsthand experience, the defendants in that action allegedly "did nothing to relocate facilities or cabins or inform the public and families of the real danger." *Id.* The *Steward* complaint alleges that the Individual Defendants "built and improved large personal residences on the camp property—every one of which had a second story"—while the children's cabins remained single-story structures in the floodplain. Pls.' Original Pet. ¶ 22, *Steward*. This is of course notable because many of the children who survived did so only because they were in structures with a second floor or balcony.

17. Turning to the night of the flood, the complaints allege that Dick and Edward Eastland's personal conduct directly contributed to the deaths of the campers and counselors. Several of the Prepetition Actions allege that the Individual Defendants prioritized business

interests over child safety, choosing to "keep Camp equipment dry while they watched the river swell with flood waters." Pls.' Original Pet. ¶ 67, *Bellows*; *see, e.g.*, Pls.' Original Pet. ¶ 18, *Naylor* (alleging that, at 2:13 a.m., "Edward and Dick Eastland [we]re still securing equipment around the camp" while campers "were still sheltering in place at the direction of" the defendants). Several of the Individual Defendants allegedly ordered "the campers and counselors in Twins and Bubble Inn to stay in their cabins when they easily could have walked to safety in a matter of minutes." Pls.' Original Pet. ¶ 90, *Bellows*. The *Steward* plaintiffs allege that Edward Eastland told counselors seeking to evacuate that "the water will start going down" and instructed them to "stay until you possibly cannot," orders the Families characterize as "a death sentence" that "defied every policy and guideline every federal and state agency provides for flood emergencies." Pls.' Original Pet. ¶¶ 65–66, 280, 285, *Steward*.

18. The complaints allege personal misconduct by other Individual Defendants as well. The *Bellows* complaint alleges that "Mary Liz Eastland and Willetta Eastland were nowhere to be found despite knowing the flooding was occurring, as they found their own safe, high ground." Pls.' Original Pet. ¶ 79, *Bellows*.

19. Finally, the complaints allege that the Individual Defendants' tortious conduct continued after the flood. The *Getten* complaint alleges, for example, that Tweety, Edward, and Mary Liz Eastland "repeatedly communicat[ed] to Plaintiffs that there was hope that their daughter was still alive even though Camp Mystic and the owners and directors knew dead bodies had been found," causing severe emotional distress. Pls.' Second Am. Pet. ¶ 89, *Getten*. The *Steward* complaint alleges that "Tweety Eastland personally authored, approved, and sent multiple letters and communications" to grieving parents that "invoked [one decedent child's] memory without

consent to promote a return to Camp Mystic," forming the basis of certain parents' intentional infliction of emotional distress claims. Pls.' Original Pet. ¶¶ 358–61, *Steward*.

20. In addition to the direct liability claims described above, the complaints also assert certain derivative and vicarious liability theories against the Debtors and the Individual Defendants. For example, the *Peck* complaint pleads ratification "in the alternative if necessary" and respondeat superior. Pls.' Original Pet. ¶¶ 76–77, *Peck*. The *Getten* complaint asserts joint enterprise, respondeat superior, and veil-piercing claims premised on alter ego and undercapitalization theories. Pls.' Second Am. Pet. ¶¶ 73–86, *Getten*. These theories are generally pleaded as alternative or supplemental grounds for recovery.

21. In sum, the Families assert claims against the Individual Defendants premised primarily on direct, personal liability—each Individual Defendant's personal knowledge, personal decisions, and personal conduct spanning decades that created dangerous conditions at Camp Mystic, actions on the morning of July 4, 2025 that directly caused the deaths of twenty-seven children and counselors, and post-flood conduct that compounded the Families' injuries.

22. Although the Families had commenced discovery in the Prepetition Actions, significant categories of evidence remain outstanding—including text messages and other electronic communications sent or received by the Individual Defendants around the time of the flood, which may shed light on what the Individual Defendants knew and when they knew it, as well as the real-time decisions made on the night of the flood.

## III. <u>The Texas Legislature's Investigation and Report</u>

23. On June 18, 2026, following hearings, evidentiary review, and more than 140 witness interviews, the Texas Senate and House General Investigating Committees released their

"Report on the Camp Mystic Flood Disaster of July 4, 2025" (the "Report").[5] The Report documents the "circumstances, emergency response, and lessons learned from the July 4, 2025, flood disaster" that took 28 lives at Camp Mystic. *See* Report at 35.

24. The Report concluded that Camp Mystic "did not have written emergency plans that complied with state requirements," "did not adequately prepare for the July 3–4, 2025 storm," and "did not timely evacuate in advance of the July 3–4, 2025 storm, despite ample opportunity to do so." *Id.* at 104–05. The camp's written "Emergency Instructions," posted in each cabin, directed campers to "stay in their cabins" during a flood and assured them that "[a]ll cabins are constructed on high, safe locations." *Id.* at 65, 69.

25. Critically for purposes of the Debtors' Motion, the Report went beyond documenting institutional failures; it identified specific conduct by Individual Defendants that supports their personal culpability. For example, as discussed above, the Report documented that around 2:30 a.m., when teenage counselors from two cabins defied instructions to stay in place, ran through the storm to the main office, and reported water entering their cabins, Dick and Edward Eastland drove the counselors back to their cabins and instructed them to put towels down to soak up the water. *Id.* at 37.

---

[5] Ex. A, Senate General Investigating Committee on the July 2025 Flooding Events & House General Investigating Committee on July 2025 Flooding Events, *Report on the Camp Mystic Flood Disaster of July 4, 2025* (June 18, 2026), https://senate.texas.gov/_assets/pdf/2026.06.26-FINAL-report-corrected.pdf. The Court may take judicial notice of the Report. *See, e.g.*, *Alharbi v. Beck*, 62 F. Supp. 3d 202, 209 (D. Mass. 2014); *In re Poirier*, 346 B.R. 585, 588 (Bankr. D. Mass. 2006) (collecting cases). In turn, the Report's factual findings are admissible for their truth under the Rule 803(8) hearsay exception for "legally authorized investigation[s]." Fed. R. Evid. 803(8); *United States v. Gluk*, 831 F.3d 608, 613 (5th Cir. 2016); *see also In re Enron Corp.*, No. 01-16034-AJG, 2005 WL 6237551, at *27 (Bankr. S.D. Tex. Dec. 9, 2005) (applying the public records hearsay exclusion to congressional reports).

26. More generally, the Report described Dick Eastland's status as "the patriarch" who "called the shots at Camp Mystic." *Id.* at 57. And the Report concluded that "[i]f there was any threshold of flooding at which sheltering in place would be abandoned and campers would be instructed how and where to evacuate to higher ground, that plan would have been known only by the camp's co-executive director, Dick Eastland." *Id.* at 36, 104. Camp Mystic's crisis response procedures presumed "the active involvement of Dick and Tweety Eastland," and "[t]here was no written plan for what to do if Dick and Tweety were unavailable to perform their duties." *Id.* at 99–100.

27. The Report also documented that Mary Liz Eastland conducted counselor training at which counselors were told not to worry about flood emergencies because "that's never going to happen"—with Edward Eastland reportedly knocking on wood. *Id.* at 69.

## IV. <u>The Bankruptcy Filing and Certain Families' Motion to Lift the Stay</u>

28. Just six days after the Texas Legislature released its report—and as the state court prepared to issue decisions on the Families' motions for sanctions based on a pattern of alleged bad-faith conduct attributed to the Debtors and Individual Defendants in the Prepetition Actions—the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing these jointly administered cases before this Court.

29. On July 13, 2026, an ad hoc group comprised of the parents of twenty-four of the twenty-seven campers and counselors (the "<u>Ad Hoc Group</u>") filed a motion seeking entry of an order confirming that the automatic stay did not apply to the direct claims against the non-debtor Individual Defendants (the "<u>Comfort Motion</u>"). *See* Chapter 11 Cases, ECF No. 77. The Ad Hoc Group argued that under settled Fifth Circuit precedent, the automatic stay protects only debtors and does not extend to non-debtor co-defendants, and that the Families' wrongful death claims are

direct, personal tort claims that belong exclusively to them—not to the Debtors as property of the estate—because the claims do not derive from any injury to the Debtors. *See generally id.*

30. That same day, the Debtors removed each Prepetition Action to federal court.[6] A few days later, the Debtors sought to transfer those actions to the U.S. District Court for the Southern District of Texas.[7]

31. On July 22, 2026, the Office of the United States Trustee for the Southern District of Texas appointed the Committee to represent the interests of unsecured creditors in these cases. The Committee is composed of thirteen family members of the children and counselors who lost their lives in the July 4, 2025 flood.

32. Shortly thereafter, on August 2, 2026, the Ad Hoc Group was disbanded and the families that previously comprised that group filed a substituted version of the Comfort Motion. *Id.*, ECF Nos. 130, 132. The substituted motion conveyed the same arguments and request for relief. *See generally id.*, ECF No. 132.

33. The Individual Defendants objected to the substituted Comfort Motion on August 5, 2026. *Id.*, ECF No. 147.[8]

---

[6] *Bellows*, 26-cv-1916 (W.D. Tex.); *Peck*, 26-cv-1922 (W.D. Tex.); *Steward*, 26-cv-1926 (W.D. Tex.); *Naylor*, 26-cv-1923 (W.D. Tex.); *Getten*, 26-cv-1919 (W.D. Tex.).

[7] Case No. 4:26-mc-01321 (ECF 1) (S.D. Tex.)

[8] On August 21, 2026, the Debtors filed a "Notice to the Court of Related Proceedings Bearing on Stay Relief Request." *Id.*, ECF No. 179. It is unclear whether any of the materials appended to the Notice are the same materials upon which the Debtors purport to rely to support their Motion in this Adversary Proceeding. Regardless, the Debtors did not file those materials in this Adversary Proceeding nor explain how they satisfy the Debtors' evidentiary burden with respect to the Motion. *See infra* ¶¶ 62–69. Accordingly, nothing in the Notice can satisfy that burden. *See In re James*, 300 B.R. 890, 895–96 (Bankr. W.D. Tex. 2003) ("Although this Court is required to search this record in this adversarial proceeding when considering this or other motions, that record does not include the record in [the] main bankruptcy case."); *id.* at 896 ("[D]ocuments which are not attached to or incorporated into the record on a motion can not be considered."); *see also Balke v. Carmichael*, No. CV H-19-313, 2019 WL 13191287, at *17 (S.D. Tex. July 30, 2019)

## V. <u>The Committee's Discovery Efforts in the Chapter 11 Cases</u>

34. Since its appointment, the Committee has diligently pursued discovery from the Debtors and certain of the Individual Defendants in the Chapter 11 Cases. For example, on August 5, 2026, the Committee sent the Debtors a set of preliminary diligence requests—seeking the types of easily accessible documents normally produced in commercial bankruptcy matters, such as insurance policies, bank account statements, and documents reflecting the Debtors' assets.

35. The Committee also endeavored to work with the Debtors and Individual Defendants on an agreeable production plan and schedule related to a set of draft Rule 2004 discovery requests seeking a broader set of materials relevant to the Committee's investigation of the Debtors' conduct, assets, and liabilities.

36. The Committee's draft requests called for production of similar types of materials: documents relating to appraisals of any of the Debtors' assets, transfers of assets to insiders, board materials, and formation documents. Certain of the requests also sought information related to the Debtors' potential liabilities in the Prepetition Actions—such as materials related to the Debtors' knowledge of flood risk at Camp Mystic, and communications around the time of the flood.

37. Although the parties were able to reach agreement on some of the Committee's requests, the Debtors and Individual Defendants have refused to produce documents related to the Debtors' liability in the Prepetition Actions. Confusingly in light of the relief sought in the Motion (discussed below), the Debtors claim that such liability discovery should occur in the Prepetition Actions.

(explaining that "[t]aking judicial notice of the fact that a document was filed is not the same as admitting that document into the record" and declining request to do the latter).

## VI. <u>This Adversary Proceeding, the Debtors' Motion, and the Certain Heaven's 27 Families' Lift-Stay Motion</u>

### A. The Debtors' Commencement of This Adversary Proceeding and the Certain Heaven's 27 Families' Filing of a Motion To Lift the Automatic Stay

38. Rather than permit the Families' claims against the Individual Defendants to proceed in state court, the Debtors commenced this Adversary Proceeding and filed the Motion seeking extraordinary relief: a declaration that the automatic stay extends to the non-debtor Individual Defendants who control and operate the Debtors, or, alternatively, a preliminary injunction.

39. The Motion requests extension of the stay to the Families' already-filed Prepetition Actions as well as the *filing* of actions against the Individual Defendants that "may" be brought by unidentified "prospective plaintiffs" and that "in any way relate to or arise out of the events of the July 4, 2025 flood with respect to" Camp Mystic (the "<u>Unfiled Actions</u>" and with the Prepetition Actions, the "<u>Non-Debtor Actions</u>"). Motion ¶¶ 2–3.

40. On August 25, 2026, the Debtors filed a First Amended Complaint. Adversary Proceeding, ECF No. 5.

41. The next day, on August 26, the Certain Heaven's 27 Families filed a preliminary objection to the Motion, arguing against extension of the stay to the Individual Defendants and that the filing of the Motion "illustrate[d] the [Individual Defendant] Eastlands' poor judgment and the Debtors' utter lack of independence." Adversary Proceeding, ECF No. 6 ¶ 2. As of that date, neither the Debtors nor the Individual Defendant Eastlands had responded to the Heaven's 27 Families' discovery requests, and those families accordingly explained that they would supplement their objection "once the Debtors comply with their discovery obligations." *Id.* ¶ 3.

42. On August 28, 2026, the Debtors, the Certain Heaven's 27 Families, the Committee, and the Individual Defendants filed a Stipulation and Agreed Scheduling Order

outlining those parties' agreed schedule for discovery, briefing, and resolution of the Debtors' Motion, the Certain Heaven's 27 Families' Comfort Motion, and "any other motion for relief from the automatic stay filed on or before 11:59 pm CT on August 31, 2026" (collectively, the "Stay Motions"). Adversary Proceeding, ECF No. 10 at 3. As reflected in the stipulation, a hearing on the Stay Motions is set for October 9, 2026. *Id.* at 5.

43. On August 31, 2026, the Certain Heaven's 27 Families filed a motion for relief from the automatic stay ("Lift-Stay Motion"). Chapter 11 Cases, ECF No. 204. The Debtors and certain of their insurers opposed the Lift-Stay Motion on September 21, 2026. Chapter 11 Cases, ECF Nos. 252, 257. The Individual Defendants filed their own opposition to the Lift-Stay Motion on September 22, 2026. *Id.*, ECF No. 259. Like the other Stay Motions, the Certain Heaven's 27 Families' Lift-Stay Motion is scheduled to be heard on October 9, 2026. *See* Adversary Proceeding, ECF No. 10 at 5.

**B. The Committee's Intervention in the Adversary Proceeding**

44. Also on August 31, the Committee moved to intervene in the Adversary Proceeding under Rule 24 of the Federal Rules, arguing that "[t]he outcome of this Adversary Proceeding will materially affect the path forward in the Chapter 11 Cases" and that the Committee "has a direct and immediate stake in whether the Families' wrongful death claims against the Individual Defendants may proceed." Adversary Proceeding, ECF No. 11 ¶¶ 2–3. The Debtors objected to the Committee's motion to intervene on September 4, 2026. *Id.*, ECF No. 14. On September 8, 2026, the Committee filed its reply in support of its motion. *Id.*, ECF No. 15. That motion is now fully briefed and pending review by the Court.

## ARGUMENT

45. The "well-established rule" in the Fifth Circuit "is that an automatic stay of judicial proceedings against one defendant does not apply to proceedings against co-defendants." *Marcus,*

*Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 230 n.4 (5th Cir. 1986); *see Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 544 (5th Cir. 1983) ("[W]e conclude that § 362 does not operate as an automatic stay of claims against the co-defendants of [the debtors].").

46. That rule reflects the fundamental principle that the automatic stay exists to protect *debtors*—not their insiders, officers, or co-defendants—and it reinforces the fundamental bargain at the heart of bankruptcy law. As the Supreme Court recently explained, "beneath th[e] complexity" of the Bankruptcy Code "lies a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places virtually all its assets on the table for its creditors." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2024) ("*Purdue*"). The *Purdue* Court thus held that non-debtors who "have not filed for bankruptcy and have not placed virtually all their assets on the table for distribution to creditors" cannot obtain "what essentially amounts to a discharge." *Id.* at 215.

47. Here, the Debtors bear the burden of showing that "well-established rule" does not apply and that the Individual Defendants are entitled to the protection of the stay. *See Beran v. World Telemetry, Inc.*, 747 F. Supp. 2d 719, 723 (S.D. Tex. 2010) ("The party invoking the stay has the burden to show that it is applicable."); *In re Divine Ripe, L.L.C.*, 538 B.R. 300, 312 (Bankr. S.D. Tex. 2015) (same); *see also Wedgeworth*, 706 F.2d at 545 ("[T]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936))).

48. The Debtors' Motion should be denied for multiple reasons. *First*, section 362(a)(1) protects only the Debtors—not their officers, family members, or co-defendants—and section 362(a)(3) is inapplicable because the Families' wrongful death claims belong exclusively to them, not to the estate. *Second*, the Debtors cannot satisfy the requirements for a preliminary injunction under section 105(a). Courts have recognized that extending the automatic stay to non-debtors is an "extraordinary equitable remedy" requiring the movant to establish all four preliminary injunction elements—including irreparable harm, which in turn requires proof of "unusual circumstances" such as an identity of interests or a serious threat to the reorganization. The Debtors fail on all counts: there is no identity of interest between the Debtors and the Individual Defendants, who face direct, personal liability for their own tortious conduct; the Non-Debtor Actions will not meaningfully affect the Debtors' reorganization; and the Debtors cannot demonstrate likelihood of success, a favorable balance of harms, or that the public interest supports shielding individuals from accountability for the deaths of twenty-seven children and counselors. *Third*, the Court does not have jurisdiction to enjoin the Unfiled Actions, and the Court should in any event decline the Debtors' request for similar reasons to those above. *Finally*, the Motion should be denied on threshold procedural grounds for failure to comply with the Bankruptcy Local Rules ("Local Rules").

49. In short: the Individual Defendants are not participants in bankruptcy's "simple bargain": they have not filed for bankruptcy, offered their assets for distribution, or submitted to the Bankruptcy Code's requirements. *Purdue*, 603 U.S. at 209, 215. They have no entitlement to bankruptcy's protections, and the Debtors should not be permitted to continue using their position in these proceedings to benefit their non-debtor insiders at the expense of their creditors and a timely resolution of the Chapter 11 Cases.

## I. The Automatic Stay Does Not Extend, and Should Not Be Extended, to the Non-Debtor Individual Defendants

### A. Section 362(a)(1) Does Not Apply to the Individual Defendants

50. Section 362(a)(1) of the Bankruptcy Code provides that the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial . . . action or proceeding against the debtor." 11 U.S.C. § 362(a)(1). That provision "clearly focuses on the insolvent party," and the purpose of section 362—providing the debtor with a "breathing spell" while protecting creditors from a race for the debtor's assets—would not be "advanced by application of the stay rule to [non-debtor] co-defendants." *Wedgeworth*, 706 F.2d at 544.

51. The structure of the Bankruptcy Code itself confirms this limitation. In chapter 13 cases, Congress expressly extended the stay to non-debtors who are liable on the same consumer debt as the debtor. *See* 11 U.S.C. § 1301(a). That Congress included this explicit extension in chapter 13 but omitted any comparable language in section 362(a) suggests a deliberate legislative policy against extending the protection of the stay to non-debtors. *See Wedgeworth*, 706 F.2d at 544. The Debtors ask this Court to read into section 362 protections that Congress declined to include.

52. The Fifth Circuit and courts in the Southern District of Texas have repeatedly reaffirmed the limitation in section 362(a)(1). Most recently, in *McConathy v. Foundation Energy Fund IV-A, L.P.*, the Fifth Circuit reiterated that "a bankrupt debtor and non-bankrupt parties are not subject to the same automatic stay analysis." 111 F.4th 574, 581 (5th Cir. 2024). The court observed that "[i]t is clearly established that the automatic stay does not apply to non-bankrupt co-defendants of a debtor 'even if they are in a similar legal or factual nexus with the debtor.'" *Id.* at 582 (quoting *Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir. 1991)); *see also,*

*e.g.*, *Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001) ("Section 362 is rarely . . . a valid basis on which to stay actions against non-debtors."); *GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985) ("By its terms the automatic stay applies only to the debtor, not to co-debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code nor to co-tortfeasors."); *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003) (same); *Beran*, 747 F. Supp. 2d at 722 ("Ordinarily, the automatic stay under § 362 does not apply to actions against a nondebtor.").

53. The Debtors argue that the Families' claims against the Individual Defendants "are premised upon the theory that the Individual Defendants are the controlling persons of the Debtors." Motion ¶ 33. But this is both untrue and irrelevant. It is untrue because the claims against the Individual Defendants are not premised on the theory that they are strictly liable for the Debtors' corporate torts or that the Individual Defendants are alter egos of the Debtors. Rather, the claims are premised on the theory that the Individual Defendants are liable ***for their individual conduct*** as humans—conduct that must then be separately attributed to the Debtors to establish vicarious liability. And it is irrelevant because case law is crystal clear that the automatic stay does not apply of its own force to claims against non-debtor co-defendants merely because the co-defendants are "controlling persons" of a debtor. *See, e.g.*, *In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 109–110 (Bankr. S.D. Tex. 2014) (holding that the automatic stay does not apply to the debtor's managing member and sole shareholder because the debtor "is a legal entity separate from its members."); *Beran*, 747 F. Supp. 2d at 724–25 (declining to extend the automatic stay to the debtors' current officers). The claims asserted against the Individual Defendants in the Prepetition Actions are no different than claims against non-debtor officers or affiliates in any

other chapter 11 case and, like in those cases, the automatic stay does not bar their continued prosecution.

### B. Section 362(a)(3) Does Not Reach the Prepetition Actions Against the Individual Defendants

54. In the alternative, the Debtors resort to section 362(a)(3), which stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The Debtors make essentially two arguments that section 362(a)(3) applies: (1) that certain unspecified claims raised by the Families against the Individual Defendants are estate claims, and (2) that the Families' claims against the Individual Defendants will deplete the proceeds of insurance policies that are estate assets. Both arguments are wrong.

#### i. The Families' Claims Against the Individual Defendants Are Not Estate Claims

55. The Debtors first argue that "continuation of the Prepetition Actions is . . . prohibited by the automatic stay" because certain of those actions include claims that "became property of the Debtors' estates." Motion ¶ 35.

56. Courts distinguish direct-injury claims—which "do[] not involve any harm to the debtor" and "cannot be part of the estate"—from derivative claims that are based on injuries "to the debtor." *In re Buccaneer Res., L.L.C.*, 912 F.3d 291, 293 (5th Cir. 2019). It is "entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct." *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 585 (5th Cir. 2008). "Put differently: 'the fact that the bankruptcy estate may have claims for its own direct injuries that it could have brought as of the commencement of the case does not mean that the creditor's claims are merely derivative of the debtor's.'" *In re SBMC Healthcare, LLC*, 519 B.R. 172, 182 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL

2062992 (S.D. Tex. May 11, 2017) (quoting *In re R.E. Loans LLC*, 2014 WL 465301 (Bankr. N.D. Tex. Feb. 5, 2014)).

57. The wrongful death claims at the heart of the Prepetition Actions belong exclusively to the Families. Because the Debtors could not have raised these claims, they are not—and never were—property of the estate. *See In re Educators Grp. Health Tr.*, 25 F.3d 1281, 1284 (5th Cir. 1994) ("[I]f the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate.").

58. To be sure, the Debtors may have their own, separate claims against the Individual Defendants. That is one of the reasons why the Debtors' current management—which consists of Individual Defendants—is inherently conflicted, an issue more fully addressed in the Committee's Motion for an Order Appointing a Chapter 11 Trustee. *See generally* Chapter 11 Cases, ECF No. 227. And it is also one of the reasons that the Committee must be allowed to conduct a full investigation into the claims the estate may have against the Individual Defendants based on the events leading up to and during the flood—an investigation the Debtors have categorically resisted in order to protect the Individual Defendants. But the Debtors do not have claims against the Individual Defendants for causing their girls to die in the flood and then intentionally inflicting emotional distress in connection with those drownings. Only the Heaven's 27 Families suffered those unimaginable losses and hold those claims.

59. In any event, the fact that there may be derivative claims in the Prepetition Actions does not require that those actions be stayed in their entireties. *See In re JJ Arch LLC*, No. 24-10381 (JPM), 2024 WL 2928033, at *8 (Bankr. S.D.N.Y. June 10, 2024). The court in *JJ Arch LLC* addressed the propriety of staying a state court action that featured a mixture of claims:

(1) "claims brought *against* the Debtor," (2) "derivative actions brought on behalf of the Debtor against [certain non-debtors]"—which the court noted were "properly considered property of the Debtor's estate," and (3) claims "between non-Debtor third parties." *Id.* at *7–*8. The court concluded that the automatic stay applied only to the first category. *Id.* at *9.

60. So too here: the fact that the Prepetition Actions comprise a mixture of claims does not justify extension of the stay to the entirety of the Prepetition Actions—particularly the direct claims against the Individual Defendants. The Families' direct tort claims against the Individual Defendants are separate and distinct from any estate claims.

61. The cases which the Debtors cite (Motion ¶ 35) do not warrant a different result. *In re S.I. Acquisition, Inc.* featured "a state court suit that [wa]s premised *solely upon* the theory that the defendants therein [we]re the controlling entities or persons of a chapter 11 debtor (and thus accountable for the debtor's debts)." 817 F.2d 1142, 1150 (5th Cir. 1987) (emphasis added). And, in *In re Schimmelpenninck*, a creditor sued the wholly-owned subsidiary of a debtor "under theories of alter ego and single business enterprise," arguing that the wholly-owned subsidiary was "responsible for the debts of its parent, the Debtor." 183 F.3d 347, 350 (5th Cir. 1999). Neither case involved the type of direct claims against non-debtors—which could not be brought by the Debtors—at issue here.

#### ii. The Debtors' Purported Insurance Policies Do Not Justify Extension of the Stay to the Individual Defendants

62. The Debtors next argue that the Individual Defendants' coverage by the Debtors' insurance policies "bars prosecuting the Claims against the Individual Defendants" (Motion ¶ 38). This argument is similarly unavailing. Even if the Individual Defendants are covered by the Debtors' policies—a fact the Debtors have not established—the mere existence of shared insurance coverage does not trigger the automatic stay.

63. As an initial matter, aside from a cursory reference to a "per-occurrence aggregate coverage limit of $6 million" (Motion ¶ 19), the Debtors provide *no evidence* regarding their insurance policies. They do not identify the policies, explain their terms, or demonstrate that the policies would actually cover the Families' claims against the Individual Defendants. This evidentiary void is particularly glaring because the determination about whether insurance proceeds are property of a debtor's estate is highly fact-specific. *See In re Sfuzzi, Inc.*, 191 B.R. 664, 668 (Bankr. N.D. Tex. 1996) ("[T]he question of whether the [insurance] *proceeds* are property of the estate must be analyzed in light of the facts of each case."). A party seeking to extend the automatic stay bears the burden of establishing its applicability. *See Beran*, 747 F. Supp. 2d at 723. The Debtors' say-so in a brief devoid of supporting evidence cannot carry that burden.

64. More fundamentally, the mere fact that directors and officers are covered by the same insurance policies as a debtor does not mean that continued litigation affects property of the estate as required by section 362(a)(3). To the contrary, directors' and officers' "contractual right to liability coverage"—as distinct from *debtors'* right to such coverage—are not property of the estate. *In re Granite Partners, L.P.*, 194 B.R. 318, 337–38 (Bankr. S.D.N.Y. 1996). Thus, the automatic stay does not bar actions "by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights." *Id.* at 338. Courts recognize that while *collecting* from limited insurance proceeds may be barred by the automatic stay, *establishing liability* for third parties who are insureds under a policy does not actually affect property of the estate. *See, e.g.*, *In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 622, 645 (Bankr. S.D.N.Y. 2023).

65. In *Roman Catholic Diocese of Rockville Centre*, the court rejected the same argument the Debtors advance here: that "because the actions are brought against co-insured

parties, they will, as a practical matter, necessitate the use of insurance proceeds." *Id.* at 642. There, even though "the insurance proceeds constitute[d] property of the estate," the state-court actions were not acts "'to obtain possession of' or 'to exercise control over' property of the estate within the scope and meaning of section 362(a)(3)" because "nothing on the face of the State Court Actions establishe[d] that the relief sought *must* be satisfied from insurance proceeds." *Id.* at 644–45 (emphasis added). Absent a showing that the state-court actions must be satisfied from insurance proceeds, the court declined to extend the stay based on the purportedly shared insurance proceeds. *Id.*

66. The *Roman Catholic Diocese of Rockville Centre* court reinforced that point, reasoning that, if the non-debtors needed to access insurance proceeds to "defend against the[] claims"[9] or to cover a settlement or judgment, those non-debtors could "move for relief from the stay if accessing those insurance proceeds [wa]s a necessary consequence of those events." *Id.* The Court should follow suit and permit the Individual Defendants (or Families) to move for relief from the stay if or when it is necessary to collect insurance proceeds to satisfy any judgments.

67. Critically, coverage under the policies upon which the Debtors appear to be relying would not be depleted by continued litigation against the Individual Defendants. Although the Debtors have not identified the policies they purport to rely upon, a commercial general liability policy the Debtors filed elsewhere confirms that defense-related payments covered under the policy "will not reduce the limits of insurance." Chapter 11 Cases, ECF No. 170-1 at 683 (Commercial Package Policy). And an excess liability policy issued to the Debtors likewise provides that "[d]efense expenses to which this policy applies shall not reduce the Limits of

[9] The Debtors do not contend that the Individual Defendants' defense costs are covered by insurance. *See* Motion ¶¶ 36–38.

Insurance." *Id.* at 815 (Excess Liability Policy). In other words, the insurance policies are not "wasting policies"—meaning that defense costs will not reduce the amount of insurance available under the policies. Regardless of the amount of defense costs incurred by the Individual Defendants, and regardless of whether those defense costs are paid by the insurers under the shared insurance policies, the Debtors' estates will still have access to the full "per-occurrence aggregate coverage limit of $6 million" (Motion ¶ 19) the Debtors assert exists. As a result, allowing the Prepetition Actions to continue will not affect the amount of insurance coverage available to the Debtors' estates under the policies, and there is therefore no impact on property of the estate by allowing the litigation against the Individual Defendants to go forward.

68. This case is unlike *In re OGA Charters, L.L.C.*, which the Debtors cite. Motion ¶ 36. That case did not involve claims against non-debtors such as the Individual Defendants and, moreover, the debtor had already entered into settlements that "would exhaust the $5 million in liability [insurance] coverage" before entering bankruptcy. 901 F.3d 599, 601 (5th Cir. 2018). The Debtors do not purport to have reached any settlements with the Families or any other parties that actually—not hypothetically—exceed the alleged limit on their policies. And, in any event, that case held only that, in "limited circumstances," certain proceeds of a debtor's insurance policy "are property of the estate" *id.* at 605—a situation that, as explained above, does not alone justify extension of the stay.

69. In short, like section 362(a)(1), section 362(a)(3) does not extend the automatic stay to the Individual Defendants or to the direct claims against those defendants in the Prepetition Actions.

## II. <u>There Are No "Unusual Circumstances" That Justify Entry of an Injunction Extending the Stay Under Section 105(a)</u>

70. In rare cases, courts have extended the automatic stay to non-debtors under section 105(a) in unusual circumstances where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Reliant Energy Servs.*, 349 F.3d at 825 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)); *see In re Sahene Constr., LLC*, No. 23-10096, 2023 WL 3010073, at *3 (Bankr. M.D. La. Apr. 19, 2023) ("Extension of the stay would require this court to enjoin the Arbitration under its equitable powers contained in 11 U.S.C. § 105(a).").

71. Section 105 authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Entry of a preliminary injunction under that section is an "extraordinary equitable remedy" that requires the movant to establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998). The remedy is "never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). The party seeking such relief "has a heavy burden of persuading the . . . court that all four elements are satisfied," and "if the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue." *In re Sahene Constr., LLC*, 2023 WL 3010073, at *3 (internal quotation omitted).

72. The Debtors have not met (and cannot meet) their burden to show that unusual circumstances apply in this case. In fact, they fail to satisfy *any* of the preliminary injunction elements, much less all four.[10]

**A. There Are No "Unusual Circumstances" Such That, in the Absence of a Stay, the Debtors Will Be Irreparably Harmed**

73. Most prominently, the Debtors insist that "unusual circumstances justify extending the stay to the Individual Defendants because there is both [(1)] an identity of interests between the Debtors and Individual Defendants and [(2)] commencement or continuation of the Covered Actions against the Individual Defendants would have an adverse impact on the Debtors' ability to reorganize." Motion ¶ 39. At bottom, both arguments amount to assertions that the Debtors will be irreparably harmed absent extension of the stay. *See* Motion ¶¶ 56–58. Neither of the Debtors' rationales withstands scrutiny.

**i. The Narrow "Identity of Interest" Exception Does Not Apply**

74. First, as explained above, courts have recognized a narrow exception permitting extension of the stay to non-debtors where there exists "such identity between the debtor and the third-party defendant *that the debtor may be said to be the real party defendant*." *Reliant Energy Servs., Inc.*, 349 F.3d at 825 (quoting *A.H. Robins Co.*, 788 F.2d at 999) (emphasis added).

75. The unusual circumstances doctrine has "stringent factual requirements," *In re Divine Ripe, L.L.C.*, 538 B.R. 300, 308 (Bankr. S.D. Tex. 2015), and requires "an actual, as

[10] The Debtors' Motion artificially separates the "Unusual Circumstances" analysis from the analysis required for entry of a preliminary injunction under section 105(a). But, as the cases to which the Debtors cite make clear, whether there are unusual circumstances justifying extension of the stay is part of the broader analysis of whether to enter such a preliminary injunction. *See, e.g.*, *In re Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995) ("If the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions.").

opposed to an alleged or potential, identity of interests," *Beran*, 747 F. Supp. 2d at 723–24. No such identity exists here.

76. Where "a non-debtor codefendant may be held *independently liable* of the debtor, then there is no compelling basis by which a court must extend the automatic stay provisions of § 362 to the non-debtor codefendants." *Duval v. Gleason*, No. C-90-0242-DLJ, 1990 WL 261364, at *4 (N.D. Cal. Oct. 19, 1990) (emphasis added); *see also, e.g.*, *Holland v. High Power Energy*, 248 B.R. 53, 58 (S.D. W. Va. 2000) ("[T]he 'unusual circumstance' exception does not apply where the third party codefendant has obligations that are independent and primary, not derivative of those of the debtor." (internal quotations omitted)); *In re Bidermann Indus. U.S.A., Inc.*, 200 B.R. 779, 784 (Bankr. S.D.N.Y. 1996) ("[U]nusual circumstances do not exist where the debtor's insider is independently liable, the right to indemnity is not absolute, and the continuation of the suit will not interfere with the bankruptcy."); *In re Thompson*, No. 22-11921-RMB, 2023 WL 2466435, at *6 (Bankr. W.D. Wis. Mar. 10, 2023) ("'[U]nusual circumstances' warranting imposition of a stay as to non-debtors . . . are not present where the debtor would not be bound or the liability of the non-debtor is distinct from the debtor's liability."). Courts thus routinely decline to extend stays to debtors' managers and members. *See, e.g.*, *Beran*, 747 F. Supp. 2d at 724 (declining to extend stay to the claims against the debtor's president, former CEO, and former CFO); *In re Divine Ripe, L.L.C.*, 538 B.R. 300, 301 (Bankr. S.D. Tex. 2015) (declining to extend stay to claims against the debtor's "sole member"); *In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 110 (Bankr. S.D. Tex. 2014) (finding that stay did not extend to a debtor's "managing member").

77. Against the weight of that authority, the Debtors argue that the Individual Defendants' "contractual and statutory rights against the Debtors" create an identity of interest.

Motion ¶ 42. In effect, the Debtors contend that they will be irreparably harmed because prosecution of claims against the Individual Defendants amounts to prosecution of claims against the Debtors. *See id.* ¶¶ 57–58.

78. But the Debtors have not supplied any evidence—such as organizational documents, automatic and undisputed indemnification agreements, or even citations to purported statutory provisions—supporting their contention that the Debtors are obligated to indemnify the Individual Defendants. Their motion rests entirely on conclusory assertions. As above, that evidentiary defect defeats the Debtors' argument. *See, e.g.*, *In re Divine Ripe*, 538 B.R. at 312 ("[T]he Debtor has not provided evidence . . . establishing cause to extend the protections of § 362 to a non-debtor party . . . Thus . . . this Court cannot stay proceedings of a nonbankrupt co-defendant."). The unsupported, "mere possibility of a future indemnification claim will not support application of the automatic stay." *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 564 B.R. 192, 195 (S.D.N.Y. 2016) (collecting cases). Such an unsupported indemnification assertion "falls short of demonstrating irreparable injury." *In re Sahene Constr., LLC*, 2023 WL 3010073, at *4.

79. Even had the Debtors supplied the agreements or provisions upon which they premise indemnification, it is still unlikely that the Debtors would be able to carry their burden. Indemnification rights do not create an identity of interests sufficient to extend the automatic stay unless the right to indemnity is "absolute"—that is, automatic upon entry of judgment. *In re Bidermann*, 200 B.R. 779, 784 (Bankr. S.D.N.Y. 1996); *see also Sterling v. Greater Hou. Transp. Co.*, No. CV H-20-910, 2021 WL 5155683, at *4 (S.D. Tex. Sept. 14, 2021) (holding that an indemnification clause limited in scope does not create an identity of interest); *In re Divine Ripe, L.L.C.*, 538 B.R. 300, 308 (Bankr. S.D. Tex. 2015) (declining to extend stay to non-debtor where

"Debtor provided no such evidence to support a claim that [non-debtor] would be entitled to absolute indemnity by the Debtor."); *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 34 (S.D.N.Y. 1990) (declining to extend stay where an indemnification agreement was not absolute); *N.J. Carpenters*, 564 B.R. at 195 ("The mere possibility of a future indemnification claim will not support application of the automatic stay. . . ."). If the non-debtor "must ultimately demonstrate his entitlement to indemnity" under the relevant agreements or law, "the right to indemnity is not absolute." *Bidermann*, 200 B.R. at 784–85.

80. The distinction is critical: an indemnification right that would merely give rise to an unsecured claim against the estate—requiring the indemnitee to file a proof of claim and wait in line with other creditors—is not the type of "absolute indemnity" contemplated by the exception. *See In re Sahene Constr., LLC*, 2023 WL 3010073, at *4.

81. The Debtors have not provided any evidence that the Individual Defendants would be entitled to "absolute indemnity." In fact, the Debtors concede the *opposite*: their indemnification provisions "include[] standard exclusions for gross negligence and willful misconduct." Motion ¶ 16 n.2. That concession dooms the Debtors' argument. The Families' complaints allege precisely the conduct excluded from indemnification. Thus, if the Individual Defendants are found liable in the Prepetition Actions—which include allegations of gross negligence—they would need to "demonstrate [their] entitlement" to the indemnification the Debtors purport to offer. *Bidermann*, 200 B.R. at 784–85. By the Debtors' own admission, the Individual Defendants' indemnification rights are not—and cannot be—"absolute."

82. Given the apparent contingency of the Individual Defendants' purported indemnification claims against the Debtors, it is not even clear that such claims remain valid. Under 11 U.S.C. § 502(e)(1)(B), "the bankruptcy court must disallow any contingent claim for

reimbursement where the claiming entity is co-liable with the debtor." *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 589 (5th Cir. 2024).

83. As explained by another judge in this district, there are "three elements necessary for a claim against the debtor to be disallowed under this provision: (i) the debtor is co-liable with the claimant; (ii) the claim is contingent; and (iii) the claim is for reimbursement or contribution. Courts interpret a claim for indemnity to be a claim for reimbursement or contribution. . . . A claim for indemnification is generally considered contingent unless the claimant has actually paid the third party. . . . Finally, the debtor's co-liability with the claimant is implicit in an indemnity arrangement such as the one in this case, where the arrangement between a debtor and a claimant is one of a surety who has issued bonds for which the obligor (debtor) has agreed to indemnify it." *In re Alta Mesa Res., Inc.*, No. 19-35133, 2022 WL 17984306, at *3 (Bankr. S.D. Tex. Dec. 28, 2022) (internal quotations omitted).

84. If, as the Debtors contend, "the commencement or continuation of Covered Actions as to the Individual Defendants would be a de facto proceeding against the Debtors," and any amounts not yet received by the Individual Defendants pursuant to their purported indemnification obligations remain unpaid, then those amounts would appear to be disallowed under section 502(e). They thus *cannot* "deplete the Debtors' assets to the detriment of the creditor body as a whole," as the Debtors contend. Motion ¶ 42.

**ii. The Claims Against the Individual Defendants Are Not Inextricably Interwoven With Those Against the Debtors**

85. The Debtors also argue that there is an identity of interests because the claims against the Individual Defendants are "inextricably interwoven" with the claims against the Debtors. Motion ¶¶ 43–44. That narrow consideration is part of the broader analysis of whether the parties share an identity of interest, *see, e.g.*, *In re Jefferson Cnty., Ala.*, 491 B.R. 277, 287

(Bankr. N.D. Ala. 2013); *Sterling v. Greater Hou. Transp.*, No. CV H-20-910, 2021 WL 5155683, at *5 (S.D. Tex. Sept. 14, 2021), and the Debtors' argument fails for the same reasons.

86. As explained above, the claims asserted by the Families against the Individual Defendants are classic direct tort claims arising from the Individual Defendants' personal conduct. These claims are based on the Individual Defendants' own tortious conduct—not solely on any theory of vicarious liability, agency, or indemnification that would make the Debtors the "real party defendant." Although there is an overlapping factual nexus for the claims, that is not enough to make the claims themselves "inextricably intertwined" when the theories of legal liability are distinct. *See, e.g.*, *Beran*, 747 F. Supp. 2d at 723–25.

87. The mere presence of overlapping or identical allegations against both debtor and non-debtor defendants is insufficient to trigger the "identity of interests" exception. In *Divine Ripe*, this court denied a motion to extend the automatic stay to a non-debtor managing member of a debtor LLC, even though the claims against the non-debtor and the debtor were identical. 538 B.R. at 312–13. As the court explained, "the presence of identical allegations against the debtor and non-debtor defendants is an insufficient ground to extend the stay to the non-debtor. . . . There must be an actual, as opposed to an alleged or potential, identity of interests, such that a judgment against the non-bankrupt party would in fact be a judgment against the bankrupt party." *Id.* at 312.

88. As in *Divine Ripe*, a judgment against the Individual Defendants for their personal conduct would not constitute a judgment against the Debtors. The Individual Defendants face personal liability for their own acts and omissions. For example, a finding that Dick Eastland was grossly negligent in his response to the Flash Flood Warning, or that Edward Eastland's "stay put" instructions constituted gross negligence, would not alone bind the Debtors or establish any liability on the part of the estate. In order to establish liability on the part of the Debtors, the

Families would need to further establish, for example, that the Individual Defendants were acting within the scopes of their employment.

89. It is thus not true, as the Debtors assert, that "the only basis on which the Individual Defendants could be sued in the Covered Actions involves their affiliation with the Debtors and the Debtors' business operations." Motion ¶ 44.

90. The Debtors cite *Nesloney v. Midway Oilfield Constructors, Inc.* to support their position that "the claims against the non-debtors and the debtor 'are inextricably interwoven . . . and should be resolved in one proceeding.'" Motion ¶ 43 (quoting No. H-18-407, 2018 U.S. Dist. LEXIS 180915, at *4 (S.D. Tex. Oct. 22, 2018)). There, the district court entered a discretionary stay of claims against the debtor's "sole owner and president" because that individual's "conduct *[wa]s the same as*" the debtor's and because the plaintiff in that action would "seek to prove the same [Fair Labor Standards Act] liability against [the non-debtor] as he would against [the debtor]." *Nesloney*, 2018 U.S. Dist. LEXIS 180915, at *3 (emphasis added). Here, by contrast, the Families allege that the Individual Defendants bear personal liability for their individual tortious conduct. *E.g.*, Pls.' Original Pet. ¶ 139, *Steward* ("Plaintiffs have pleaded valid causes of action against Tweety Eastland for negligence, negligence per se, gross negligence, premises liability, and intentional infliction of emotional distress based on her own acts and omissions."). The Individual Defendants' conduct is not "the same as" the Debtors': it is the conduct of individuals acting outside the scope of their employment duties, who allegedly knew of a danger, had the power to prevent it, and chose not to act.

91. The other out-of-circuit cases cited by the Debtors (Motion ¶ 43) are equally inapposite. *In re W.R. Grace & Co.*, for example, involved "pending actions against various affiliated entities and third parties whose purported liability was *solely derivative* of" the debtor's.

386 B.R. 17, 21 (Bankr. D. Del. 2008) (emphasis added). So, too, in *In re Continental Airlines*, there was "evidence" that the debtor was "the real party defendant" and that the actions to be stayed were "commenced against parties other than [the debtor] solely in an effort to circumvent the automatic stay." 177 B.R. 475, 479 (D. Del. 1993). None of the cases cited by the Debtors disturb the basic point that the Families' claims against the Debtors and the Individual Defendants are distinct; claims against the latter can and should be allowed to proceed even during the pendency of the Debtors' bankruptcy.

**iii. The Debtors' Reorganization Efforts Will Not Be Adversely Impacted by the Non-Debtor Actions**

92. The ultimate purpose of occasional stay extensions is to prevent irreparable harm by "suspend[ing] actions that pose a *serious threat* to a corporate debtor's reorganization efforts." *In re First Cent. Fin. Corp.*, 238 B.R. 9, 19 (Bankr. E.D.N.Y. 1999) (emphasis added); *see Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y. 1999) ("The broader rule here is that a debtor's stay may extend to a non-debtor only when necessary to protect the debtor's reorganization."). And there is "no support for the view that any and all minor impacts on the value of estate property can justify the extension of the stay." *In re Panther Mountain Land Dev., LLC*, 686 F.3d 916, 924 (8th Cir. 2012).

93. The Debtors have not carried their burden: they have not demonstrated—or even attempted to quantify—any serious threat to their reorganization from the Non-Debtor Actions. *Beran*, 747 F. Supp. 2d at 724; *see In re Divine Ripe*, 538 B.R. at 311 ("[A]bsent support, there is no basis for this Court to consider application of its discretionary powers.").

94. They assert that litigation against the Individual Defendants poses risks of res judicata, collateral estoppel, and "evidentiary prejudice" that justify extending the automatic stay.

Motion ¶ 46. Here, again, the Debtors' argument amounts to a claim about the irreparable harm they will suffer absent extension of the stay under section 105(a). *See id.* ¶¶ 57–58.

95. The Debtors' argument inverts the proper analysis. The mere possibility that a judgment against a non-debtor *might* have some collateral effect on a debtor does not suffice to justify extending the automatic stay. If it did, virtually every case involving debtor and non-debtor co-defendants would warrant extension of the stay, eviscerating the "well-established rule" that the stay protects only debtors. Courts have consistently rejected this argument. *See, e.g.*, *Beran*, 747 F. Supp. 2d at 723 (finding "the potential application of collateral estoppel" insufficient "to conclude that a judgment against the individual defendants . . . would in effect be a judgment against [the Debtor]").

96. The Debtors' "record taint" argument—that they will be "compelled to defend their interest" in the Non-Debtor Actions to "prevent harm to their estates" (Motion ¶ 51)—fares no better. They worry that evidence produced in the Non-Debtor Actions "could be used to prejudice the Debtors in litigation and negotiations in these Chapter 11 cases." *Id.* ¶ 50. But the Debtors are already protected by the automatic stay. They cannot be compelled to participate in state court litigation, and any evidence developed against the Individual Defendants would be subject to admissibility objections in any subsequent or separate proceeding against the Debtors.

97. Extending the automatic stay under section 105(a) whenever there is a "common nucleus of operative facts," as the Debtors demand (Motion ¶ 50), would result in staying almost every—if not *every*—case involving a debtor defendant, all of which are likely to arise from related facts. Such an extension to non-debtors is reserved for the rare circumstances in which ongoing litigation poses a "serious threat" to the debtor's reorganization efforts. *In re First Cent. Fin. Corp.*, 238 B.R. at 19.

98. The cases on which the Debtors principally rely are distinguishable by their facts and demonstrate why the stay should not be extended here. In *In re LTL Management, LLC*, for example, the debtor was created through a divisional merger specifically to assume all the parent company's liabilities; the debtor was, by design, "the real party in interest" for all claims against the protected parties. 638 B.R. 291, 305–06, 311 (Bankr. D.N.J. 2022). The court focused on the evidence that the "corporate transactions and indemnity agreements that left Debtor ultimately responsible for [the underlying] liabilities"—determining, for example that, unlike here, the "Debtor's indemnification obligations [we]re automatic"—and accordingly found an "identity of interests" between the debtor and the at-issue non-debtors because claims against the protected parties "involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor." *Id.* at 305–06, 313. Against that backdrop, the court reasoned that "principles of res judicata, collateral estoppel, and record taint" further supported extension of the stay. *Id.* at 313.

99. Here, by contrast, there is no "identity of interest" between the Debtors and the Individual Defendants. *See supra* at ¶¶ 73–91. To the contrary, the Individual Defendants face personal liability for their own distinct conduct: their personal knowledge, personal decisions, and personal actions and inactions. These are different claims, based on different roles and conduct. Any speculative risk of collateral estoppel, res judicata, or record taint cannot justify the extraordinary remedy of extending the automatic stay to non-debtors.

100. At bottom, even if the Debtors could show some incidental impact from the state court litigation, the proper exercise of the Court's discretionary power requires "weigh[ing] competing interests and maintain[ing] an even balance." *In re Divine Ripe*, 538 B.R. at 309 (quotation omitted); *see In re Panther Mountain Land Dev., LLC*, 686 F.3d at 924 (rejecting the

view that "any and all minor impacts" could justify extension of a stay); *In re Uni-Marts, LLC*, 404 B.R. 767, 781 (Bankr. D. Del. 2009) (declining to extend stay to non-debtor even though debtor would be required to indemnify non-debtor because debtor had insurance to cover any loss and "it is difficult to see how the Debtor would sustain any loss, much less one that would materially impair its reorganization."). The Debtors have not demonstrated that any alleged adverse impact outweighs the substantial harm to the Families from being denied their day in court against the individuals personally responsible for their children's deaths. *See infra* ¶¶ 101–11. The Individual Defendants are not in bankruptcy and have no entitlement to the protections of the Bankruptcy Code.

**B. The Debtors Have Not Satisfied Any of the Other Elements Necessary to Justify Entry of a Preliminary Injunction**

101. The Debtors' arguments are similarly unavailing as to each of the other elements needed to justify entry of a preliminary injunction under section 105(a): they cannot show that the balance of harms favors extension of the stay; the public interest favors denying that relief and allowing the Families to pursue their claims against the Individual Defendants; and they have not demonstrated a substantial likelihood of success on the merits.

**i. The Balance of Harms Favors Denying the Injunction**

102. The balance of harms overwhelmingly favors the Families—and, by extension, the Committee they comprise. On one side of the scale: twenty-seven families whose children were killed in the July 4, 2025 flood seeking to hold accountable the individuals that they allege are personally responsible. On the other: the Debtors' speculative, unsupported assertions about potential indemnification claims, possible insurance depletion, and theoretical collateral estoppel effects—none of which they have substantiated with evidence. Congress itself recognized the weight of claims like these when it specifically excepted "personal injury tort or wrongful death

claims" from the bankruptcy court's core jurisdiction, reflecting that such claims are uniquely suited to resolution outside the bankruptcy process. *See* 28 U.S.C. § 157(b)(2)(B); 28 U.S.C. § 1411(a) (preserving jury trial right "with regard to a personal injury or wrongful death tort claim"); *see also* U.S. Const. amend. VII (preserving right to jury trial generally).

103. The Debtors assert that the potential harm to the Families is "only a short delay" (Motion ¶ 60), but they do not explain—much less demonstrate—how long they believe the delay will be or their basis for that belief. Nor do they show why any further delay in the Families' pursuit of accountability of the *Individual Defendants* for their misconduct is outweighed by any cognizable harm to the *Debtors*.

104. The consequence of granting the injunction would be to deprive the Families of their right to proceed against the Individual Defendants for an indefinite period. *See Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) ("[T]he clear damage to the plaintiffs is the hardship of being forced to wait for an indefinite and, if recent experience is any guide, a lengthy time before their causes are heard."). The Individual Defendants are not parties to this bankruptcy. They should not be permitted to use the Debtors' filing as a shield against personal accountability for conduct that resulted in the deaths of twenty-seven children and counselors.

**ii. The Public Interest Favors Denying the Injunction**

105. The public interest likewise overwhelmingly favors denying the injunction. Twenty-seven children and counselors are dead. The public has a paramount interest in holding individuals personally accountable for conduct that resulted in those deaths—an interest that is uniquely clear in this case.

106. The 115-page Report commissioned by the Texas Legislature underscores this interest. The legislature's immense expenditure of resources on its investigation, and the "swift[]" actions it took—"enact[ing] three statutes directed at youth-camp safety" within months of the

tragedy, Report at 107—reflects the state's recognition that personal accountability is essential. Critically, the Report identified specific conduct by Individual Defendants supporting their personal culpability—including that Dick Eastland "called the shots at Camp Mystic" and was the only person who would have known of any evacuation plan, and that Mary Liz Eastland conducted counselor trainings in which counselors were told not to worry about flood emergencies because "that's never going to happen." *Id.* at 57, 69, 104.

107. Beyond accountability for this tragedy, there is a broader public interest in ensuring that non-debtor individuals cannot abuse a corporate bankruptcy filing to shield themselves from personal liability or disclosure of their bad acts. The Bankruptcy Code's purpose is to protect honest but unfortunate debtors and their estates, not to provide a haven for non-debtor insiders seeking to evade the consequences of their own actions. If a non-debtor seeks the benefit of a bankruptcy filing—including the automatic stay—then it must take on the burdens of a bankruptcy filing, including the marshaling of assets, disclosure obligations, and transparency that comes from a chapter 11 case.

108. That principle of transparency is particularly salient here. The Families have serious concerns that the Debtors' bankruptcy was timed to avoid disclosure of critical information about the Individual Defendants' actions in the critical hours in which flood waters were rising—including text messages among the Individual Defendants that they have consistently refused to produce in litigation. Even more than a year after the tragedy, the Families still do not have a full picture of their daughters' final hours. While the Committee intends to seek full disclosure in the context of these Chapter 11 Cases, the public interest also favors disclosure by the Individual Defendants in the Non-Debtor Actions.

109. The Debtors' posture with respect to discovery and the Committee's investigation confirms these concerns: the Debtors and Individual Defendants have blocked every effort by the Committee to fulfill its statutory obligation to investigate the claims held by and against the estate with respect to the flood. They have argued that discovery into the events of the flood should not occur in the Chapter 11 Cases because discovery is ongoing in the state court litigation, and that questions regarding liability in connection with the flood should occur there. Yet through this Motion, they simultaneously seek to halt that same state court litigation indefinitely. This contradictory strategy—refusing discovery in bankruptcy because the state actions are pending, while seeking to stay the Families' claims against the Individual Defendants in state court—exemplifies the Debtors' broader effort to use procedural mechanisms to prevent the Families from ever obtaining the answers they deserve. The Debtors and the Individual Defendants should not be permitted to use the Debtors' bankruptcy as a shield from that discovery.

110. The Debtors' efforts to resist discovery at all costs—and their decision to file this adversary proceeding and devote substantial estate resources to shielding their insiders from personal accountability—raise serious questions about whether the Debtors' management is prioritizing the interests of the estate or the interests of the Individual Defendants. The public interest favors disclosure, transparency, and accountability within a chapter 11 case, not allowing Debtors to use a chapter 11 case and the automatic stay to protect their insiders.

111. In short, the Families' interest in closure, accountability, and justice—interests shared by the broader public—would be grievously undermined by an injunction shielding those personally responsible for their children's deaths.

**iii. The Debtors Cannot Demonstrate a Substantial Likelihood of Success on the Merits**

112. Finally, the Debtors cannot demonstrate a substantial likelihood of success on the merits. They cite out-of-circuit cases to argue that the "success on the merits" element "focuses on whether the debtor has a reasonable or realistic likelihood of successfully reorganizing." Motion ¶ 54 (collecting out-of-circuit cases). Then, in conclusory fashion, the Debtors assert that they "have a reasonable or realistic likelihood of confirming a plan of reorganization" and "have sufficient assets to provide in a plan for the treatment of allowed claims in a manner that satisfies the requirement of section 1129 of the Bankruptcy Code." *Id.* ¶ 55.

113. Setting aside that this Circuit does not appear to have addressed the appropriate standard for evaluating a debtor's likelihood of success on the merits under circumstances such as this one, the Debtors have provided no evidence supporting their contention about the likely outcome of these Chapter 11 Cases. They do not, for example, supply a declaration from their Chief Restructuring Officer or attach materials showing the assets they believe will allow for successful reorganization. Absent such support, the likelihood of success is *at best* "uncertain." *In re Roman Cath. Diocese of Rockville Ctr.*, 651 B.R. at 651.

114. On the merits of the stay relief that the Debtors seek, as explained above, the Debtors cannot establish that the automatic stay applies or should be extended to the Individual Defendants. *See supra* at ¶¶ 50–69.

115. Accordingly, because the Debtors fail to satisfy any of the elements necessary for a preliminary injunction—much less *all* of them—the Court should refuse to award such an "extraordinary" remedy.

## III. <u>This Court Lacks Subject Matter Jurisdiction to Enjoin the Unfiled Actions, and Such Relief Would Be Premature</u>

116. Even if the Debtors were entitled to a stay extension as to the Prepetition Actions—which, as explained above, they are not—the Court should not take the extraordinary step of also enjoining parties who have not yet filed any lawsuit against the Debtors or Individual Defendants from doing so in the future, for several reasons.

117. First, the Court lacks subject matter jurisdiction to enjoin the commencement of *future* actions against third parties by *future* third-party plaintiffs. The Debtors seek to enjoin all actions against the Individual Defendants that "may" be brought by any "prospective plaintiffs" and that "in any way relate to or arise out of the events of the July 4, 2025 flood with respect to" Camp Mystic. Motion ¶¶ 2–3. To establish "related to" jurisdiction, the Debtors must demonstrate that the Unfiled Actions "(1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the bankruptcy estate." *In re Reliant Expl. Ltd.*, 336 B.R. 286, 289 (Bankr. S.D. Tex. 2005). This requires an assessment of the actual causes of action asserted in lawsuits sought to be enjoined. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225, 232 (3d Cir. 2004) (holding that the bankruptcy court erred by merely "assum[ing]" that claims against non-debtors would reduce estate assets). The Debtors cannot satisfy this standard for the simple reason that the claims in the Unfiled Actions do not yet exist. The Court cannot evaluate whether unpled claims against non-debtors "relate to" the Chapter 11 Cases before such claims are actually asserted.

118. Second, enjoining third parties from filing future lawsuits also raises serious due process concerns. Given that the Debtors seek an indefinite injunction against the Families filing any lawsuits against the individual defendants, the Families who have not yet filed a lawsuit may find themselves facing statute of limitations issues. Those Families need to be able to file an action

to preserve their rights against the Individual Defendants. Precluding these future claimants from filing a lawsuit to preserve their rights under the statute of limitations simply because full prosecution of such actions might have an effect on the chapter 11 cases would implicate significant due process concerns by eliminating state law rights the plaintiffs have against non-debtors.

119. Third, this request runs headlong into the Supreme Court's recent admonition in *Purdue* that the Bankruptcy Code should not be read to "afford courts" expansive authority to protect non-debtors from third-party claims absent clear statutory authorization. *See Purdue*, 603 U.S. at 222. As the *Purdue* Court explained, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Id.* at 216 n.2 (quotation omitted). It does not authorize a Court to issue a broad injunction protecting non-debtors from any future lawsuits that might be filed by future third-party plaintiffs that relate to a certain topic—here, the July 4 flood. Neither sections 362(a)(1) nor (a)(3) confer such authority, *see supra* ¶¶ 50–69, and the Debtors supply no other basis for such a broad extension of the stay over unpled claims by third parties.

120. It is for precisely these reasons that even when courts enter orders preliminarily enjoining state court actions against non-debtors, they often include protections in those orders for future plaintiffs. For example, in *Roman Catholic Diocese of Rockville Centre*, the consensual order entered by the court specifically allowed parties to commence and serve additional lawsuits (even upon the Debtor), but provided that the Debtor could seek to extend the injunction to such lawsuits. Docket Order Granting Debtor's Motion for a Preliminary Injunction, No. 1:20-ap-01226, (Bankr. S.D.N.Y. Nov. 4, 2020), ECF No. 36 ¶¶ 3–4. In this way, the court addressed the jurisdictional and due process concerns raised by future claims of future plaintiffs, even in the context of a consensual preliminary injunction order.

121. In any event, even assuming *arguendo* that this Court possesses jurisdiction and statutory authority to enjoin third parties from commencing the Unfiled Actions, the Court should decline to exercise that authority—in particular with respect to the Heaven's 27 families. The Debtors have identified no concrete, imminent harm—let alone irreparable injury—from the mere *filing* of future lawsuits against the non-debtor Individual Defendants. And the universe of potential claimants is small and well-defined, consisting of the 26 families who lost daughters at Camp Mystic. The Chapter 11 Cases were filed less than a year after the July 4, 2025 flood, and those Families who had not yet filed suit should not be prejudiced by the Debtors' decision to file for bankruptcy before such cases were commenced.

122. Certainly, if the Prepetition Actions are allowed to go forward, the Unfiled Actions should likewise be permitted to proceed. But even if the Court determines to enter a preliminary injunction, the Court should include protections in its order that allow the filing and service of the Unfiled Actions, even if they are stayed thereafter. Filing a complaint would not deplete insurance proceeds, would not bind the Debtors to any judgment, and would not create any preclusive effect. And prospective plaintiffs may need to file such claims to preserve rights that would otherwise be extinguished by statutes of limitations running against the Individual Defendants. Extending the automatic stay to lawsuits that do not exist is both jurisdictionally improper and fundamentally premature.

## IV. <u>The Motion Should Independently Be Denied on Threshold Procedural Grounds</u>

123. As an independent, alternative basis for denial, the Motion should be denied or stricken because the Debtors failed to comply with Local Rules 9013-1(b) and 9013-1(h) of the Bankruptcy Local Rules for the Southern District of Texas.

124. Local Rule 9013-1(b) requires that every motion "seeking an order" include, "immediately below the title," the notice language prescribed by the rule, informing opposing

parties of the deadline to respond and the consequences of failing to respond. The Motion does not include this required notice language.

125. Local Rule 9013-1(h) separately requires that "[e]ach motion, application, objection, and response filed with the court must be accompanied by a proposed order." The Motion was not accompanied by a proposed order. This procedural defect provides a further, independent basis for denial.

126. Courts in this District have enforced compliance with Local Rule 9013-1, including by striking filings for noncompliance. *See, e.g.*, *In re Rodriguez*, Case No. 21-07005, ECF 144 (Bankr. S.D. Tex. Apr. 27, 2022) ("The Motion fails to comply with Bankruptcy Local Rules 9013-1(b), (d), (f), and (h) and Federal Rules of Civil Procedure 7(b)(1)(B) and 10, and will be struck."). The Debtors' failure to comply with these mandatory procedural requirements provides an independent, threshold basis for denial—without reaching the merits.

127. These are not mere technical defects. The Debtors' failure to include a proposed order, for example, leaves open significant questions about exactly what are the contours of the relief that the Debtors are seeking: Are the Debtors seeking an indefinite preliminary injunction or a time-limited injunction? Will the Debtors allow the filing and service of future lawsuits (as other courts do) or are they even resisting that accommodation? And, of course, the fact that the Debtors have not identified the evidence on which they rely has required the Committee and the Ad Hoc Group to guess at the factual basis on which the Debtors intend to rely; the Debtors included no declaration in support of their motion, no insurance policies they claim to be implicated, and no other evidence justifying the extraordinary relief they seek.

128. At bottom, the Debtors are not entitled to the relief sought by the motion, for all of the reasons above. But the fact that they have not even attempted to establish an evidentiary basis for their request defeats it at the outset.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court deny the Motion in its entirety and grant such other and further relief as the Court deems just and proper. The Families—members of the Committee's constituency—are entitled to their days in court.

Dated: September 25, 2026

Respectfully submitted,
**WILLKIE FARR & GALLAGHER LLP**
By: *<u>/s/ Jennifer J. Hardy</u>*
Jennifer J. Hardy (Texas Bar No. 24096068)
600 Travis Street
Houston, Texas 77002
Telephone: 713-510-1700
Facsimile: 713-510-1799
Email: jhardy2@willkie.com

**AND**

Brett H. Miller (*pro hac vice*)
Hon. Shelley C. Chapman (Ret.) (*pro hac vice*)
James H. Burbage (*pro hac vice*)
Gabrielle Antonello (*pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: 212-728-8000
Facsimile: 212-728-8111
Email: bmiller@willkie.com
schapman@willkie.com
jburbage@willkie.com
gantonello@willkie.com

**AND**

Christopher DiPompeo (*pro hac vice*)
Justin D. Rattey (*pro hac vice*)
1875 K Street, N.W.
Washington, DC 20006
Telephone: 202-303-1000
Facsimile: 202-303-2000
Email: cdipompeo@willkie.com
jrattey@willkie.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*