**EXHIBIT A**

# REPORT ON THE CAMP MYSTIC FLOOD DISASTER OF JULY 4, 2025

## SENATE

GENERAL INVESTIGATING COMMITTEE ON THE JULY 2025 FLOODING EVENTS

Senator Pete Flores, Chair

Senator Charles Perry, Vice Chair

Senator Bryan Hughes

Senator Lois Kolkhorst

Senator José Menéndez

## HOUSE

GENERAL INVESTIGATING COMMITTEE ON THE JULY 2025 FLOODING EVENTS

Representative Morgan Meyer, Chair

Representative Joe Moody, Vice Chair

Representative Drew Darby

Representative Paul A. Dyson

Representative Erin Elizabeth Gámez

JUNE 2026

**SENATE**
**GENERAL INVESTIGATING**
**COMMITTEE ON THE**
**JULY 2025 FLOODING EVENTS**

**PETE FLORES**
**CHAIR**

**COMMITTEE CLERK**
**HAYLEE PLUMLEY**

**HOUSE**
**GENERAL INVESTIGATING**
**COMMITTEE ON THE**
**JULY 2025 FLOODING EVENTS**

**MORGAN MEYER**
**CHAIR**

**COMMITTEE CLERK**
**RYAN MARQUESS**

---

# Report on the Camp Mystic Flood Disaster of July 4, 2025

**Austin, Texas**

**June 18, 2026**

**SENATE**
**GENERAL INVESTIGATING COMMITTEE**
**ON THE JULY 2025 FLOODING EVENTS**

**HOUSE**
**GENERAL INVESTIGATING COMMITTEE**
**ON THE JULY 2025 FLOODING EVENTS**

June 18, 2026

The Honorable
Dan Patrick
Lieutenant Governor and
President of the Senate

The Honorable
Dustin Burrows
Speaker of the
House of Representatives

Dear Mr. President and Mr. Speaker:

The Senate and House General Investigating Committees on the July 2025 Flooding Events transmit this report of the committees' inquiries authorized respectively by Senate Resolution 2 and House Resolution 177, 89th Legislature, 2d Called Session.

Respectfully submitted,

Senator Pete Flores, Chair
Senate General Investigating Committee

Representative Morgan Meyer, Chair
House General Investigating Committee

Senator Charles Perry, Vice Chair

Representative Joe Moody, Vice Chair

Senator Bryan Hughes

Representative Drew Darby

Senator Lois Kolkhorst

Representative Paul A. Dyson

Senator José Menéndez

Representative Erin Elizabeth Gámez

# Table of Contents

Transmittal Letter ..... 3

Preface ..... 6

Acknowledgments ..... 7

In Memoriam ..... 8

**Introduction and Executive Summary ..... 35**

**1 General Background ..... 40**

1.1 History and culture of Texas Hill Country camps ..... 40
1.2 Geography and history of flooding ..... 40
1.3 Regulations governing youth recreational camps in July 2025 ..... 43
1.4 Overview of state and local Kerr County emergency preparedness and disaster response resources ..... 45
1.5 Overview of the July 4, 2025, flood and impact ..... 47

**2 Procedural History ..... 49**

**3 Camp Mystic Background ..... 53**

3.1 Camp layout ..... 54
3.2 Camp culture ..... 56
3.3 Permanent camp staff ..... 57
3.4 Seasonal camp staff ..... 60
3.5 Residential assignments for non-counselor staff ..... 63
3.6 Emergency preparedness ..... 65
3.7 Communications and weather monitoring ..... 66

**4 Camp Mystic July 2025 Flood Narrative ..... 69**

4.1 Counselor training ..... 69
4.2 Arrival of second-session campers ..... 70
4.3 Wednesday, July 2, 2025 ..... 71
4.4 Thursday, July 3, 2025 ..... 72
4.5 Friday, July 4, 2025 — early pre-flood hours ..... 76
4.6 First evacuation mission: Bug House, Look Inn, and Hang Out ..... 81
4.7 Second evacuation mission: Tumble Inn I & II and Jumble House ..... 84
4.8 Third set of evacuation missions ..... 85
*Bubble Inn* ..... 85
*Twins I and Twins II* ..... 86
*Giggle Box and Wiggle Inn* ..... 88
4.9 Self-evacuation of Nut Hut ..... 89

4.10 Self-evacuation of Chatterbox .......... 90
4.11 Evacuated campers' experience at Rec Hall .......... 91
4.12 Kozy Korner .......... 92
4.13 Polar Palace .......... 93
4.14 Garage / Uptight area .......... 93
4.15 Guard House .......... 95
4.16 Senior Hill .......... 95
4.17 Ranch House and Cypress Hollow .......... 96
4.18 Cypress Lake camp .......... 97
4.19 Incident management and reunifications .......... 97

**5 Summary of Conclusions .......... 104**

5.1 Camp Mystic did not have written emergency plans that complied with state requirements. .......... 104
5.2 Camp Mystic did not adequately prepare for the July 3-4, 2025 storm. .......... 104
5.3 Camp Mystic did not timely evacuate in advance of the July 3-4, 2025 storm, despite ample opportunity to do so. .......... 105
5.4 Re-unification efforts and incident management were chaotic, with traumatic effects for families. .......... 106

**6 Summary of 2025 Legislative Reforms .......... 107**

**Appendix A Selected Building Elevations at Camp Mystic .......... 111**

**Appendix B Matrix and Maps of Distances Between Selected Structures .......... 113**

# PREFACE

This is a report of the Senate and House General Investigating Committees on the July 2025 Flooding Events that examines the July 4, 2025, flood disaster at Camp Mystic on the Guadalupe River in Kerr County, Texas.

In the aftermath of the July 2025 floods, the Texas Legislature reacted immediately. Across two called special sessions from July 21 to September 4, 2025, numerous hearings were conducted—in Austin and in Kerrville—to gather information and to enact reform legislation. Over 140 unique witnesses testified before various committees, sharing perspectives reflecting a wide spectrum of responsibilities, knowledge, and direct experience relating to the effects of the catastrophe. While the tragedy at Camp Mystic loomed in the background, none of the 2025 hearings were focused on what happened there, why so many lives were lost, and whether there are specific lessons to be learned that may inform future reform. This report adds important, necessary details to an already substantial prior record of legislative inquiry.

Justifiably, there has been robust public reporting and debate about the duties and responsibilities of youth summer camps relating to an unusually severe weather event like the storm that produced the July 4, 2025, flood. It is not the purpose of this report to definitively resolve the questions of governmental, corporate, and individual responsibility presented in the civil disputes that are pending now or may be pursued in the future. Rather, this report objectively presents a timeline of decision-making and emergency response at Camp Mystic spanning three fateful hours in the early morning of July 4, along with other contextual information from before and after the flood to provide a more complete record for any further legislation.

This report does not mark the end of legislative inquiry. It is, instead, a starting point for the next stage of reform as we strive continuously to make camps safer, emergency response more effective, and disaster relief more compassionate for our fellow citizens in their moments of crisis.

Senator Pete Flores, Chair
Senate General Investigating Committee

Representative Morgan Meyer, Chair
House General Investigating Committee

## ACKNOWLEDGMENTS

The Senate and House General Investigating Committees on the July 2025 Flooding Events gratefully acknowledge the assistance of all who contributed to this investigation and to the preparation of this report. It would not have been possible without the generous cooperation of many still-grieving people who continue to process the trauma of losing family and friends in the July 4, 2025, flood.

The Committees especially appreciate the support received from Lieutenant Governor Dan Patrick, House Speaker Dustin Burrows, their respective staffs, and the offices of Chairman Pete Flores and Chairman Morgan Meyer.

Finally, the Committees thank their staffs and expert investigators Casey Garrett and Michael Massengale, along with their colleagues Heather McFarlane and Kim Parks, for their efforts to complete this important work.

# IN MEMORIAM

This report is dedicated to the memory of all who lost their lives at Camp Mystic on July 4, 2025.

**Out of an abundance of caution, pages 9–34 of the Texas Legislature Report have been removed in compliance with Federal Rule of Bankruptcy Procedure 9037.**

# Introduction and Executive Summary

With a holiday weekend approaching, the night of July 3, 2025, fell on the Texas Hill Country with a National Weather Service Flood Watch in effect. In Kerr County, that weather alert converted to a Flash Flood Warning at 1:14 a.m. As the early morning hours of July 4 progressed, the region was ravaged by unusually heavy rainfall, resulting in widespread flooding that claimed at least 135 lives. At the time of this report, two victims still have not been found. The floods caused extensive property damage and exposed deficiencies in emergency planning and local coordination. The aftermath has cast a shadow of apprehension and doubt over the continuing viability of summer camp traditions along the Guadalupe River.

The Texas Legislature responded swiftly, conducting numerous hearings and enacting emergency reform legislation. Both the Senate and the House of Representatives also created general investigating committees as authorized by Government Code Section 301.017, to conduct inquiries and hearings to develop a more complete record for legislative use.

Amid the wider tragedy and the broader impact of the floods, 100-year-old Camp Mystic near Hunt, Texas, stands out for having lost 28 souls, including 25 young campers, two young adult counselors, and the camp's co-executive director. As the factors leading to this catastrophic loss of life were not specifically probed during the 2025 legislative hearings due to time constraints for taking action during special sessions, this report is focused primarily on examining the preparation for, response to, and impact of the flooding at Camp Mystic. The lessons to be learned from the camp's inadequate emergency planning and response are worthy of careful study for opportunities to avoid similar future tragedies.

***Inadequacy of advance emergency planning.*** At the time of the 2025 flood, Texas youth camps like Camp Mystic were required to have written emergency plans, including "procedures for emergency shelter and for evacuation of each occupied building and the facility." Campers were required to be "instructed as to their actions in the event of…the need to evacuate." And camps were obliged to train their staff, including requiring them to review the procedures, with specific assignments made to each staff member and counselor.

Although Camp Mystic had the necessary license to operate and it had passed state inspections, it did not provide adequate training for staff in emergency situations. The camp did not

provide written emergency plans that specified how each occupied building would be evacuated in the event of a need in response to flooding, as occurred on July 4, 2025. Instead, the camp's written emergency plan directed campers to shelter in place during a flood and to await further instruction. Procedures for actual evacuation of cabins were not reviewed with camp staff and counselors; specific assignments of responsibilities were not made to each staff member and counselor. Because there was no evacuation plan, campers were not instructed about how an evacuation would occur. To the extent Camp Mystic had any flood evacuation plan for its Guadalupe Camp cabins based on past experience, that plan was not put in writing, and it was not communicated in advance to staff, counselors, or campers. If there was any threshold of flooding at which sheltering in place would be abandoned and campers would be instructed how and where to evacuate to higher ground, that plan was not communicated to staff, and would have been known only by the camp's co-executive director, Dick Eastland.

The camp had a public address system that routinely was used to deliver camper instructions and to play "Taps" at bedtime. It could have been, but was not, used to deliver evacuation instructions to campers and counselors during the flood. Additionally, walkie-talkies were used for communication at the camp, but they were not issued to individual cabins or to cabin counselors. Campers and counselors were prohibited from having mobile phones in cabins.

***Inadequacy of storm preparation.*** Texas emergency planning coordinators monitored the incoming storm that produced the July 4 floods. The Texas Division of Emergency Management issued a series of alerts to its partners in local government, it pre-positioned personnel and equipment, and it conducted planning calls for local emergency management personnel. These alerts and warnings effectively were disregarded by Kerr County officials, who were substantially absent from duty, and who failed to conduct effective local emergency coordination relating to summer camps in advance of the storm. As flooding began, the county judge was away and unaware, and the county's emergency coordinator was sick and asleep in bed with no delegate at the watch while the entire tragedy unfolded.

Even without meaningful guidance from local officials, Camp Mystic senior staff (but not counselors or campers) had access to weather updates and the responsibility to be aware and to plan appropriately. Although over-air cellular service was unreliable, Camp Mystic had broadband internet service and a Wi-Fi network extending to a number of structures. The National Weather Service issued a series of weather alerts of increasing severity. In the early afternoon of July 3, a Flood Watch took effect through the morning of July 4, specifically including Kerr County, which warned of the possibility of "[l]ocally heavy rainfall" which "could cause flash flooding." Thus the general public—including Camp Mystic, which had assumed responsibility for the safety of 557 campers—was on notice on the evening of July 3 of the risk of flash flooding in the area overnight. However, key Kerr County officials and Camp Mystic leadership retired that night without any heightened awareness of the potential

for extreme weather. At Camp Mystic, only Dick Eastland and a night watchman stayed awake to monitor weather.

At 1:14 a.m. on July 4, the National Weather Service converted its Flood Watch to a Flash Flood *Warning*, effective through 4:15 a.m. Flash flooding in the area was "ongoing or expected to begin shortly." The potential impact was identified to include "[l]ife threatening flash flooding of creeks and streams," and the community of Hunt was specifically identified as a location "that will experience flash flooding." The 1:14 a.m. warning also stated: "Most flood deaths occur in vehicles."

Around 1:45 a.m., Dick Eastland used a walkie-talkie to awaken his son, Guadalupe River camp co-director Edward Eastland, to help with securing boats and camp equipment. Despite the 1:14 a.m. Flash Flood Warning, they perceived no flood risk to cabins. Around 2:30 a.m., teenage counselors from Bug House and Look Inn, the cabins closest to the river, defied the instructions to stay in their cabins. They ran through the storm to the main office, reported water entering the cabins, and asked for help. The counselors were driven back to their cabins by Dick and Edward, who determined that the water was running off the side of a hill and not rising from the nearby river. The counselors were instructed to put towels down to soak up the water. Then shortly before 3:00 a.m., the riverside front-gate guard made a frantic distress call by walkie-talkie, reporting flooding of the guardhouse. Dick then decided to begin an evacuation of campers. Shortly after, the guardhouse was overwhelmed by flood waters and was swept away.

As these events unfolded, the remaining adult camp staff in their residences gradually and separately became aware of the severity of the storm, and some were exposed to rising water and eventually evacuated themselves to higher ground.

Even after accounting for rising creeks which caused the physical isolation of a part of the camp closest to the river, there were at least 39 adults present at the Camp Mystic Guadalupe River camp, excluding the teenage counselors assigned to camper cabins, who could have been tasked to assist with an orderly flood evacuation. But there was no plan for them to do so, and no training that would have prepared them for what to do. As a consequence, those adults demonstrated no heightened vigilance in response to the Flood Watch or the subsequent Flash Flood Warning. In particular, no adult staff received advance assignments of responsibilities to assist with evacuating the children in the Guadalupe River cabins, and their resulting detachment and non-involvement meant they were unaware of the crisis experienced by the campers as it was occurring.

***Failure to timely evacuate.*** Shortly after 3:00 a.m., Dick Eastland summoned Edward and the night watchman to meet him to begin evacuating campers. Water covering the road near the cabins measured about an inch, and water was beginning to enter the cabin closest to the

river. From the 1:14 a.m. Flash Flood Warning until this time, if all campers had been instructed to evacuate their cabins by foot, there still was ample time and opportunity for them all to move the very short distances to reach higher and safer ground.

Instead of using the PA system or going cabin-to-cabin to order immediate evacuation, Dick Eastland instructed Edward and the night watchman to help evacuate the three cabins closest to the river by driving the campers in vehicles. Those campers and counselors were transported a short distance to a large structure on slightly higher ground called Rec Hall, a 100-year-old structure where the campers and teenage counselors were left without adult guidance or communication for the entirety of the flood event. Those in Rec Hall survived only by climbing to a second-floor internal balcony that was mere inches above the eventual peak of the flood water.

The same three men then returned with their vehicles in a second effort to evacuate the next cabins in sequence. By then water on the road covered their ankles, but conditions were such that campers still had the opportunity to evacuate by foot, and some did. Counselors watching from the porch of an adjacent cabin frantically asked whether they should walk their campers to Rec Hall, and they were allowed to do so.

With no adult help, other counselors self-evacuated cabins on their own initiative. With flood water rising and no help coming, some counselors were forced to lead their campers to higher ground. Because the camp did not have an actual evacuation plan and had not trained counselors and campers in an evacuation drill, some counselors became separated from their campers, who walked on to Rec Hall unsupervised. Some campers thus became separated from their cabin counselors for the remainder of the flood event, and one unsupervised camper tragically perished when she returned to her cabin to retrieve an item and was swept away by the flood.

Meanwhile, counselors and campers continued to shelter in place in the Bubble Inn, Twins I, Twins II, and Wiggle Inn cabins, awaiting instruction as instructed by the camp's written emergency plan. Having delivered the second group of evacuated campers to Rec Hall, Dick and Edward Eastland returned a third time to the cabins with their vehicles, while the night watchman decided the water had risen too high to drive. The three men went to assist at three different cabins, but by then the water was too high to evacuate the campers by foot.

The available evidence strongly suggests that Dick Eastland loaded all campers and both counselors from Bubble Inn into his vehicle. It was swept into the Guadalupe River, and all of them perished.

Since campers in the connected Twins I and Twins II cabins were not evacuated in the over two hours that had passed after the 1:14 a.m. Flash Flood Warning, Edward Eastland

determined that they could no longer safely evacuate on foot. When it became obvious they were on the verge of drowning in the cabins, the counselors were left with no choice but to push the cabins' 8- to 9-year-old campers underwater and out the door and windows in hopes they could find safety.

One Twins camper could not escape, and she perished in her cabin. The others all were swept away in the flood. Some, including Edward, survived, but eleven Twins campers did not. Because of vaulted ceilings in Wiggle Inn, the campers and counselors there, along with the night watchman, survived by floating on mattresses into the rafters.

***Inadequacy of incident management.*** Before daybreak, the flood waters receded. The devastation quickly became apparent, and Camp Mystic staff understood relatively soon that the whereabouts of 28 people were unknown. Yet parents of campers were traumatized by incomplete and conflicting information while waiting to learn whether their loved ones had survived. In addition to their dismay about the camp's lack of emergency planning and failed response, many parents have shared frustrations about poor local communication and coordination in the aftermath.

* * *

Many of the grieving families, as well as the public at large, have had lingering questions about what happened to the children entrusted to the care of Camp Mystic. The Eastland family has cooperated with this investigation, and this report answers many of the families' and the public's questions.

# 1 GENERAL BACKGROUND

## 1.1 History and culture of Texas Hill Country camps

There is a long and well-loved tradition of young Texans attending summer camps along the Guadalupe River. Over a century ago, Rio Vista opened as the first youth sleep-away camp in Kerr County, in 1921. Its founder hoped to emulate popular YMCA camps along the East Coast. It was a success.

Soon thereafter, in 1924, Edward J. "Doc" Stewart opened Kerrville's "Camp Texas." That was followed in 1926 by Stewart's Camp for Girls, which was later known as Camp Mystic. Stewart also went on to open Heart O' the Hills Inn to provide lodging for parents transporting their children to camp, and that property later became Heart O' the Hills Camp for Girls.

Camp Waldemar, another camp for girls, was also founded in 1926, by Miss Ora Johnson. Other early camps included Camp La Junta, Camp Arrowhead, and Kickapoo Kamp, followed by Texas Lions Camp, Camp Loma Linda (on the grounds of what is now Mo-Ranch), and Echo Hill Camp.

Nineteen summer camps operated in Kerr County as of July 2025, mostly situated along the Guadalupe River and its North and South Forks, Cypress Creek, Turtle Creek, and other tributaries.[1] These camps provide local jobs and invigorate the local economy. Over the past century, these camps and their traditions have also provided generations of Texans with life-long memories and friends.

## 1.2 Geography and history of flooding

The Hill Country youth camps built along the Guadalupe River and its tributaries are situated in the most flash flood-prone area in the United States, a region known as "Flash Flood Alley,"

[1] H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 171, 89th Leg., 1st C.S. (July 31, 2025) (testimony of William "Dub" Thomas, Emergency Mgmt. Coordinator, Kerr Cnty.).

as depicted in this image from a YouTube video, *Be Flood Aware 2017*, published by the Upper Guadalupe River Authority (UGRA).[2]




As explained in the video, the Hill Country's limestone rocks and hilly terrain contribute to the propensity for flash flooding.

> …the water rushes down hills, and if it happens to rain…you can get walls of water coming down…. You can end up, especially if it rains west of Kerrville, up around Hunt and Ingram and westward, with massive walls of water coming down at the same time. So the topography is favorable for water to not just stagnate, but to rush down creeks, rivers, and streams. If you get three or four inches of rain at one time, that can be a real serious problem.[3]
>
> ….

[2] Upper Guadalupe River Authority, *Be Flood Aware 2017*, YouTube (Mar. 22, 2017) (hereinafter, *Be Flood Aware 2017 Video*), https://youtu.be/iTsJxE-ZZU0?si=o6C_09NOGZz1Tfxl (at 2:03— "Central Texas has been identified as the most flash-flood prone area in the United States by the National Weather Service and has often been referred to as Flash Flood Alley."); *see also* H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 287, 89th Leg., 1st C.S. (July 23, 2025) (testimony of Bryan McMath, Exec. Dir., Tex. Water Dev. Bd.).

[3] *Be Flood Aware 2017 Video*, *supra* note 2 (at 1:16-1:55—explanation of Hill Country meteorologist Cary Burgess).

> Unfortunately, extreme conditions can cause flooding to impact areas previously thought to be safe.[4]

The region's history of flooding is well-documented. As part of the research for a proposed project, in 1988 the UGRA received a study entitled "A Summary Flood History of Kerr County."[5] That report summarized area flooding from 1869 to 1988. Before 2025, the most significant recorded floods for Camp Mystic occurred in 1932, 1978, and 1987.

**July 1-2, 1932**. In July 1932, torrential downpours in Kerr County caused deadly flooding.[6] Camp Mystic was in the path of the surge.[7] The Guadalupe stream gauge in Hunt, Texas, measured the water at 36.6 feet. This set the record until July 4, 2025. At Camp Mystic, the campers were eating lunch as the flood waters neared the dining hall.[8] The Camp Mystic director calmly directed them through the back door and sent them up a nearby hill. The flood washed away at least three cabins, and it destroyed the dam at Camp Mystic.[9] Camp Rio Vista lost six cottages, and Camp Stewart lost half of its cottages.[10] At least four people died.

**August 1-4, 1978**. Tropical Storm Amelia stalled over the Hill Country in August 1978, causing the Guadalupe River to peak at 32.79 feet in Kerrville and 40.9 feet in Comfort, Texas. This flood stranded Camp Mystic and cut it off from direct communication.[11] Camp Mystic was the most severely damaged summer camp (with no loss of life), and officials paused the camp session.[12]

**July 17, 1987.** During the late evening of July 16, 1987, through the early morning of July 17, thunderstorms moved slowly eastward through the Hill Country.[13] The storms followed the same path, one after another. This resulted in a massive flood wave that traveled down the Guadalupe River through Ingram, Kerrville, and eventually Comfort, Texas.[14] At Comfort, the Guadalupe River crested at 31.5 feet. Hundreds of people were evacuated. One summer camp approximately 40 miles east of Camp Mystic, Pot O'Gold Ranch, placed its campers on

---

[4] *Id.* (at 4:53).

[5] Roy D. Sedwick, A Summary Flood History of Kerr County (1988). The document was prepared by Remote Operating Systems as part of the background research for the proposed Automated Flood Warning and Detection System" for the UGRA. *Id.* It was provided to the UGRA "because of its potential general interest to Kerr County." *Id.*

[6] *Id.* at 8–9.

[7] Jonathan Burnett, *Flash Floods in Texas* 51 (2008).

[8] *Hill Country Digging Out of Sediment*, San Antonio Express-News, July 5, 1932, at 2.

[9] *Town Plank Come Back After Floods*, Austin American, July 6, 1932, at 2.

[10] Sedwick, *supra* note 5, at 9.

[11] *Flood Strands 1,400 Campers*, San Antonio Light, Aug. 3, 1978, at 2.

[12] *Red Cross Committee Speeds Rehabilitation*, Kerrville Mountain Sun, Aug. 24, 1978, at 10.

[13] Sedwick, *supra* note 5, at 29.

[14] *1987 Guadalupe River Flood*, Nat'l Weather Serv.: Austin/San Antonio, Tex., https://www.weather.gov/ewx/wxevent-19870717.

a bus. There was an attempt to evacuate the bus as it was overtaken by water; however, as they were wading to dry ground, a water wall, estimated to be as much as half a mile wide, rushed upon the campers. Ten campers drowned. At Camp Mystic, campers from "the two cabins closest to the Guadalupe River were moved to the recreation center."[15]

The Texas State Climatologist has confirmed that there have been only two flash flood warnings pertaining to Camp Mystic during camp season (i.e. June, July, and August) between October 1, 2007, and July 1, 2025.[16]

### 1.3 Regulations governing youth recreational camps in July 2025

The Texas Youth Camp Safety and Health Act was enacted in 1989 and codified as Chapter 141 of the Texas Health and Safety Code.[17] The Act imposes on a youth camp operator the duty of providing each camper with safe and healthful conditions, facilities, and equipment that are free from recognized hazards that cause or may tend to cause death, serious illness, or bodily harm.[18]

The Act requires a license to own, operate, control, or supervise a youth camp.[19] The Department of State Health Services (DSHS) serves as the principal authority governing the health and safety at youth camps, including the power to grant or deny youth camp licenses.[20] In furtherance of that role, the executive commissioner of DSHS shall establish health and safety standards for youth camps, including standards for the camper supervision, personnel qualifications, provision of medical services, and safety of food, equipment, activities, and physical facilities.[21] The commissioner also may establish other rules to implement the Act, such as minimum camper-to-counselor ratios for overnight stays at youth camps.[22] For example, in July 2025, "at least one adult supervisor to ten children in the camp" was required

---

[15] *Camp Owners Say They Have Flash Flood Evacuation Plans*, Bryan-College Station Eagle, July 19, 1987, at 2.

[16] *See generally Iowa Env't Mesonet*, Iowa State Univ., https://mesonet.agron.iastate.edu (archive of National Weather Service alert data). During the timespan of 2002-2007, there were 34 flash flood warnings (or 21 days with flash flood warnings) during camp season. *See id.*

[17] Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989.

[18] Tex. Health & Safety Code § 141.011.

[19] *Id.* § 141.003.

[20] *Id.* § 141.006.

[21] *Id.* § 141.009.

[22] *Id.* § 141.008(c).

generally,[23] and for overnight or sedentary activity, "at least one adult supervisor to every 25 campers" was required.[24]

Importantly, under the rules applicable in July 2025, youth camps were required to have a *written* emergency plan, posted in each occupied building, that addresses disaster, serious accident, epidemic, or fatality.[25] The rules specified that the plan "shall include procedures for emergency shelter and for the *evacuation* of each occupied building and facility."[26] Campers were required to be instructed on these procedures, including when evacuation is necessary.[27] Camps were required to make specific assignments to each staff member and counselor.[28] The rule required the plan to be reviewed with all camp staff and volunteers.[29] Finally, the camp was required to keep documentation of this training.[30]

Camper deaths are required to be reported to DSHS within 24 hours of occurrence.[31]

The Act authorizes a representative of DSHS to inspect youth camps,[32] and in 2025, it was DSHS policy to send an inspector trained in food safety to inspect youth camps once a year while the camp was operating.[33]

DSHS has several options to enforce Chapter 141 when it appears that a person has violated the statute or one of its implementing rules. The agency may revoke a youth camp's license

---

[23] 25 Tex. Admin. Code § 265.12(b) (2025) (rule in effect July 4, 2025), *superseded by* 25 Tex. Admin. Code § 265.32 (eff. Feb. 2, 2026); *see* 51 Tex. Reg. 571 (Jan. 30, 2026) (adoption preamble). The Code defines an adult for these purposes as a "person at least 18 years of age or older." 25 *id.* § 265.11(2).

[24] 25 *id.* § 265.12(b). The 2025 legislation directed the Health and Human Services Commission to establish minimum overnight camper-to-counselor ratios for youth camps by rule. Tex. Health & Safety Code § 141.008(c) (added by Act of Sept. 5, 2025, 89th Leg., 2d C.S., H.B. 1, § 4). The Commission's implementing rule, effective February 2, 2026, set age-tiered minimums of one counselor for every five campers ages 4-5, one for every six ages 6-8, one for every eight ages 9-14, and one for every ten ages 15-17. 25 Tex. Admin. Code § 265.32; *see* 51 Tex. Reg. 571 (Jan. 30, 2026) (adoption preamble) (proposed Nov. 28, 2025, 50 Tex. Reg. 7678).

[25] 25 Tex. Admin. Code § 265.15(k) (2024) (superseded by 25 Tex. Admin. Code § 265.31, eff. Feb. 2, 2026) ("Emergency plans required").

[26] *Id.* (emphasis supplied).

[27] *Id.*

[28] *Id.* The Code did not define the terms "staff," "staff member," and "camp staff," all of which were used in this rule.

[29] *Id.*

[30] *Id.*

[31] 25 *id.* § 265.15(e).

[32] Tex. Health & Safety Code § 141.007.

[33] Hearing on C.S.S.B. 1 Before the S. Select Comm. on Disaster Preparedness & Flooding, 89th Leg., 2d C.S. 11, 29 (Aug. 20, 2025) (testimony of Adam Buuck, Assoc. Deputy Comm'r for Consumer Prot., Tex. Dep't of State Health Servs.); *see also* H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, 89th Leg. (Apr. 28, 2026) (testimony of Adam Buuck, affirming Vice Chair Perry's characterization that the 2025 on-site inspection consisted of a "check-off…by basically the food safety person," and contrasting that with the post-reform "technical review of an actual evacuation plan").

and assess penalties through administrative proceedings.[34] It also may seek civil remedies against youth camps in Texas civil courts, including an injunction to restrain a person from continuing to violate Chapter 141 or its associated rules.[35]

### 1.4 Overview of state and local Kerr County emergency preparedness and disaster response resources

Texas emergency preparedness and disaster response are governed generally by the Texas Disaster Act of 1975, as amended and codified in Chapter 418 of the Texas Government Code.[36] That statute delineates the roles of the Governor,[37] the Texas Division of Emergency Management (TDEM),[38] and local governments.[39] It provides the framework for state finances supporting disaster response,[40] mutual aid,[41] mitigation,[42] disaster housing,[43] and citizen preparedness.[44]

Under Chapter 418, all disasters in Texas are locally managed. By statute, elected mayors serve as the emergency management directors for municipal corporations, and county judges serve as directors for the unincorporated area of a county.[45] Although Section 418.1015 authorizes a director to designate an emergency management coordinator as an assistant, the statute specifies no minimum qualifications on that position, leaving the selection entirely to the appointing mayor or county judge.[46]

State law reserves the authority to order an evacuation to local officials, and the only intra-jurisdictional override Chapter 418 permits is the county judge's authority to direct an evacuation that encompasses municipal territory.[47] TDEM coordinates with and supports local

---

[34] Tex. Health & Safety Code §§ 141.012–.020.
[35] *Id.* § 141.015.
[36] *See* Acts 1987, 70th Leg., ch. 147, § 1, eff. Sept. 1, 1987 (codified as Tex. Gov't Code §§ 418.001 et seq.); *see generally* Tex. Gov't Code § 418.002 (outlining purposes of Chapter 418); *id.* § 418.003 (outlining limitations of Chapter 418); H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 28–29, 89th Leg., 1st C.S. (July 23, 2025) (testimony of Chief Nim Kidd, describing TDEM's role under Chapter 418).
[37] *See* Tex. Gov't Code §§ 418.011–.027, 418.121 (powers and duties of Governor).
[38] *See id.* §§ 418.041–.059.
[39] *See id.* §§ 418.101–.1102 (local and interjurisdictional emergency management).
[40] *See id.* §§ 418.071–.074.
[41] *See id.* §§ 418.111–.1181.
[42] *See id.* §§ 418.121–.129.
[43] *See id.* §§ 418.131–.136.
[44] *See id.* § 418.151.
[45] *See id.* § 418.1015.
[46] *See id.* § 418.1015; H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 44, 89th Leg., 1st C.S. (July 23, 2025) (testimony of Chief Nim Kidd).
[47] *See* Tex. Gov't Code § 418.108(h).

governments and federal partners rather than to command or control resources at the local level, and the agency's chief chairs the Governor's Emergency Management Council, a statutorily designated body of state agencies assembled to support local response.[48]

Through Chapter 418's mutual-aid framework, the State may deploy specialized intrastate and interstate resources alongside Council agencies routinely deployed in flood response—the Department of Public Safety, the Texas Department of Transportation, the Texas Military Department, the Texas A&M Forest Service, and the Texas Parks and Wildlife Department.[49] At the local level, those state assets supplement the standing response capacity of county sheriffs' offices, municipal police and fire departments, emergency service districts, and volunteer fire departments.

When an incident overwhelms or is anticipated to overwhelm local capacity, TDEM works with the Governor's office to obtain a gubernatorial disaster declaration and to conduct the damage assessments that unlock state and federal recovery resources.[50] To support routine coordination, TDEM circulates Form DEM-147, by which mayors, county judges, and emergency management coordinators are asked annually to update their contact information so that they may be invited to TDEM's pre-event briefings. However, participation in TDEM's briefings is voluntary, and Chapter 418 contains no enforcement mechanism to compel attendance by any local director or coordinator.[51]

In Kerr County, there was an emergency management "Basic Plan" coordinated with the cities of Kerrville and Ingram. The Basic Plan, dated November 20, 2020, was approved and signed by the county judge and the mayors of both cities. That plan acknowledged: "It is our responsibility to protect public health and safety and preserve property from the effects of hazardous events. We have the primary role in identifying and mitigating hazards, preparing for and responding to, and managing the recovery from emergency situations that affect our community."[52] It identified flash flooding as a hazard "highly likely" to occur, with "major" estimated impact on public health, safety, and property.[53] The plan also acknowledged, "[o]ur

---

[48] *See id.* §§ 418.041–.044.

[49] *See id.* § 418.109–.115 (mutual aid); H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 29-30, 89th Leg., 1st C.S. (July 23, 2025) (testimony of Chief Nim Kidd).

[50] *See* Tex. Gov't Code § 418.014, .016; H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 30, 89th Leg., 1st C.S. (July 23, 2025) (testimony of Chief Nim Kidd).

[51] H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, at 193–94, 89th Leg. (Apr. 28, 2026) (testimony of Chief Nim Kidd).

[52] Kerrville/Ingram/Kerr County Basic Plan at BP-10.

[53] *Id.* at BP-9.

citizens have the responsibility to prepare themselves and their families to cope with emergency situations…."[54]

Under the Kerrville/Ingram/Kerr County Basic Plan, the Emergency Management Coordinator was responsible for keeping the county judge, mayors, and city manager "apprised of our preparedness status and emergency management needs,"[55] as well as performing "day-to-day liaison with the state emergency management staff."[56] Primary responsibility for communications was assigned to the Kerrville Police Chief.[57] Primary responsibility for evacuation was assigned to the Kerrville Police Chief and Kerr County Sheriff.[58]

The line of succession for Kerr County is from the county judge to the commissioners in order of their seniority.[59] The next in line of succession for the role of Emergency Management Coordinator is the Fire Marshal.[60]

A flood watch required "Increased Readiness" under the Basic Plan, for which indicative actions "may include increased situation-monitoring, reconnaissance of known trouble spots, [and] deploying warning signs."[61] A flash flood warning required "High Readiness," for which indicative actions "may include notifying the public about the warning, evacuating low-lying areas, open[ing] shelters to house evacuees, and continuous situation monitoring."[62]

## 1.5 Overview of the July 4, 2025, flood and impact

In the pre-dawn hours of Friday, July 4, 2025, a catastrophic flash flood swept through the Texas Hill Country, killing at least 135 people across multiple central Texas counties in the deadliest United States flash flood since 1976.[63] Extreme rainfall of approximately ten to fifteen inches over the upper Guadalupe River basin caused the river to rise across south-

[54] *Id.* at BP-10.
[55] *Id.* at BP-18.
[56] *Id.* at BP-19.
[57] *Id.* at BP-20.
[58] *Id.* at BP-21.
[59] *Id.* at BP-30.
[60] *Id.* at BP-30.
[61] *Id.* at BP-31.
[62] *Id.* at BP-32.
[63] *See, e.g.*, U.S. Dep't of Comm., Office of Inspector General, Office of Audit and Evaluation, *Review of the National Weather Service's Actions to Support Kerr County During the Catastrophic Flash Flood in Texas*, at 1 (Apr. 9, 2026) *available at* https://www.oig.doc.gov/wp-content/OIGPublications/OIG-26-017-I-SECURED.pdf (hereinafter, OIG Report); Jeff Masters et al., *The deadliest floods in U.S. history*, Yale Climate Connections (July 28, 2025), https://yaleclimateconnections.org/2025/07/the-deadliest-floods-in-u-s-history/.

central Texas.[64] At the U.S. Geological Survey gauge on the Guadalupe River at Hunt, the river rose from approximately ten feet around 3:00 a.m. and crested at 37.52 feet at 5:10 a.m.[65]

Kerr County bore the heaviest toll, with 117 confirmed deaths, including 37 children.[66] The addition of two souls still missing brings the total number of Kerr County deaths to 119.[67] Additional fatalities and substantial property destruction occurred outside Kerr County, including the Sandy Creek area of western Travis County, where at least ten residents perished,[68] and in the Liberty Hill area of Williamson County, which sustained three confirmed deaths, twenty-nine road closures, and the loss of one major bridge.[69] The Texas Department of Transportation reported damage to 85 on-system state roads and bridges across the affected region, including the complete washout of the RM 1431 bridge at Cow Creek in Travis County.[70]

Governor Greg Abbott issued a state disaster declaration on July 4, mobilizing a coordinated state and federal response that included the Texas Department of Public Safety, the Texas Military Department, the U.S. Coast Guard, and numerous volunteer search and rescue teams.[71] The U.S. Department of Commerce Office of Inspector General subsequently characterized the event as having caused "widespread and severe property damage, injury, and loss of life" across central Texas.[72]

---

[64] *See* H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, 89th Leg., 1st C.S. (July 31, 2025) (written testimony of John Nielsen-Gammon, Texas State Climatologist, at p. 4).

[65] *See* OIG Report, *supra* note 63, at 10.

[66] *See id.* at 1; *see also* Louis Amestoy, *Texas Rangers release names of 117 killed in July 4 flood*, Kerr Cnty. Lead (Aug. 8, 2025), https://kerrcountylead.com/texas-rangers-release-names-of-118-killed-in-july-4-flood/ (listing names).

[67] *See, e.g.*, Atirikta Kumar, *Texas identifies the 119 people killed in Kerr County floods*, Tex. Trib. (Aug. 8, 2025), https://www.texastribune.org/2025/08/08/texas-hill-country-floods-victims-names/.

[68] H. Select Comm. on Disaster Preparedness & Flooding, *Public Hearing*, at 125–26, 89th Leg., 2d C.S. (Aug. 22, 2025) (testimony of Stephanie Morris).

[69] H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, 89th Leg., 1st C.S. (July 31, 2025) (testimony of County Judge Steve Snell).

[70] H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 201–02, 89th Leg., 1st C.S. (July 23, 2025) (testimony of Carl Johnson, Chief Engineer, Texas Dep't of Transp.).

[71] *See id.* at 40–41 (testimony of Chief Nim Kidd, Tex. Div. of Emergency Mgmt.) ("The Governor so far as declared 26 Texas counties for disaster"); *see also* Act of Aug. 22, 2025, 89th Leg., 2d C.S., S.B. 3, § 16.501(1) (referencing "the disaster declaration issued by the governor…in response to the July 2025 Hill Country floods").

[72] *See* OIG Report, *supra* note 63, at 1.

# 2 PROCEDURAL HISTORY

On September 3, 2025, the Texas House of Representatives, 89th Legislature, 2d Called Session, adopted House Resolution No. 177 creating a general investigating committee on disaster response.[73] The following day, the Texas Senate adopted Senate Resolution No. 2, creating the General Investigating Committee on the July 2025 Flooding Events.[74]

The Senate Committee was charged with making a complete and thorough examination of the facts and circumstances surrounding the flooding events which occurred on or about July 4, 2025, and which resulted in the tragic loss of life and injuries to Texans. The committee was given all the powers and duties, and empowered to operate according to, the procedures prescribed by Subchapter B, Chapter 301, Government Code, and the Senate Rules of Procedure, as applicable.

The House Committee was charged with the responsibility to "conduct all inquiries into the 2025 flooding disasters, including investigating: (1) factors contributing to the floods; (2) allocation of resources to and effectiveness of flood disaster preparedness and response; and (3) operations of and coordination between local, state, and federal governmental entities with regard to flood prevention, disaster preparedness, and response…." The Committee was granted the powers of a general investigating committee under the House Rules of Procedure and Chapter 301, Government Code, and it was granted all powers granted to committees by the House Rules of Procedure and Chapter 301, Government Code.

Lt. Governor Patrick appointed the members of the Senate Committee: Sen. Pete Flores, Chair; Sen. Charles Perry, Vice Chair; Sen. Bryan Hughes; Sen. Lois Kolkhorst; and Sen. José Menéndez. Speaker Burrows appointed the members of the House committee: Rep. Morgan Meyer, Chair; Rep. Joe Moody, Vice Chair; Rep. Drew Darby; Rep. Paul A. Dyson; and Rep. Erin Elizabeth Gámez.

Even before these Committees were created, the Texas Legislature's response to the July 2025 floods began with the creation of the Senate Select Committee on Disaster Preparedness and

---

[73] H.R. 177 (Enr.), 89th Leg., 2d C.S. (Sept. 3, 2025), *available at* https://capitol.texas.gov/tlodocs/892/billtext/pdf/HR00177F.pdf#navpanes=0.

[74] S.R. 2 (Enr.), 89th Leg., 2d C.S. (Sept. 4, 2025), *available at* https://capitol.texas.gov/tlodocs/892/billtext/pdf/SR00002F.pdf#navpanes=0.

Flooding[75] and the House Select Committee on Disaster Preparedness and Flooding.[76] Those select committees, chaired respectively by Senator Charles Perry and Representative Ken King, met jointly twice during the 1st Called Session, 89th Legislature, gathering general testimony in Austin on July 23, 2025,[77] and Kerrville on July 31, 2025.[78] The House Select Committee then met separately in Austin on August 5, 2025, to consider specific legislation.[79] During the 2nd Called Session, 89th Legislature, the Senate Select Committee convened in Austin on August 20, 2025,[80] and the House Select Committee convened in Austin on August 22, 2025.[81]

The transcripts of those 2025 hearings comprise several thousand pages of testimony from county judges, emergency management coordinators, the Chief of the Texas Division of Emergency Management, the Upper Guadalupe River Authority, meteorologists, hydrologists, and members of the public. This prior work has substantially informed the further investigation conducted by the Committees.

The Committees jointly engaged Casey Garrett and Michael Massengale as expert investigators. Ms. Garrett is a former prosecutor and a practicing criminal defense attorney. Justice Massengale is a former appellate judge and a practicing commercial arbitrator. Each of them worked previously as expert investigators for the 2022 House Investigative Committee on the Robb Elementary Shooting in Uvalde, Texas.[82]

The investigation proceeded along several parallel tracks: review and synthesis of the public legislative record; independent witness interviews; review of evidence developed in other proceedings; multiple site visits to Camp Mystic; and engagement with counsel for the parties

---

[75] Press Release, Off. of Tex. Lt. Governor, Lt. Governor Dan Patrick Announces Members of the Senate Select Committee on Disaster Preparedness and Flooding (July 14, 2025), https://www.ltgov.texas.gov/2025/07/14/lt-governor-dan-patrick-announces-members-of-the-senate-select-committee-on-disaster-preparedness-and-flooding/.

[76] *See* Speaker Dustin Burrows, *Procl. Creating the House Select Committee on Disaster Preparedness and Flooding* (July 15, 2025), *available at* https://capitol.texas.gov/tlodocs/89R/schedules/pdf/PROCSelectCommDisasterPrepFloodingsigned.pdf.

[77] H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, 89th Leg., 1st C.S. (July 23, 2025) (notice), https://capitol.texas.gov/tlodocs/89R/schedules/pdf/C2362025072309001.PDF; *id.* (minutes), https://capitol.texas.gov/tlodocs/89R/minutes/pdf/C2362025072309001.PDF; *id.* (video), https://senate.texas.gov/videoplayer.php?vid=22379.

[78] H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, 89th Leg., 1st C.S. (July 31, 2025) (video), https://senate.texas.gov/videoplayer.php?vid=22430.

[79] H. Select Comm. on Disaster Preparedness & Flooding, *Public Hearing*, 89th Leg., 1st C.S. (Aug. 5, 2025).

[80] S. Select Comm. on Disaster Preparedness & Flooding, *Public Hearing*, 89th Leg., 2d C.S. (Aug. 20, 2025) (video), https://senate.texas.gov/videoplayer.php?vid=22495.

[81] H. Select Comm. on Disaster Preparedness & Flooding, *Public Hearing*, 89th Leg., 2d C.S. (Aug. 22, 2025).

[82] *See* H. Investigative Comm. on the Robb Elem. Shooting, *Interim Report* (July 17, 2022), https://www.house.texas.gov/pdfs/committees/reports/interim/87interim/Robb-Elementary-Investigative-Committee-Report-update.pdf.

to related civil litigation. The original source material for this report includes more than 150 interviews conducted by the investigators. All witnesses cooperated voluntarily.[83] The investigators reviewed audio recordings and transcripts of 911 calls, contemporaneous witness statements, and newspaper and other media reporting.

In particular, during visits to Camp Mystic across four different days, the investigators conducted separate interviews of Tweety Eastland, Edward Eastland, Mary Liz Eastland, Britt Eastland, Catie Eastland, Richard Eastland, Leslie Eastland, Craig Althaus, Betsy Althaus, and Glenn Juenke.

Throughout the investigation, the investigators have communicated with counsel for the parties to the pending civil actions arising from the flood. The investigators have attended court proceedings, including the temporary-injunction hearings held in the Travis County District Court on March 4-5 and April 13, 2026, and they have reviewed transcripts of those proceedings they were unable to attend in person.

On April 20, 2026, the Committees convened to conduct a site visit of Camp Mystic Guadalupe River in Hunt, Texas.

On April 27, 2026, the Committees met concurrently to conduct an organizational meeting to consider and adopt rules. The Committees also received a public briefing from the investigators in connection with the inquiry into the 2025 flooding event.[84]

On April 28, 2026, the Committees again met concurrently to hear invited testimony in connection with their inquiry into the 2025 flooding event.[85] The first panel of witnesses consisted of Camp Mystic leaders, including Edward Eastland, Mary Liz Eastland, Britt Eastland, and Richard Eastland. That was followed by testimony from Nim Kidd, Chief of the Texas Division of Emergency Management.

The next panel consisted of parents of Camp Mystic campers who survived the flood, and other witnesses: Dr. Julie Sprunt Marshall, Schuyler Marshall, Bolton Walters, Grant Griffin,

---

[83] This report addresses an event that remains the subject of active criminal, regulatory, and civil proceedings. Moreover, many material witnesses have been traumatized, including many children who survived the events of July 4, 2025. Throughout this process, the Committees and their investigators have strived to be mindful throughout of the privacy, dignity, and well-being of those witnesses and the families of those who lost their lives.

[84] H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, 89th Leg. (Apr. 27, 2026) (notice), https://capitol.texas.gov/tlodocs/89R/schedules/html/C3552026042710001.htm; *id.* (video), https://senate.texas.gov/videoplayer.php?vid=22681.

[85] H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, 89th Leg. (Apr. 28, 2026) (witness list), https://capitol.texas.gov/tlodocs/89R/witlistmtg/pdf/C5462026042810001.PDF; *id.* (video), https://senate.texas.gov/videoplayer.php?vid=22682.

Phillip Roberson, Charlotte Johnson, Fletcher Cordell, and Katherine Hoffman. The Committees then heard from "Heaven's 27" parents of Camp Mystic campers and counselors who died in the July 4 flood: Cici Steward, Carrie Hanna, Malorie Lytal, Allison Naylor, John Patrick Marsh, Michael McCown, and Matthew Childress.

Finally, the Committees heard testimony from representatives of the Department of State Health Services: Commissioner Dr. Jennifer Shuford, Associate Deputy Commissioner Adam Buuck, Director of Legal Services Ryan Bane, and Deputy Chief Counsel Nycia Deal.

The House Committee reported receiving 72 comments from the public in connection with the April 28, 2026, hearing.

On June 18, 2026, the Committees met concurrently to receive a final presentation from the investigators, ask questions, and concurrently adopt this report.

# 3 CAMP MYSTIC BACKGROUND

Camp Mystic is a private, non-denominational Christian summer camp for girls located in the Texas Hill Country. Campers are eligible to attend after they have completed second grade.[86] Over its 100 years of existence, generations of families have attended Camp Mystic. Many people place their daughters on the waiting list as soon as they are born. It is common for families to send sisters or cousins to attend the camp together. A 1975 *Texas Monthly* essay noted that the campers and counselors at Camp Mystic often meet life-long friends that make "a remarkable difference in all sorts of social endeavors, both in college and the years that follow it."[87]

Camp Mystic is operated by the Eastland family. Dick Eastland's grandmother, Agnes "Ag" Stacy, became familiar with Camp Mystic in the summer of 1933 when she sent her daughter to the camp. The next year, Ag herself worked at Camp Mystic as a director. In 1939, she and her husband, William Gillespie "Pop" Stacy, decided to purchase the camp.[88]

Ag and Pop, along with their two children, continuously operated Camp Mystic except for when it was leased as a rehabilitation and recovery camp for World War II veterans from 1943-1945.




[86] Camp Mystic, Camper Application, https://campmystic.com/camper-applicationv4/.
[87] Prudence Mackintosh, *The Greatest Experience of Your Life*, Texas Monthly (May 1975), https://www.texasmonthly.com/being-texan/the-greatest-experience-of-your-life/.
[88] Camp Mystic, Mystic History, https://campmystic.com/mystic-history/.

## 3.1 Camp layout

Camp Mystic sits on 725 acres near Hunt, Texas, at the confluence of the Guadalupe River and Cypress Creek. The camp is separated into two parts: the original Camp Mystic Guadalupe River which opened in 1926, and the newer Camp Mystic Cypress Lake, which opened in 2020. (Unless otherwise specified or required by context, generic references to the "camp" in this report relate to the Guadalupe River camp where flooding occurred on July 4, 2025.)




All the Camp Mystic cabins that flooded in 2025 are part of the Guadalupe River camp. That camp is divided into two distinct groups of cabins. The ten cabins on "Senior Hill" were built at higher elevations, and they housed older campers. It was not uncommon for floods to submerge the low-lying land bridge over Cypress Creek, isolating Senior Hill from the rest of the Guadalupe River camp. The only adults who stayed overnight on Senior Hill were camp counselors.

The younger campers stayed in cabins on the "Flats." Aptly named, the cabins on the Flats were built at lower elevations, were closest to the Guadalupe River, and near Camp Mystic's administrative buildings. Building elevations for selected structures on the Flats are compiled in Appendix A. Distances between selected structures on the Flats are reported in Appendix B.




There were thirteen camper cabins on the Flats. Eight were built with their backs to the steep bluff (depicted on the map in darker green). The other five camper cabins on the Flats (Bubble Inn, Twins I and II, Giggle Box, and Wiggle Inn) are located across the paved road (shown on the map as "Camp Mystic Way South").

"Rec Hall" is a large wooden structure constructed in 1927 from local cypress trees and located on the Flats side of the Guadalupe River camp. The building is a central meeting location primarily used for recreational activities such as arts and crafts, counselor skits, and dance classes during camp season. There is a U-shaped balcony above the floor of Rec Hall, accessible by a single staircase.

Other buildings located on the Flats include: the Office, connected to Kozy Korner (where senior counselors and other camp staff reside); Harrison Hall, which is the dining hall; and the camp store, known as the Commissary, which has a second-floor living quarters known as "Polar Palace" and used by the camp's female kitchen staff.

At the top of the bluff behind the long row of Flats cabins, a lookout point known as "Sky High" has a pavilion and an iconic "Mystic" sign that faces the Guadalupe River and State Highway 39.

The Federal Emergency Management Agency (FEMA) revised its Flood Insurance Rate Map (FIRM) for Kerr County, effective March 3, 2011. That map placed most of the residential cabins and central facilities of the Guadalupe River camp within a "Special Flood Hazard Area" (SFHA)[89] with several structures situated within the regulatory floodway of the South Fork of the Guadalupe River. Beginning in 2013, Camp Mystic engaged the federal Letter of Map Amendment (LOMA) process, through which a property owner may submit certified survey and engineering data in an attempt to demonstrate that an identified structure sits above the base flood elevation and was erroneously included within the Special Flood Hazard Area. FEMA approved Camp Mystic's submissions, removing approximately fifteen Guadalupe River camp structures from the Special Flood Hazard Area in 2013.[90]

### 3.2 Camp culture

Camp Mystic was touted as a rustic experience for its campers, with over thirty activities, including archery, arts and crafts, fishing, golf, guitar, horseback riding, riflery, and swimming.[91] The campers' cabins were not air conditioned. Campers did not have access to the internet, and they were not permitted electronic devices with cameras, touch screens, Wi-Fi

[89] A Special Flood Hazard Area is "[a]n area having special flood, mudflow or flood-related erosion hazards and shown on a Flood Hazard Boundary Map (FHBM) or a Flood Insurance Rate Map (FIRM)…. The SFHA is the area where the National Flood Insurance Program's…floodplain management regulations must be enforced and the area where the mandatory purchase of flood insurance applies…." Fed. Emerg. Mgmt. Agency, *Special Flood Hazard Area (SFHA)*, https://www.fema.gov/about/glossary/special-flood-hazard-area-sfha.

[90] Kerr County, Texas and Incorporated Areas, Flood Insurance Study No. 48265CV000B, at 34 (rev. May 15, 2020), https://map1.msc.fema.gov/data/48/S/PDF/48265CV000B.pdf (identifying the Mar. 3, 2011 countywide revision as the first revision to the prior effective FIS); FEMA FIRM, Panel 48265C0450F (eff. Mar. 3, 2011), available via FEMA Flood Map Service Center, https://msc.fema.gov; *see also* H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, at 143–44, 89th Leg. (Apr. 28, 2026) (testimony of Britt Eastland & Richard Eastland acknowledging the 2011 FIRM revision and its effect on Camp Mystic structures). The 2013 and 2019-2020 LOMA approvals are reflected on the FEMA Flood Map Service Center for Panel 48265C0450F and in publicly available FEMA records. *See, e.g.*, Ryan J. Foley et al., *FEMA Removed Dozens of Camp Mystic Buildings From 100-Year Flood Map Before Expansion, Records Show*, Associated Press (July 12, 2025), republished by *The Texas Tribune*, https://www.texastribune.org/2025/07/12/camp-mystic-flood-plain-FEMA/; Richard Eastland, *Why Camp Mystic's Cabins Were Out of the Floodplain*, YouTube (Mar. 23, 2026), https://www.youtube.com/watch?v=GBC-R-y_8ew, at approx. 16:50-17:10, 17:33-18:23 (recorded statement addressed to the Investigating Committees, discussing Camp Mystic's 2013 LOMA submission and FEMA's October 2013 determination removing Guadalupe River camp structures from the SFHA).

The federal LOMA process generally, and the Camp Mystic LOMAs in particular, have drawn significant public attention and are a matter of continuing concern to the Heaven's 27 families, to Camp Mystic, and to the Texas Legislature, which addressed the LOMA pathway directly in the Heaven's 27 Camp Safety Act. *See* Tex. S.B. 1, 89th Leg., 2d C.S. (2025) (Enr.); Tex. Health & Safety Code §§ 141.002, 762.001; 51 Tex. Reg. 570 (Jan. 30, 2026) (DSHS adoption of amendments to 25 Tex. Admin. Code Ch. 265, Subchapter B, including new § 265.36 (Floodplain Safety Requirements)). This report's findings as to how Camp Mystic prepared for, and responded to, the events of July 4, 2025, do not turn on the LOMA history, and resolving any controversies regarding the LOMA determinations was therefore outside the scope of this investigation.

[91] Camp Mystic, Activities, https://campmystic.com/activities/.

capabilities, or gaming features. Even the counselors assigned to camper cabins could only access their mobile phones during time off; otherwise, their phones were surrendered to and kept at the camp's office.

Independence and personal growth were encouraged for Camp Mystic campers. Campers had limited communication with their parents during the camp sessions, which lasted for up to a month. Parents were not allowed phone calls with campers, although letters and emails were encouraged.

Camp Mystic has identified itself as a "nondenominational Christian camp." Organized prayer and Bible studies occured multiple times daily, with devotionals planned every morning after breakfast and every evening in the cabins. On Sundays, campers were required to wear white, and a vespers service would be held in the evening.[92]

Both counselors and campers accorded due respect to the Eastland family, and the rules of the camp were taken seriously. In similar fashion, the younger generation of Eastland family camp directors deferred to Dick Eastland's unquestioned status as the patriarch and leader of Camp Mystic. Some former campers have described the culture as one of "obedience." However characterized, there appears to have been a general culture that prioritized rule-following and acceptance of authority over the exercise of individual judgment and decision-making.

### 3.3 Permanent camp staff

Dick Eastland and his wife, Tweety, took over as executive directors of Camp Mystic in 1987. Dick and Tweety were high school sweethearts. They married in 1975 while attending The University of Texas at Austin. A year later, they moved to Camp Mystic to work under the direction of Dick's grandmother, Agnes Stacy, and the camp's executive directors Inez and Frank Harrison.[93]

Together, Dick and Tweety jointly ran the day-to-day operations of Camp Mystic.

Dick was the patriarch and he called the shots at Camp Mystic. Variously described by the senior staff as "large and in charge," "The General," and "The Eagle," Dick oversaw the logistical and regulatory side of camp operations. He was known to micromanage the things that were most important to him, taking personal control over assigning campers to their

---

[92] Camp Mystic, Inspiration, https://campmystic.com/inspiration/.

[93] *See* H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, at 91, 89th Leg. (Apr. 28, 2026) (testimony of Edward Eastland, Co-Director, Camp Mystic Guadalupe River) (confirming, in colloquy with Sen. Menéndez, that Dick and Tweety Eastland "had been working there since they graduated from college" and that his "great-grandmother in 1939 purchased the camp").

specific cabins and organizing significant traditions like campfire nights. He taught a generation of girls to fish.

Dick loved operating Camp Mystic, and he was admired and respected by the camp community. He helped to found the Camping Association for Mutual Progress ("C.A.M.P."), an organization devoted to raising health and safety standards for all camps.[94]

Dick was also the member of the camp staff most focused on weather safety. After the 1987 flood, he advocated for and successfully helped to establish an automatic flood alert and rain gauge system for the region. Dick also served multiple terms on the board of the Upper Guadalupe River Authority (UGRA), a position he held at the time of his death on July 4, 2025.[95] He was aware of the area's topography and its propensity to flood, and he shared that information with his family members who helped to run the camp.[96]

By contrast, Tweety focused her attention on the relational and human elements of the camp. Identifying as a self-described "people person" rather than a "numbers person," she led Bible studies and hosted devotionals. She taught a popular cooking and baking class, and she specialized in looking out for homesick campers. By 2025, she had begun to step back from some responsibilities at the camp.

While living and working at Camp Mystic, Dick and Tweety raised their four sons: Richard, Britt, James, and Edward.

Of the four Eastland sons, James was the first to work full-time at Camp Mystic. He began in 2004, the same year Dick was treated for cancer. Working with his father, James initiated plans to build a second campsite at Camp Mystic, an idea that was eventually realized as Camp Mystic Cypress Lake.

Richard, after graduating from college, moved to Kerrville to be an English teacher. He began working for Camp Mystic during the summers in 2002, and he was responsible for feeding everyone. He eventually went to culinary school. In 2012, Richard married his wife, Leslie, and he began working full-time at Camp Mystic. Richard continues to serve as the executive chef and kitchen manager for both camps at Camp Mystic.

---

[94] Information about C.A.M.P. can be found on its website at https://www.camp-tx.com.

[95] H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, at 86, 89th Leg. (Apr. 28, 2026) (testimony of Richard Eastland).

[96] On March 23, 2017, Dick forwarded to family members a UGRA email with links to a press release and the "Be Flood Aware" video discussed earlier in this report. *See supra* notes 2-4 and accompanying text. The email recipients included Tweety, Richard and his wife Leslie, Britt and his wife Catie, Edward and his wife Mary Liz. Dick's message stated: "Great YouTube video. Please watch…."

Edward began working at Camp Mystic during the summers while he attended The University of Texas. His future wife, Mary Liz, was a lifetime Camp Mystic camper, counselor, and even a member of the "Big Three" (as explained below, the most senior category of counselor). Mary Liz also worked summers at Camp Mystic along with Edward, while she attended the Baylor School of Nursing. The couple married after college graduation, and they moved to Camp Mystic to work full-time. Mary Liz, who was a registered nurse, served as medical director, hired the other nurses, and helped with counselor recruiting.

Though James had been viewed by many as Dick's heir apparent to lead Camp Mystic, in 2015 he died suddenly from a previously undiagnosed heart condition. His tragic passing was a catalyst that brought the remaining Eastland brother, Britt, back to help the family to run the camp.

Britt had been practicing law as a criminal defense attorney in San Antonio, living there with his wife Catie, a school teacher. Though they had no prior expectation of working at Camp Mystic, after coming to help out after James's death, they decided to remain.

The opening of the Cypress Lake camp in 2020 created an opportunity for the beginnings of a leadership transition. While retaining the title of executive director, Dick decided to name Britt and Catie as the directors of Cypress Lake. At the same time, Dick named Edward and Mary Liz as the directors of the Guadalupe River camp.

Despite his director title, Edward still considered Dick to be in charge of the Guadalupe River camp. Edward's responsibilities included bookkeeping, communications with camper parents, updating camper data, and interfacing with the state inspectors. In addition to her duties overseeing the nurses, Mary Liz began to take over some responsibilities from Tweety, and she even moved into the office that previously had been used by Tweety. With Edward's help, Mary Liz also oversaw counselor training, including emergency training.

Although by 2025 Tweety had stepped back from some camp duties, that was not the case with Dick. Despite naming Britt, Edward, and their wives as directors of the two camps, he had not receded from his role as the camp's leader. He continued to occupy his office, and in camp decision-making, he retained the power of veto.

Also living year-round at Camp Mystic in 2025 were Craig and Betsy Althaus. The Althauses, who were long-time family friends of the Eastlands, began to work full-time for Camp Mystic in 2002. Craig worked as the maintenance supervisor, overseeing facilities and equipment, daily activities of the grounds crew, and security. Betsy served as Assistant Director, primarily working in the office.

## In Memoriam



### Richard "Dick" Eastland

*Age 70 • Executive Director, Camp Mystic*

Richard "Dick" Eastland (Hunt, TX) was the beloved husband of Willetta (Tweety) Eastland and the father of four sons, Richard, Britt, James and Edward. Dick met Tweety at The University of Texas, and they married their junior year of college. After graduation, the couple moved to Camp Mystic in Hunt, Texas, where they made their home and life together.

Dick graduated from The University of Texas with a degree in Business Administration, was a member of Sigma Alpha Epsilon fraternity and a life member of the Texas Exes. He was an avid handball and tennis player and loved bird hunting and fishing with family and friends. He loved hosting family yard parties and attending his grandchildren's school and sporting events, as well as celebrating holidays with them.

Dick shared his time and leadership skills, coaching his sons' Little League baseball and basketball teams and with several organizations serving the Texas Hill County, including the Hunt School Board and the Upper Guadalupe River Authority, as well as playing a significant role in founding the Camping Association for Mutual Progress.

### 3.4 Seasonal camp staff

In addition to the year-round personnel, Camp Mystic employed seasonal staff.

- **Gatekeeper.** Camp Mystic employed a summer gatekeeper. During the summer of 2025, **Francis Blackwell-Loper** lived in the small cabin at the entrance of Camp Mystic. Francis is part of a multi-generational Camp Mystic family, and during the school year she works as a teacher in Lubbock, Texas.

- **Night watchmen.** Camp Mystic did not have 24-hour security, but it engaged two watchmen who alternated working a daily shift of 10:00 p.m. to 2:00 a.m. (3:00 a.m. on Saturdays). The watchman on duty the night of July 3, 2025, was **Glenn Juenke**, a retired Houston Police officer who also briefly worked as police chief of Ingram, Texas, near Hunt. He began working at Camp Mystic in 2022.

- **"The Big Three."** The Big Three were a group of handpicked, senior counselors, usually around 20 years old and in their third or fourth year as a counselor. These young women served as the faces of their camp session, and they reported directly to the camp directors. Because of their elevated status, they received an extra weekend of specialized training in May before the start of the first camp session. Unlike regular counselors, the Big Three did not live in a cabin with children, and they were not assigned responsibility for a specific group of campers. Instead, they lived in Kozy Korner, a building attached to the camp's main office. The Big Three held the titles of Program Director, Activities Director, and Tribe Coordinator. Their primary duties included supervising the other counselors, creating campers' schedules, and making daily announcements. Because of their roles, the Big Three were allowed to keep their personal mobile phones, while the regular counselors had to turn them in to the office after their time off. The Big Three also were provided with camp walkie-talkies so they could communicate with the camp directors, grounds crew, and night security.

- **Counselors.** Camp Mystic historically has assigned at least three counselors to each cabin, with a preference for hiring former campers. After finishing their senior year of high school, girls were eligible to serve as a first-year counselor, also known as a counselorette, or "Ette" for short. Ettes typically were paired with older, more experienced counselors. Many of the counselors preferred being assigned to older campers because the younger campers required constant supervision and assistance, including helping with hair washing, bed wetting, and severe homesickness. The opening of the Cypress Lake camp increased the hiring need for counselors, and Camp Mystic resorted to staffing many cabins with two counselors—in some cases, two Ettes. This created logistical problems because if one counselor left (or was on time off), only one counselor remained to care for the needs of the entire cabin. A single cabin counselor effectively was cut off from the rest of the camp because the counselors were prohibited from keeping mobile phones in the cabins, they also did not have walkie-talkies to communicate with other camp staff, and they could not leave a cabin with campers completely unsupervised.

- **Photographers.** Camp Mystic employed counselor-aged photographers to document the campers' daily experiences so their families could see what they were doing. The photographers' primary duty was to walk around to the various activities and to take pictures of every girl, every day. These thousands of photos were then uploaded daily, so parents could review the images and download pictures of their children. There were two camp photographers working during the second session in 2025.

- **Nurses**. There were three nurses on duty at the Guadalupe River campus infirmary, called "Heaven Can Wait." The nurses were available 24 hours daily to care for the campers. The nurses reported to Mary Liz Eastland, also a registered nurse.

- **Kitchen workers**. A sizeable kitchen staff was required to feed approximately 800 people across two camps, three times daily during camp season. They were instructed to maintain a detached and professional relationship with respect to campers. Camp Mystic worked with a staffing company which arranged for foreign citizens to visit and work during camp season on J-1 visas. This staff was made up of young people who were in college, seeking the opportunity to visit the United States. In the summer of 2025, the prep cooks, dining hall attendants, and camp-store workers all came from Poland. **Frank Albritton**, Tweety Eastland's brother who stayed in a cabin called Squeeze Inn, also worked in the kitchen as the early morning cook for the Guadalupe River camp.

- **Grounds crew**. The grounds crew was comprised entirely of men from Mexico, working seasonally on work visas for the summer. Many of these laborers returned to Camp Mystic annually, recruiting family members and friends to assist. The workforce was multi-generational, and they were supervised by Craig Althaus. They were instructed to remain strictly "invisible," having no contact with campers.

### 3.5 Residential assignments for non-counselor staff

The residential assignments for camp staff were a factor when Camp Mystic flooded on the morning of July 4, 2025, separating some parts of the Guadalupe River camp from others.




A group of buildings is separated from the rest of the Guadalupe River camp by a small creek called Edmunson Creek, also known as "Bubble Gum Creek." These buildings included:

- ***Ranch House***, home to Edward and Mary Liz Eastland, and their four sons.
- ***Bee Hive***, assigned to Meredith Martin, a seasonal office assistant.
- ***Cypress Hollow***, home to Dick and Tweety Eastland.

Another cluster of buildings was situated between Edmunson Creek and the camper cabins on the Flats. Those buildings include:

- ***Pop Inn***, home to Richard and Leslie Eastland, but unoccupied in the summer of 2025 due to renovations.
- ***Squeeze Inn***, home to Frank Albritton.

- ***Granny's House***, temporary residence for Richard Eastland during the summer of 2025.
- ***Sugar Shack***, home to Craig and Betsy Althaus.
- ***Uptight***, second-story living quarters for female seasonal workers, located above the garage.[97]
- ***Heaven Can Wait / Infirmary***, assigned residence for three female nurses.

Finally, some staffers resided near the cabins on the Flats:

- ***Kozy Korner***, attached to the front office, housed two camp photographers and a babysitter for the Eastland grandchildren. The "Big Three" also slept in Kozy Korner.
- ***Polar Palace***, above the Commissary, housed six of the female Polish kitchen staff.

Excluding the regular counselors who resided with campers in cabins, there were at least 39 adults on the Flats-side of Edmunson Creek during the July 4 flood event at Camp Mystic.

| **Building** | **Number of non-cabin-counselor adults** | **Occupants** |
|---|---|---|
| Granny's House | 1 | Richard Eastland |
| Sugar Shack | 2 | Craig and Betsy Althaus |
| Squeeze Inn | 1 | Frank Albritton |
| Uptight | ≥10 | 10-15 female staff slept through the storm in Uptight, the dormitory over the garage |
| Garage | ≥9 | at least 9 grounds crew were stranded on the Flats-side of Edmunson Creek, sheltering in the garage |
| Heaven Can Wait (infirmary) | 3 | seasonal nurses |
| Kozy Korner | 7 | "Big Three" senior counselors; two camp photographers; office assistant; and a babysitter |
| Polar Palace | 6 | female seasonal kitchen workers |
| **Total** | **≥39** | |

[97] *See* Tr. of Hr'g on Application for Temp. Inj. (Day 1) at 75–76, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (Dist. Ct., Travis County, Tex. Apr. 13, 2026) (testimony of Edward Eastland).

### 3.6 Emergency preparedness

A one-page document titled "Emergency Instructions" was displayed in each building at the Guadalupe River camp, and that same document also was placed in the binders distributed to counselors and in the "Camp Mystic Employee Guide to Health & Safety."

## EMERGENCY INSTRUCTIONS

I. Accidents (Horse falls, falling injuries, cuts, etc.)

1. Be sure that the victim has an open airway and is breathing.
2. Do not move the victim.
3. Calm the victim.
4. Send someone for the nurse.
5. Stop bleeding with pressure directly over the injury if she has an open wound.

II. Floods

In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

III. Tornado

1. Stay inside cabins.
2. Provide for cross-ventilation by opening windows.
3. Take cover under beds.
4. Stay inside cabins unless given official notice to do otherwise.

IV. Fires

Empty cabins immediately.

FLATS: All campers on flats report to the flagpole. One counselor should be in front of the cabin group and two behind, after you have checked your cabin and are positive that every camper is out.

SENIOR HILL: All campers on Senior Hill go immediately to the Golf Box on the Golf Course, using the same procedure as the Flats . . . that is, checking the cabins to make sure that everyone is out. Each cabin must stay together. Do not return to your cabin or leave your place of waiting until told to do so by the office. Never go watch the fire.

V. Helpful Information Regarding the Infirmary

If you observe any physical illness, an unneeded loss of weight, or a camper constantly feeling bad, please see to it that she checks with the nurse. You as a counselor can help the nurses by keeping a close check on your campers and seeing to it that they get to the doctor on the day that he is at camp so that the nurses will not have to make an unnecessary trip into town.

Camp Mystic also maintained an emergency procedures binder at the front office of the Guadalupe River camp. During the annual state inspection, Edward Eastland would show this binder to the inspector.

The binder included tabbed sections for "Accident," "Flood," "Tornado," "Fire," and "Crisis Response." A pocket on the inside front cover contained a page of "Waterfront Rules." The information behind the tabs for accident, flood, tornado, and fire were word-for-word replications of the information on the one-page emergency instructions. An additional loose page included a flood supplies checklist for the storage shed on Senior Hill.[98] The checklist included a can opener and cases of cereal, bottled water, bread, peanut butter, jelly, plastic silverware, paper cups, and apple juice. The checklist also included the following additional instructions "in case of flood":

1. Please contact the office using the phone outside of the Rifle Range: Important Numbers to dial:

    a. … — Ranch House (Dick and Tweety)

    b. … — Betsy

    c. … — Program Director

2. Most Floods come and go within a few hours but if it is still flooding during a meal time please pass out the supplies to everyone on the hill

    a. <u>If it is still raining</u> — Do your best to deliver food to each cabin on the hill. Ask 1 counselor in each cabin to help collect and deliver food. Use empty boxes in the shed or in the cabins to carry a collection of food and supplies to each cabin.

    b. <u>If the raining has stopped</u> — Make a makeshift buffet line on the road outside of this shed

## 3.7 Communications and weather monitoring

Cellular service in and around Camp Mystic is generally unreliable. Communication nevertheless was possible within the camp and between the camp and the outside world.

In addition to intermittent mobile phone service, Camp Mystic had broadband internet service with a fiber connection. There also was a Wi-Fi network to connect to the internet in any Guadalupe River camp building that had air conditioning. This meant that the non-counselor

---

[98] The Senior Hill "Flood Supplies Checklist for Storage Shed" kept in the office with the emergency procedures binder indicated that it had been updated on July 26, 2012. A later version of the same document, updated June 13, 2014, was displayed in the Senior Hill storage shed. The main difference in the 2014 revision was an added paragraph stating in case of flood: "DO NOT LET ANYONE GET CLOSE TO THE WATER. It is very dangerous and even a few inches of rushing water can knock a person off their feet. Please inform all counselors to keep their campers in their cabins."

staff members who carried mobile phones could and did use them for phone calls and text messaging, particularly when connected to the Wi-Fi network.

Due to the camp's broadband internet access, the staff had the ability to access weather information available to the general public. In addition to weather alerts available on the internet and communicated directly to mobile phones, Kerr County provided an opt-in "Code Red" weather reporting service that communicated weather alerts based on location.

Dick Eastland habitually monitored the weather. In addition to external sources, he had a consumer-grade AcuRite 5-in-1 Weather Sensor installed outdoors near his Cypress Hollow residence, and he was able to monitor that device from his mobile phone. On the night of July 3, 2025, he repeatedly launched the MyAcurite, NOAA Radar, and Apple Weather applications on his phone, as well as visiting several websites, including the National Weather Service, the Guadalupe-Blanco River Authority, and the United States Geological Survey site for water-gauge data.

Walkie-talkies were used to communicate at the camp, supported by an antenna at top of the bluff, near Sky High. The radios were generally available to the adult camp staff, including the Big Three—but not the other counselors. When a message was communicated by walkie-talkie, it generally could be heard by every other person near an operative walkie-talkie (i.e. assuming that the walkie-talkie was on and its volume was not turned down, which was not always true for every walkie-talkie, particularly at night).

A public address system stationed in the office was used regularly, primarily by the Big Three senior counselors. They orally communicated messages to campers on site and played "Taps" at the end of each night. Although the office eventually flooded early in the morning of July 4, 2025, there is no indication that the loudspeakers were not fully operative and available to be used to communicate evacuation instructions.

# Timeline of the 2025 Flooding at Camp Mystic

*Hunt, Kerr County, Texas · June 29 – July 4, 2025*

## PRECEDING DAYS

*Antecedent conditions and forecast posture*

| | |
|---|---|
| **June 29** | 557 campers arrive at Camp Mystic for the second session. |
| **July 2** | Weather forecasts rain; DSHS inspection occurs at Camp Mystic. |
| **July 3** | National Weather Service issues Flood Watch. |

## JULY 4, 2025

*All times Central*

| | |
|---|---|
| **1:14 a.m.** | **NWS issues Flash Flood Warning.** |
| **1:45 a.m.** | Dick Eastland radios son Edward and the grounds crew to move equipment. |
| **2:11 a.m.** | Night watchman reports flooding to retired fire chief. |
| **2:14 a.m.** | Edmundson/Bubble Gum Creek becomes impassable. |
| **2:30 a.m.** | Bug House and Look Inn counselors run to the office to report water in the cabins. |
| **2:33 a.m.** | Dick texts wife Tweety reporting over four inches of rain. |
| **2:37 a.m.** | Dick and Edward drive Bug House / Look Inn counselors back to the cabins. |
| **2:55 a.m.** | Gate guard radios for help and reports flooding inside the guard house. |
| **3:00 a.m.** | **Dick decides to evacuate Bug House and Look Inn.** |
| **3:11–3:19** | Bug House, Look Inn, and Hang Out evacuated to Rec Hall by vehicle. |
| **3:20–3:30** | Tumble Inn I & II evacuated by vehicle; Jumble House directed to walk to Rec Hall. |
| **3:30–3:40** | Nut Hut and Chatterbox self-evacuate up the hill; Dick drives to Bubble Inn. |
| | Edward assists at Twins I & II; the night watchman assists at Giggle Box and Wiggle Inn. |
| | Dick radios for help with Bubble Inn. |
| **3:51 a.m.** | Dick is submerged. |
| **4:09 a.m.** | Edward is submerged and swept to the Bug House tree with campers and counselors. |
| **4:19 a.m.** | 911 call reports rescue of two Twins campers downriver. |
| **5:00–7:00** | Other adults help survivors descend from trees and roofs. |

# 4 Camp Mystic July 2025 Flood Narrative

## 4.1 Counselor training

The 2025 Camp Mystic second-session counselors arrived on June 27, 2025, for two days of training. The Guadalupe River camp counselor training was primarily conducted by Mary Liz Eastland, with assistance from Edward. It focused on interacting with the campers, leading devotionals, and youth-protection training and testing.

The counselors received a binder containing information they might need during the term. The binders provided to the Guadalupe River counselors included one page of "Emergency Instructions," which is the same document displayed in each cabin at the Guadalupe River camp (and depicted in section 3.6 above).[99]

The Emergency Instructions had five sections: "Accidents (Horse falls, falling injuries, cuts, etc.)," "Floods," "Tornado," "Fires," and "Helpful Information Regarding the Infirmary." With respect to floods, it stated:

> In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

One counselor reported that during training, the group read this paragraph together. Some counselors have reported that they then were told not to worry because "that's never going to happen," as Edward Eastland knocked on wood.

At least one counselor reported consulting the binder for guidance during the July 4 flood. Others stated that they recalled the shelter-in-place instruction from the training at orientation.

[99] Other contents in the binder included documents titled "Counselor Responsibilities," "What is a Camp Counselor?," and "Set Boundaries EARLY!"

Unlike the section on floods, the section on fires included instructions about how and where to relocate from cabins:

> Empty cabins immediately.
>
> FLATS: All campers on flats report to the flagpole. One counselor should be in front of the cabin group and two behind, after you have checked your cabin and are positive that every camper is out.
>
> SENIOR HILL: All campers on Senior Hill go immediately to the Golf Box on the Golf Course, using the same procedure as the Flats ... that is, checking the cabins to make sure that everyone is out. Each cabin must stay together. Do not return to your cabin or leave your place of waiting until told to do so by the office. Never go watch the fire.

This procedure for evacuating cabins in response to fires—which expressly assumed *three counselors per cabin* by requiring one counselor to lead the group and two counselors to follow—was not rehearsed by the counselors with campers upon their arrival. However, seven cabins on the Flats were assigned only two counselors. These two-counselor cabins included those with the youngest campers—Bubble Inn, Twins I, and Twins II.

### 4.2 Arrival of second-session campers

Sunday, June 29, 2025, marked the first day of the second session at Camp Mystic, and 557 campers arrived—386 to attend the Guadalupe River camp, and 171 for the Cypress Lake camp. Some arrived by bus, and others were dropped off by their parents. For those who chose to drive directly to the camp, the drop-off procedure required parents to stay in the vehicle while the camper got out with her trunk. The Eastlands, camp staff, and counselors welcomed the arriving girls. If a parent showed concern, it was common for Dick Eastland to soothe the family's anxiety. He reassured the parents that "we've got your girl," or "don't worry, Camp Mystic is the safest place on earth."

Richard and Leslie Eastland's two daughters were among the second-session group of campers. One was assigned to Bug House, and the other was assigned to Nut Hut.

### 4.3 Wednesday, July 2, 2025

July 2, 2025, was the day of the annual inspection conducted at Camp Mystic by the Department of State Health Services.[100] As in previous years, the inspector assigned to Camp Mystic was Maricela Zamarripa, who interacted primarily with Edward Eastland as she toured camp facilities and completed a mobile-inspection report. The items on the report covered a broad spectrum of requirements applicable to youth camps, including "Required Emergency Plans." That part of the inspection report incorrectly affirmed Camp Mystic's compliance with the requirements:

| Required Emergency Plans | |
| --- | --- |
| **Is there a written plan of procedures to be implemented in case of a disaster, serious accident, epidemic, or fatality formulated and posted in the camp's administrative on-site office or location?** | Yes |
| **Are all camp staff and volunteers made aware of the plan of emergency to be implemented during the staff-training program or volunteer briefing?** | Yes |
| **Is there documentation of this training kept at the camp's administrative on-site office or location?** | Yes |

This report was incorrect in several respects. While there was a written and posted plan of emergency procedures, it did not address epidemics or fatalities. Additionally, to the extent it is fairly inferred that the "written plan of procedures" referenced in a DSHS inspection should have been one that complied with applicable DSHS rules, the written Camp Mystic emergency plans were deficient because, among other things, they did not include procedures for evacuation in the event of a flood.[101] Not only was there no such evacuation plan in writing,

[100] As described by DSHS Associate Deputy Commissioner for Consumer Protection Adam Buuck, as of July 2025, DSHS licensed approximately 375 youth camps and aimed to inspect each of them annually during the June-August operational season. Inspections were performed by registered sanitarians whose certification was "pointed towards sanitation…public health, like clean water and disposable waste," not emergency response. Using 86 inspection criteria drawn from the 15 standards in Tex. Health & Safety Code § 141.0025 and 25 Tex. Admin. Code § 265.15(k), inspectors verified that a camp had a written emergency plan addressing "disaster, serious accident, epidemic, or fatality," that the plan was posted in every building, that staff and volunteers had been trained on it, and that the 1:10 supervisor-to-camper ratio was met. However DSHS did not "approve" the plan's substance. *See* Hearing on C.S.S.B. 1 Before the S. Select Comm. on Disaster Preparedness & Flooding, 89th Leg., 2d C.S. 8, 11, 28–29 (Aug. 20, 2025); *see also* H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, at 446–47, 89th Leg. (Apr. 28, 2026).

[101] *See* 25 Tex. Admin. Code § 265.15(k) (2024) (superseded by 25 Tex. Admin. Code § 265.31, eff. Feb. 2, 2026) (the plan "shall include procedures for emergency shelter and for the *evacuation* of each occupied building and facility" (emphasis supplied)).

camp staff were not trained on flood evacuation either. Because such training did not happen, it could not have been documented.

Nevertheless, the completed report was signed by Zamarripa (identified as "Inspector/Sanitarian") and by Edward Eastland (as "Owner/Operator/Manager/PIC").

Also on July 2, weather forecasts began to suggest heavy rain in the Texas Hill Country for the next few days.[102] The Texas Division of Emergency Management issued a press release announcing that it had "activated state emergency response resources in anticipation of increased threats of flooding in parts of West and Central Texas heading into the holiday weekend."[103] It noted that the National Weather Service reported "heavy rainfall with the potential to cause flash flooding is anticipated across West Texas and the Hill Country beginning tonight and is expected to last a few days. Texans are encouraged to monitor local forecasts and avoid driving or walking into flooded areas."[104] At 8:10 p.m., TDEM issued an email bulletin to its emergency management partners in local government, alerting them of a "Situational Awareness Call for Severe Weather Affecting the State of Texas" scheduled for a videoconference at 10 a.m. the next morning.

Kerr County Emergency Management Coordinator (EMC) William B. "Dub" Thomas worked a full day, despite not feeling well.[105] He previously had requested and had been approved for personal leave the next day, July 3.[106]

## 4.4 Thursday, July 3, 2025

The sky was cloudy and misty throughout the day as the campers participated in their activities on July 3.

TDEM conducted its regular 10:00 a.m. videoconference for its local-government emergency management partners. Kerr County EMC Thomas was off duty, at home, and sick in bed; he did not participate in the call. No other representative of Kerr County is known to have done so.

---

[102] *See* H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 32–33, 89th Leg., 1st C.S. (July 23, 2025) (testimony of Nim Kidd, Chief, Tex. Div. of Emergency Mgmt.).

[103] Press Release, Tex. Div. of Emergency Mgmt., *TDEM Activates State Emergency Response Resources Ahead of West, Central Texas Flood Threat* (July 2, 2025), https://tdem.texas.gov/press-release/7-2-25. When a resource is "activated" by TDEM, it has been deployed in the field, coordinated with local officials, and ready near or in the hazard area for immediate response.

[104] *Id.*

[105] *See* H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 36–37, 89th Leg., 1st C.S. (July 23, 2025) (testimony of William B. "Dub" Thomas, Emergency Management Coordinator, Kerr Cnty.).

[106] *Id.*

TDEM later published another press release, announcing an increase in the readiness level of the Texas State Emergency Operations Center and the activation of additional state emergency resources.[107] The resources activated by July 3 included Swiftwater Rescue Boat Squads, Game Wardens, rescue boat teams, and Blackhawk and other helicopters with hoist capability to assist with flood rescues.

At 1:18 p.m., the National Weather Service issued the following Flood Watch covering a portion of South Central Texas, including Kerr County and Camp Mystic:

> ...FLOOD WATCH IN EFFECT THROUGH FRIDAY MORNING...
>
> * WHAT...Locally heavy rainfall could cause flash flooding across portions of South Central Texas. Rainfall amounts of 1 to 3 inches with isolated amounts of 5 to 7 inches are possible.
>
> * WHERE...A portion of south central Texas, including the following counties, Bandera, Edwards, Kerr, Kinney, Medina, Real, Uvalde and Val Verde.
>
> * WHEN...Through Friday morning.
>
> * IMPACTS...Excessive runoff may result in flooding of rivers, creeks, streams, and other low-lying and flood-prone locations. Creeks and streams may rise out of their banks.
>
> * ADDITIONAL DETAILS...
> - A moist tropical airmass combined with a slow moving storm system will bring rounds of scattered to widespread showers and storms with heavy rain rates possible.
> - http://www.weather.gov/safety/flood

[107] Press Release, Tex. Div. of Emergency Mgmt., *TDEM Increases Readiness Level of State Emergency Operations Center, Activates Additional State Emergency Response Resources for Rain and Flood Threats* (July 3, 2025), https://tdem.texas.gov/press-release/7-3-25; *see also supra* note 103 (explaining "activation" of TDEM resources).

PRECAUTIONARY/PREPAREDNESS ACTIONS...

You should monitor later forecasts and be alert for possible Flood Warnings. Those living in areas prone to flooding should be prepared to take action should flooding develop.[108]

A flood *watch* means conditions are favorable for flooding to develop, but flooding has not yet occurred. The National Weather Service describes the flood watch as an indication that people in the watch area should stay alert and be ready to act.[109] However, Camp Mystic had no protocol to do anything different at the camp when a flood watch was in effect.

Around 2:00 p.m., Kerr County EMC Thomas briefly woke and checked his phone. He perceived "no local rainfall or any indication of elevated risk," and he returned to rest.[110] That afternoon and evening, Kerr County Judge Rob Kelly was out of the county, preparing his Lake Travis lake house for a family gathering.[111]

Unaware that EMC Thomas was off duty that day, the TDEM liaison assigned to Kerr County unsuccessfully tried to contact him. The TDEM liaison also was unaware of any delegate assigned to act in EMC Thomas's absence.

For dinner, campers ate fajitas in the dining hall starting at 6:00 p.m. Afterwards, the weather was sufficiently clear that a prayer service known as "Ag's Vespers" could be held outdoors. Wearing all white, the campers proceeded from the dining hall to Chapel Hill, where they listened to Tweety and Leslie Eastland reading Scripture.

Following vespers, Leslie Eastland departed the camp for the rental home her family used in Hunt while Pop Inn was being renovated. Richard Eastland retired for the night on the campgrounds at Granny's House, knowing that he would have to rise around 3:00 a.m. to begin cooking holiday meals for both camps. The rest of the camp gathered at Rec Hall for counselor skits, a highly anticipated event where the counselors performed for the campers. Counselors with the night off were able to leave the camp starting at 9:00 p.m. The skits ended around 9:30 p.m.

---

[108] Nat'l Weather Serv., Weather Forecast Office, Austin/San Antonio, Tex., *Flood Watch*, VTEC O.NEW.KEWX.FA.A.0003 (July 3, 2025, 1:18 PM CDT), https://mesonet.agron.iastate.edu/wx/afos/p.php?pil=FFAEWX&e=202507031818 (archived at Iowa Env't Mesonet, Iowa State Univ.).

[109] *See* Nat'l Weather Serv., *Flood Warning VS. Watch*, https://www.weather.gov/safety/flood-watch-warning.

[110] H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 36–37, 89th Leg., 1st C.S. (July 23, 2025) (testimony of William B. "Dub" Thomas, Emergency Management Coordinator, Kerr Cnty.).

[111] H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 21, 89th Leg., 1st C.S. (July 31, 2025).

Campers returned to their cabins to prepare for bed. One counselor from the Nut Hut cabin went to check on her best friend, a fellow Ette assigned to Bubble Inn. When she arrived, she found her friend playing music and having a joyful dance party with the Bubble Inn campers. She said goodnight and returned to her cabin.

None of the permanent staff at Camp Mystic who were interviewed as part of this investigation reported contemporaneous knowledge on July 3 of the Flood Watch issued that day, either when it was issued in the afternoon, or at any later time before retiring that evening. Camp staff uniformly reported going to bed without any subjective awareness of the possibility for severe weather overnight. Similarly, Kerr County Sheriff Larry Leitha reported that he went to bed on July 3 with "no idea to elevate the preparedness posture with the information we had at the time,"[112] even though the county's emergency management plan required "Increased Readiness."[113]

Around 9:45 p.m., night watchman Glenn Juenke arrived for his shift, knowing that rain was coming. Upon arrival, he learned from Craig Althaus that a group of kitchen staff were stranded in Johnson City, where their borrowed camp vehicle had broken down.

At 10:00 p.m., Edward Eastland radioed for a volunteer to pick up the stranded staff in the camp van. A kitchen worker volunteered, and he left the camp.

As was customary, "Taps" was played over the loudspeakers at 10:15 p.m. to signal it was time for lights out. The Big Three completed their rounds to ensure the campers were asleep, and they returned to their living quarters at Kozy Korner, connected to the main office.

At Cypress Hollow, Tweety went to bed. Dick stayed up, watching television and monitoring the weather.

At 11:00 p.m., Glenn saw lights on in a fishing shack near Ranch House, and he went to turn off the lights. He found Edward there, labeling campers' fishing poles for class the following day. Edward then returned home and went to bed shortly afterward.[114]

As the directors and staff of Camp Mystic went to bed on July 3, the Flood Watch was still in effect, but nobody was aware of it, and nobody was exercising additional vigilance, with the likely exception of Dick. There also was no outreach from Kerr County or its local government partners to alert the camp about the Flood Watch or any expectations of severe weather.

---

[112] *Id.* at 28–29.

[113] Kerrville/Ingram/Kerr County Basic Plan at BP-31. As noted above, the Basic Plan's indicative actions for Increased Readiness "may include increased situation-monitoring, reconnaissance of known trouble spots, deploying warning signs." *Id.*

[114] *See* Tr. of Hr'g on Application for Temp. Inj. (Day 1) at 128–29, *Steward v. Camp Mystic, LLC*, No. D-1-GN-26-000758 (Dist. Ct., Travis County, Tex. Apr. 13, 2026) (testimony of Edward Eastland).

## 4.5 Friday, July 4, 2025 — early pre-flood hours

As midnight passed, several of the counselors who had gone to town for dinner and shopping on their scheduled night off still had not returned. The rain intensified. The counselors did not want to drive in the weather, but they braved the conditions and made it back around 12:45 a.m. They checked in with Francis Blackwell Loper as they passed through the gate, and they turned in their mobile phones to the Big Three before returning to their assigned cabins.

Dick was awake at his home. Data collected from his phone shows that he was checking it constantly. He monitored his AcuRite app for information from his personal rain gauge. He looked at radar images and checked various news sources.

At 1:05 a.m., Glenn patrolled the camp in full rain gear. He heard on the camp radio that all the counselors had returned safely.

While Dick was still at home, his phone received a 1:06 a.m. alert from the AcuRite app that one-tenth of an inch of rain had fallen.

Then at 1:14 a.m., the National Weather Service issued a Flash Flood Warning for the area that included Camp Mystic.[115]

[115] Nat'l Weather Serv., Weather Forecast Office, Austin/San Antonio, Tex., *Flash Flood Warning*, VTEC O.NEW.KEWX.FF.W.0038 (July 4, 2025, 1:14 AM CDT), https://mesonet.agron.iastate.edu/wx/afos/p.php?pil=FFWEWX&e=202507040614 (archived at Iowa Env't Mesonet, Iowa State Univ.).

```
930
WGUS54 KEWX 040614
FFWEWX
TXC019-265-040915-
/O.NEW.KEWX.FF.W.0038.250704T0614Z-250704T0915Z/
/00000.0.ER.000000T0000Z.000000T0000Z.000000T0000Z.OO/

BULLETIN - EAS ACTIVATION REQUESTED
Flash Flood Warning
National Weather Service Austin/San Antonio TX
114 AM CDT Fri Jul 4 2025

The National Weather Service in Austin/San Antonio has issued a

* Flash Flood Warning for...
  Northwestern Bandera County in south central Texas...
  Central Kerr County in south central Texas...

* Until 415 AM CDT.

* At 114 AM CDT, Doppler radar indicated thunderstorms producing
  heavy rain across the warned area. Between 1 and 2 inches of rain
  have fallen. The expected rainfall rate is 2 to 3 inches in 1
  hour. Additional rainfall amounts of 1 to 3 inches are possible in
  the warned area. Flash flooding is ongoing or expected to begin
  shortly.

  HAZARD...Life threatening flash flooding. Thunderstorms
           producing flash flooding.

  SOURCE...Radar.

  IMPACT...Life threatening flash flooding of creeks and streams,
           urban areas, highways, streets and underpasses.

* Some locations that will experience flash flooding include...
  Kerrville, Ingram, Hunt, Waltonia, Kerr Wildlife Management Area
  and Lost Maples State Natural Area.

PRECAUTIONARY/PREPAREDNESS ACTIONS...

Turn around, don't drown when encountering flooded roads. Most flood
deaths occur in vehicles.

Be especially cautious at night when it is harder to recognize the
dangers of flooding.

In hilly terrain there are hundreds of low water crossings which are
potentially dangerous in heavy rain. Do not attempt to cross flooded
roads. Find an alternate route.

&&

LAT...LON 3013 9949 3013 9918 2990 9919 2990 9926
      2981 9931 2982 9960 3001 9959

FLASH FLOOD...RADAR INDICATED
FLASH FLOOD DAMAGE THREAT...CONSIDERABLE
EXPECTED RAINFALL RATE...2-3 INCHES IN 1 HOUR

$$

RUNYEN
```

As distinguished from a flood watch, which signals to be prepared, a flash flood *warning* is a signal to *take action.*[116] It is issued when a flash flood is imminent or occurring, and people in flood-prone areas should move immediately to high ground.

The 1:14 a.m. Flash Flood Warning specifically identified Central Kerr County, including Hunt, as a location that "will experience flash flooding." It described the impact as including

[116] *See* Nat'l Weather Serv., *Flood Warning VS. Watch*, https://www.weather.gov/safety/flood-watch-warning.

"life threatening flash flooding of creeks and streams." The Kerr County emergency management plan required a state of "High Readiness" to kick in.[117]

The Flash Flood Warning triggered phone alerts,[118] and the National Weather Service also communicated the Flash Flood Warning through social media, such as this image posted on X.com:




[117] Kerrville/Ingram/Kerr County Basic Plan at BP-32. As noted above, the Basic Plan's indicative actions for High Readiness "may include notifying the public about the warning, evacuating low-lying areas, open[ing] shelters to house evacuees, and continuous situation monitoring." *Id.*

[118] The 1:14 a.m. Flash Flood Warning carried a "considerable" damage threat tag, which caused it to be disseminated as a Wireless Emergency Alert (WEA) to mobile devices located within the warning polygon through the Federal Emergency Management Agency's Integrated Public Alert and Warning System (IPAWS). *See* OIG Report, *supra* note 63, at 5 & fig.2 (identifying the July 4, 1:14 a.m. Flash Flood Warning as a product issued via WEA, the Emergency Alert System, and NOAA Weather Radio). Not every flash flood warning triggers a WEA; a baseline-level warning does not. *Id.* at 5. Because its forecast area is prone to flash flooding, the National Weather Service's Austin/San Antonio Weather Forecast Office tags all of its flash flood warnings with a "considerable" or "catastrophic" damage threat so that each will be issued via WEA. *Id.* NWS pushes such alerts automatically, without seeking permission from state or local officials, and they reach any device within the polygon that has not disabled them. *See* H. Select Comm. on Disaster Preparedness & Flooding and S. Select Comm. on Disaster Preparedness & Flooding, *Joint Hearing*, at 100–01, 89th Leg., 1st C.S. (July 23, 2025) (testimony of Nim Kidd, Chief, Tex. Div. of Emergency Mgmt.).

The Flash Flood Warning actually was received by numerous people at Camp Mystic, but there was no protocol to do anything in response to it. Although Dick Eastland and Glenn Juenke were awake and monitoring weather, the other adult staff continued to sleep in their beds, unaware.

Some counselors also received the Flash Flood Warning alert. A counselor with a disabled phone, which she was permitted to use to play music, received the warning on it. A different counselor who had spent her night off at the counselor's lounge at Byrd House received the alert. And the Big Three, who had access to their mobile phones, also received the warning.

By 1:20 a.m., Glenn was aware of the Flash Flood Warning. When the stranded kitchen workers returned safely to camp, he communicated by radio to Craig Althaus that he could go to sleep.

Data retrieved from Dick's mobile phone documents many of his movements that night. At 1:40 a.m., Dick drove his Chevy Tahoe from his cabin to the camp office. When he arrived, Glenn was completing end-of-shift paperwork. This was the first time that Glenn, during his shift, had seen Dick at the office. The men discussed the weather. Fearing that it would get worse, Dick told Glenn to go home early while the roads were still safe. Glenn declined to leave.

At 1:45 a.m., Dick used the walkie-talkie to summon Edward, who was awakened by the call. Dick stated that two inches of rain had fallen in the last hour, and the grounds crew needed to move waterfront equipment. Dick's call was heard by several others who were awakened by it, including Mary Liz who was with Edward, and Britt and Catie Eastland at the Cypress Lake camp. Immediately after that transmission, Dick radioed the grounds crew to help.

Edward drove to the office. He crossed Edmunson Creek and noted about one inch of water over the land bridge between Senior Hill and the office. At 1:51 a.m., he read Kerr County's Code Red alert, transmitting the Flash Flood Warning to his phone.

At 2:01 a.m., Edward sent a video to Mary Liz showing that Edmunson Creek had become impassable. He was not alarmed because he had seen the creek rise before, but he wanted Mary Liz to know he would not be able to return home.

Nine minutes later, Glenn sent a text message to his wife, letting her know there was flooding and that he was "stuck at Mystic." Immediately thereafter Glenn sent a text to retired Fire Chief Stephen Hayes: "You wouldn't believe the flooding here. Wish I could get a photo of the creek by the golf course."

By 2:14 a.m., the grounds crew had finished moving the waterfront equipment. However, by then they could no longer access their living quarters because they would have had to cross

Edmunson Creek to get there. Instead, they remained in the garage and closed its exterior doors. Edward took a photo of Dick and nine men of the grounds crew who were stranded, and he texted the photo to Mary Liz. They continued to exchange messages, with Edward noting that Edmunson Creek was "getting bad," and urging Mary Liz to check the radar.



2:14 a.m.
Dick Eastland and nine grounds crewmen members

Around 2:20 a.m., a camper in Look Inn—a cabin on the Flats second-closest to the Guadalupe River—got out of her bed and stepped into water. Two of the Look Inn counselors investigated, and they realized water was seeping in from outside. As they began to use towels to stop the water from coming in further, they heard a tree crashing into their windows. They also smelled burning and decided to unplug all their fans.

Growing concerned, counselors from Bug House and Look Inn—the cabins closest to the river—stood on their cabins' porches to discuss what to do. They had no way to seek help other than to run to the front office through the storm. They decided that one counselor from each cabin would run through the storm, across the Flats, to the front office. They left around 2:30 a.m., arriving alarmed and soaking wet.

The counselors found Dick and Edward in the office, and the girls persuaded the men to come to the cabins to investigate. Before leaving, Dick texted to Tweety: "So far over 4 inches. Bubble gum creek up. Stay put. I am at the office."

The recognition of four inches of rainfall should have been significant to both Dick and Edward. The UGRA "Be Flood Aware" video that Dick had shared with the Eastlands specifically warned that "three or four inches of rain at one time…can be a real serious problem."[119]

At 2:37 a.m., Dick, Edward, and the two counselors drove from the office toward the river to Bug House and Look Inn. Dick and Edward determined that the water entering the cabins was flowing off the steep hill behind the cabins, and not from the nearby Guadalupe River. They agreed that using the towels was a good idea to control the intruding water, and they told the counselors they would return later to check on them. Edward did not think it was necessary to evacuate because there was only a small pool of water in front of the door.

At 2:42 a.m., Dick and Edward left the cabins and returned to the office to monitor the weather. Dick walked outside to monitor the river's levels.

Then around 2:55 a.m., gate guard Francis Blackwell Loper screamed through her radio, "water's coming through my house, what do I do?" Edward reported hearing staticky sounds, and he told her to seek higher ground across from the guard shack, on Kiowa Hill. Dick and Edward continued to try to reach her by radio, but she did not respond.

While patrolling along the Guadalupe River, Dick decided to start evacuating the cabins closest to the river. At around 3:00 a.m., he radioed: "We need to start getting the girls out of Bug House."

### 4.6 First evacuation mission: Bug House, Look Inn, and Hang Out

Dick coordinated Edward and Glenn to drive in three vehicles to the end of the row of Flats cabins and to begin evacuating campers and counselors. Nobody suggested communicating to campers through the PA system that they should evacuate their cabins.

At 3:10 a.m., Tweety sent a text message to Dick: "Our house is flooded." Meanwhile, at or around 3:11 a.m., Glenn awakened the Big Three in Kozy Korner. He told them that campers would be evacuating their cabins, and for them to be ready to help the campers cross from the office to Rec Hall. Despite the power still being on, nobody used the PA system located in the office—at this time or any later time—to alert or instruct campers about evacuating cabins.

Driving his truck, Edward parked behind Dick's Tahoe alongside Look Inn. There was no more than an inch of water on the road by this time. Glenn was the last to drive his truck down the road, and he parked behind Edward.

[119] *Be Flood Aware 2017 Video*, *supra* note 2 (explanation of Hill Country meteorologist Cary Burgess).




Upon arrival, the three men instructed the inhabitants of Bug House, Look Inn, and Hang Out—over 50 campers and counselors—to get in their vehicles. Most rode in vehicles to the office, then walked to Rec Hall. At least one counselor was uncomfortable getting into a vehicle with the water rising. Thus some of the counselors and campers walked instead, directly from their cabins to Rec Hall.

At 3:23 a.m., one of the camp's photographers captured an image of campers walking toward the office from the direction of the cabins on the Flats. It shows the rain was heavy, and water was beginning to pool in some areas, but the campers were able to seek higher ground by traveling from the cabins by foot.



3:23 a.m.
Campers walking past Kozy Korner to Rec Hall



3:26 a.m.
Evacuation to Rec Hall

## 4.7 Second evacuation mission: Tumble Inn I & II and Jumble House

After delivering the first group to the office, Dick began a second attempt at transporting campers and counselors. The same three men drove back toward the river to evacuate the next two cabins built along the hill: Tumble Inn I and Tumble Inn II.

Edward recalls that by that time, the water on the road had risen to be ankle-deep. Some of the camp's canoes and kayaks were floating—the highest Edward had ever seen, a sight he described as "surreal." Edward had never seen flood water touching the cabins or on the soccer field on the opposite side of the road.

As Tumble Inn counselors and campers got into the vehicles, counselors standing on the porch of the adjacent Jumble House cabin frantically asked what they should do. They were told, by Edward and by Tumble Inn counselors and campers, to move to Rec Hall. The Jumble House campers proceeded to walk from their cabin toward Rec Hall.




Having received no training about how to evacuate in a flood, the Jumble House counselors stayed behind, collecting their belongings and checking the cabin to confirm all campers had evacuated. By the time the counselors exited the cabin, all their campers had departed. They walked toward the office to seek guidance, but rising flood water prevented them from entering the office. They remained separated from the Jumble House campers for the duration of the flood.

One of the unaccompanied Jumble House campers, ten-year-old [redacted], was last seen returning to the cabin to retrieve an item. She perished in the flood waters.

Dick, Edward, and Glenn delivered the girls from Tumble Inn I and II to the office; those campers were among the final ones to reach Rec Hall. There were still seven cabins on the Flats to evacuate, and the flood water was rising rapidly.

## 4.8 Third set of evacuation missions

Contrary to the judgment and counsel of Glenn, who said the water was too high to drive, Dick immediately drove back toward the cabins for a third evacuation. He parked his Tahoe in front of Bubble Inn, with his headlights facing the Commissary.

As Glenn saw the Jumble House girls walking through the field toward Rec Hall, he realized that the water was too high to make a third trip in his truck. He also worried that the evacuating campers could get struck by lightning. He parked his truck by Byrd House, turned on his truck's hazard lights, and walked to Giggle Box.

Edward followed his father in his truck. When he reached the front of Nut Hut, his father called on the radio, saying "we have to get Bubble and Twins out!" Edward responded, "I'm going to drive and get Twins out through the bathroom window." Dick responded, "No, you can't drive there." Edward knew immediately that the water had risen to a point where he no longer could drive. Edward reversed his truck and parked next to Giggle Box. When he left his truck, flood water was up to the door.

Edward slogged through knee-high water to get to the Giggle Box porch. The counselors could not open the cabin door to get out. Then Glenn arrived, and together the two men ripped open a screen, and they helped two or three girls exit through a window.

Edward decided that he had to leave Glenn at Giggle Box and move on to assist at Twins I and Twins II. Dick was already at Bubble Inn.

### *Bubble Inn*

Little is known about what happened at Bubble Inn because Dick Eastland, the counselors, and all thirteen first-year campers lost their lives in the flood.

At around 3:40 a.m., counselors across the road at the Nut Hut and Chatterbox cabins watched Dick guide Bubble Inn campers from the cabin into his Tahoe. They caught glimpses of Dick when lightning streaked across the night sky. They still hoped to be evacuated to safety. One counselor described a vivid memory of seeing Dick with water rushing around him. Another said she saw Dick in the driver's seat with his window rolled down. Yet another said she watched helplessly as she saw the Tahoe lift into the water and spin clockwise down the river.

Dick called for help on his walkie talkie. From the Cypress Lake camp, Britt heard the radio transmissions, and he recalls Dick saying: "I have Bubble Inn cabin in my car. I'm stuck against

a tree. I need help." Dick then repeated his plea for help. Edward finally responded, "Dad, I'm sorry I can't get to you. I'm staying here with Twins." Data from Dick's watch shows that at 3:51 a.m., he was submerged in over twenty feet of water.

The flood water rose all the way to Bubble Inn's flat ceiling. Nobody could have survived inside the cabin, and no one was found there afterwards. All available evidence strongly suggests that the entire cabin entered Dick's Tahoe with him.

Dick's decision to load campers into his vehicle is a mystery. He knew it was unsafe to drive during a flood—he even so reminded Edward that very night. For years Dick promoted flood safety with the message of "turn around, don't drown." The only apparent explanation is that he must have believed it to be his last option, because they were sure to drown had they stayed inside Bubble Inn.

Sometime midday on July 4, rescue workers found the bodies of Dick Eastland and three Bubble Inn campers inside Dick's Tahoe. The other Bubble Inn campers and counselors all were found later deceased, downriver.

The Bubble Inn campers had just finished second grade. Their names are [redacted].

Both Bubble Inn counselors were Ettes who had just graduated from high school and planned to begin college in the fall. Their names are [redacted].

### *Twins I and Twins II*

Like Bubble Inn, all of the campers in the attached Twins I and Twins II cabins were eight or nine years old. All were first-time campers, and they had been at Camp Mystic for less than four days. Two counselors were assigned to each of the two cabins; all four were Ettes. One of them was 17 years old.

The Twins counselors had been screaming for help. When there was light to see, the Polish kitchen workers housed in the second story of the Commissary, called "Polar Palace," had a clear line of sight to the porch of the Twins cabins. The outdoor staircase leading up to Polar Palace was about 20 paces from that porch. The college-aged Polish kitchen workers watched in horror, not knowing what to do. They had not been trained about what to do in a flood,[120] and they had not been assigned any responsibilities to assist with an evacuation of the camp.

---

[120] H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, at 171, 89th Leg. (Apr. 28, 2026) (testimony of Richard Eastland).

As Edward approached Twins I and Twins II, waist-high water swirled around him like rapids. He reached the cabins' porch and entered Twins I. The lights were still on. He tried to reassure the girls that he was there to help and would not leave them.

Edward stepped out to the porch to speak with a counselor, but then they could not get back into Twins I because of the pressure of flood water against the door. Edward and the counselor then entered the Twins II cabin. As the water rose, Edward held on to a Twins II doorframe, trying to avoid being swept away.

The water continued to rise. As the water reached toward the ceiling in the Twins cabins, the counselors realized they would drown if they stayed inside. In Twins I, the sole remaining counselor in the cabin (the 17 year old) began pulling girls under water to push them out of the cabin through the door. In Twins II, counselors pushed girls out the back window.

Edward saw the water carrying three girls out of Twins I. He reached out and was only able to grab two of them, and he held them to his body. Another girl grabbed his neck and was positioned on his back. The water rose to his chest. Edward held on as long as he could, but as the water started rising over the back of his head, he let go and was swept away. Data from his watch shows he was submerged at 4:09 a.m.

Eight-year-old camper [redacted] never escaped Twins I, and she perished there.

All the rest of the residents of the Twins cabins were swept away by the raging current.

Edward, three of the four Twins counselors, and eight Twins campers survived after catching the branches and holding on to a tree near the Bug House cabin. Some campers who had been swept in the same direction grasped at the same tree, but were unable to hold on to a branch. One camper was spotted falling out of the tree and then being carried down the river.

The fourth Twins counselor managed to hold on to another tree near Tumble Inn, and she also survived. One Twins camper clung to a stone-covered column near Tumble Inn. She wrapped her arms and legs around the column and managed to shimmy up as the water rose. She found a stone where she could rest her chin. To maintain her strength, she alternated gripping the column with her legs, and then with her arms and chin.

Three Twins campers survived despite being swept down the river.

Two of those campers were found on debris piles in the river about a mile downriver from Camp Mystic. A family heard voices calling for help. Two brave men entered the water and rescued the girls. By 4:19 a.m., this family had called 911 to report they had saved two Camp Mystic campers out of the river.

Remarkably, the other surviving Twins camper was rescued six and a half miles downriver, near Camp La Junta, where she was taken to be treated in that camp's infirmary.

In the days following the flood, the lifeless bodies of Twins campers [redacted] all were recovered.

Despite ongoing efforts, as of the date of this report rescuers still have not found [redacted].

### *Giggle Box and Wiggle Inn*

The Giggle Box campers escaped their cabin with Glenn's assistance by climbing through a window. But because of the rising level of water, Glenn determined they no longer could reach Rec Hall safely. He decided to escort all Giggle Box campers and counselors across the road to a small pavilion called Cricket Corner. The Jumble House counselors, having been unable to enter the office, saw Glenn and the Giggle Box group, and they walked toward Cricket Corner to join them. Glenn instructed them all that if the water continued to rise, they should move up the steep hill directly behind the pavilion. Ultimately everyone from Giggle Box, as well as the Jumble House counselors, survived by moving up the hill.

After evacuating Giggle Box, Glenn proceeded to the Wiggle Inn cabin. By this time, the water was waist-high, and debris was swirling around him. The campers and counselors had gathered on the porch, expecting to be escorted to Rec Hall. Glenn decided that the girls could not leave the cabin safely. And fortunately for them, unlike the Bubble Inn and Twins cabins, Wiggle Inn had vaulted ceilings. All the Wiggle Inn campers returned inside their cabin.

Glenn enlisted help from the counselors, one of whom remained outside the cabin, perched on a window sill and assisting while clinging to the exterior roof. The girls' trunks were floating and swirling around the cabin, so they pushed the trunks out through the cabin windows to avoid the risk of injury. Glenn arranged the campers in a human chain, using the cabin's metal bed frames for support. He told jokes in an effort to calm and distract the campers from the circumstances of their plight. Eventually the water receded. Everyone in Wiggle Inn survived by sheltering in place.




## 4.9 Self-evacuation of Nut Hut

The Nut Hut cabin—positioned at the foot of the bluff and across the road from Bubble Inn—was occupied by three counselors and ten-year-old campers, including one of Richard Eastland's daughters. As the floodwater rose and other cabins were being evacuated, Glenn checked on them and asked if the cabin had taken on water. At that time it had not. One counselor recalls that Glenn told them to "hang tight, we will be back to get you."

As the water began to rise rapidly, two Nut Hut counselors attempted to brave the current to seek help. But after making it only to Chatterbox, the next cabin toward the office, one counselor returned to Nut Hut. The other counselor did not think she could make it back, and she pushed on toward a window at Chatterbox.

Realizing that no adult camp staff was coming to save them, the Nut Hut counselors finally took matters into their own hands. The sheer force of the rushing water held the cabin's front door shut. A couple of campers managed to squeeze out the door, but they were immediately caught in the swift current. A counselor managed to grab one of the girls by the shirt and the other by the arm, pulling them both to safety on the hillside. Because the door had become blocked by water, one counselor used a rock to break the screen on a side window, and the remaining counselor began passing campers through the window and out of the cabin.

Once they had escaped the flooding cabin, the barefoot campers in their pajamas had to climb up the steep, muddy, and rocky hillside in the darkness of the storm, enduring cold rain and lightning. The group made it to the pavilion on Sky High, where they sheltered for roughly two hours. They all survived.

### 4.10 Self-evacuation of Chatterbox

A Chatterbox cabin counselor was awakened by the sounds of the storm. Watching through the window from her top bunk, she saw the road outside and the cabins on the Flats. She observed cars driving and she heard voices. She watched two girls wearing raincoats with their hoods up, sprinting toward the office. She then saw girls riding in a truck bed, and others running to Rec Hall.

She stepped outside on Chatterbox's covered porch, which faces Cricket Corner. She became nervous when she saw a trash can floating down the road, and she screamed for help.

The counselor returned inside the cabin, turned on all the lights, and woke the nine-year-old campers. Assuming that somebody was coming to evacuate their cabin next, she instructed everyone to get their things together. Suddenly, she heard banging at the window, and she saw a counselor from Nut Hut begging to be let in, saying she would die if she were not brought inside. She yanked the Nut Hut counselor into the cabin through the window.

The counselors realized that no adult was coming. The water had risen on the road, and crossing to join the others at Rec Hall would not be possible. They had been taught to avoid the water in a flood because it can sweep you away.

The campers were terrified and the water continued rising. The counselors decided their best option was to climb the adjacent hill to the pavilion at Sky High. The counselors asked the campers to focus on the previous night's devotional about courage.

One counselor passed through the window and into a torrent of water rushing between the cabin and the hill. She was ready to cross the water toward the hill when she saw an equipment shed rushing toward her. Just in time, a fellow counselor pulled her out of harm's way. She then braced herself and waded across the cold, waist- to chest-deep water, and she reached the hill.

Another counselor jumped through the window and into the water, planting herself there. The remaining two counselors began passing campers through the window to the counselor in the water, who would then pass the camper to the counselor on the hill. They followed this process for all fifteen campers. The rainwater was sheeting off the hillside like a waterfall, and campers lost their shoes.

In the chaos, three Chatterbox campers became separated from the rest of their group. The counselors became upset upon realizing that they were missing campers, and they split up. One counselor remained with the group of campers while two others returned to search for the missing ones.

Before daybreak the counselors began to encounter adult camp staff who were beginning to rescue people in trees. Then they climbed to the top of the hill, where they found the previously missing campers with the group that escaped from Nut Hut.

### 4.11 Evacuated campers' experience at Rec Hall

Camp Mystic had no written flood evacuation plan that included Rec Hall as a muster site. But Dick Eastland likely had it in mind as the place to relocate campers in the event they needed to seek higher ground—it is where he evacuated campers during floods in 1978 and 1987.

The higher ground of Rec Hall was indeed a safer place for Camp Mystic campers than their cabins that flooded to the roofs and rafters. But the over 100 campers and counselors who had evacuated to that 100-year-old structure had their own harrowing tale.

As campers evacuated their cabins, most of them congregated at Rec Hall. There were no adults there to guide them other than a few teenaged counselors. As one counselor recalled:

> There was no one in Rec Hall that was like an authority figure. And at this point, we don't know anything, we weren't told anything. We were actually in the dark [we] just didn't know what to do. From my perspective, I was just sitting there, and we just watched Rec Hall filling up. The little girls were throwing up; people had to go to the restroom out the window and in the corners.

As the water quickly rose, the girls used the structure's solitary staircase to the U-shaped, five-feet-deep balcony.



Rec Hall swayed during the storm, and counselors and campers were terrified that the balcony floor would not hold their collective weight. Fearful of collapse, counselors instructed campers to throw all their personal items off of the balcony to reduce weight. Counselors further instructed campers to remain still so the unstable floor would not be compromised. Campers crowded together and the water rose all the way up to the balcony floor where the girls could touch it.

Some of the counselors began to make alternate plans if the water continued to rise. One counselor began to sing hymns and say prayers. This seemed to provide comfort.

A collapse of the Rec Hall balcony under the weight of over 100 girls would have been catastrophic. Fortunately, the water receded and the campers and counselors all survived.

### 4.12 Kozy Korner

The "Big Three" senior counselors, the camp's photographers, office workers, and Edward and Mary Liz's babysitter all stayed in Kozy Korner. This residential structure was attached to the office, which was the Guadalupe River camp's nerve center. It had Wi-Fi, a telephone attached to a landline, walkie-talkies, access to mobile phones, and the camp's PA system.

Around 3:11 a.m., Glenn Juenke woke the sleeping residents of Kozy Korner. He told them they should be ready to help evacuating campers to cross from the office into Rec Hall. Some of the senior counselors did walk to Rec Hall and assist, but none of them stayed there with the evacuees. Lacking an evacuation plan, they had no guidance about their responsibilities in the situation, and they returned to Kozy Korner.

The young women saw flashlights in the Twins cabins, and they discussed whether to go over there. They didn't know what to do.

Around 3:30 a.m., the camp's main landline rang. At this time Kozy Korner's lights, air conditioning, and Wi-Fi were all still working. A man calling from upriver frantically warned them to evacuate. Thinking that an evacuation was already in progress, and without any access to the camp's senior leadership, the young women did nothing with the information from the phone call.

By 3:44 a.m., floodwater broke a Kozy Korner door in half. The young women moved into their cabin's main living area, and they found items floating in waist-high water. They decided to leave. When they could not open the door, they tried to call for help on the walkie-talkie, but there was no response. Banding together, they pushed against the door and escaped.

They went to the porch, where they held on to columns as the water rose to their shoulders. Running out of options, they decided to climb to the cabin's roof. One of the Big Three lost

her footing and got swept away in the water. She caught a nearby volleyball net, and she was able to swim against the current back to the roof, where the others pulled her to safety.

They prayed and sang hymns and camp songs. They also could hear the campers in Rec Hall singing, and that kept them calm. They remained on the roof for about two hours. Craig Althaus and the grounds crew eventually arrived with a ladder and helped them down safely. They all survived.

## 4.13 Polar Palace

Polar Palace was the name given to the second floor of the camp's commissary, which served as a dormitory for several college-aged female kitchen workers from Poland.

These young women initially woke to severe thunder, lightning, and a leaking ceiling. Looking out their windows, they had a terrifying view of the disaster unfolding below. They saw a car stuck in the rushing water between Bubble Inn and the Twins cabins, and they watched helplessly as girls on the porch of Twins yelled for help. They had received no instruction or training about flood evacuations, and they were mindful of the limits imposed on their interaction with campers.

The water rose incredibly fast, entirely submerging the building's exterior staircase and breaching their living quarters. Two different workers called 911, only to be told to move to higher ground. Fearing that the floor would collapse or that the rising water would overtake them, the women removed a window screen, and some climbed out to the roof. While drenched and huddled in the dark, they watched vehicles floating down the river.

Once the sun rose and the flood water receded, grounds crewmen arrived and assessed the exterior staircase to be damaged and useless. The young women were told to wait for a ladder.

After getting down, the women gathered the snacks and water in their possession and brought them to the traumatized campers who had sheltered in Rec Hall. Later that morning, the women hiked uphill to Uptight (over the garage) to check on the other female members of the Polish kitchen crew. The inhabitants of Polar Palace were shocked to discover that due to Uptight's location on higher ground, their friends had safely slept through the catastrophe.

## 4.14 Garage / Uptight area

Although they received no training about flood evacuations at the camp, and they had been assigned no responsibilities to assist, either before or during the July 4 flood, a significant number of adults were positioned near the Flats cabins on slightly higher and safer ground. Two of them—Richard Eastland and one of the camp's nurses—had daughters in cabins on the Flats. Because of their location and the lack of communication about what was happening,

these parents were completely unaware of the crisis being endured by their daughters as it happened.

Betsy Althaus woke to the storm's severe thunder and lightning. Unable to return to sleep, she looked out her window at Sugar Shack. She saw taillights and what looked like little girls getting out of vehicles. Realizing that something was wrong, she woke her husband Craig. Water began to seep into their living room through the fireplace, and Craig said they needed to get out of the house.

Craig quickly dressed and left in a utility vehicle with a few members of the grounds crew to help. They drove to the nearby infirmary, Heaven Can Wait, ran inside, and yelled for the three nurses who were inside to get out and go up the hill. Craig attempted to drive further toward the campers' cabins, but he realized the water was too deep. He saw Glenn's truck, floating in the water. He saw Edward's truck turned sideways on the road, and only the top half of Dick's Tahoe—the rest of it was underwater. He retreated back to higher ground.

Meanwhile Richard Eastland, who was staying in a cabin called Granny's House, also had been awakened by the storm. His wife Leslie texted him to report that their rental house was flooding, but that she was safe. He tried, but was unable, to return to sleep. He looked through his blinds and saw some groundskeepers and a truck with its lights on at the office. He thought that it must be flooding, and equipment was being secured. He shaved, showered, and got dressed. He started working at his computer and realized the internet was out.

Richard looked at his phone, which warned of dangerous flash flooding, but he was not concerned. His watch indicated the rain would stop at 4:15 a.m.

He then noticed water coming through his doorway. Baffled by the rising water, he unplugged a backup server to protect it from damage, and he walked outside. There he saw Craig and the grounds crew breaking down the door of Squeeze Inn, where Richard's uncle, Frank Albritton, was trapped.

With the water continuing to rise, Richard, Craig, Betsy, Frank, the three nurses, and the grounds crew all retreated to a higher hillside near the garage. None of these adults had been given any prior assignment for assisting with a flood evacuation of the camp, and the grounds crew were strictly instructed not to interact with campers. None of them were asked to assist that night.

Once the water finally began to recede around dawn, the group mobilized to rescue survivors. Betsy Althaus called 911 at 5:38 a.m. to request a helicopter. This was the first 911 call from camp management.

## 4.15 Guard House

At 12:45 a.m., Francis Blackwell Loper was sitting outside on her porch when the counselors who had gone into town returned to Camp Mystic. She greeted them, straightened up her living quarters, and tried to go to bed. Thunder and lightning kept her awake. She showered and returned to bed, this time able to fall asleep.

Around 2:50 a.m., Francis awoke. She stepped out of bed to find her feet were in ankle-deep water. She reported by walkie-talkie that she was taking on water. Edward responded that she should evacuate immediately and go up Kiowa Hill, across from the gate.

Before she could escape, she saw water shooting sideways into the room from three-quarters of the way up her sitting-room door. In a matter of seconds, an earth-shattering crash blew the door off, and the cabin instantly filled with water up to the roof. She was forced to swim through the flooded rooms of her cabin. She made it to the porch, where she clung desperately to a beam. Water overtook the roof, and she was swept away.

The water pushed her into a line of trees, where she managed to catch a branch and climb into the tree. She clung to the tree for hours while the water continued to rise.

As the water eventually receded, Francis's leg became stuck in the tree's branches. She was forced to drop into the water to avoid breaking her leg. She began swimming for her life. She then gained footing on submerged brush and maneuvered onto a limestone hillside. She inched her way onto the hill where she stayed until daylight. She eventually began walking onto the golf course. Counselors spotted her and came to her aid.

Francis spent a week in the hospital, happy to be alive. The guard shack had separated from its foundation and was destroyed. Her mangled car was later found nearly nine miles downriver.

## 4.16 Senior Hill

When the land bridge flooded, Senior Hill was completely separated from the rest of the Guadalupe River camp. Although there was a loudspeaker on Senior Hill that was used daily, no one used it to notify them of the weather. None of the counselors or campers there were permitted to have cell phones. The only walkie talkie on Senior Hill was locked in a cabinet at the riflery range. As a result, the young staff and their campers were isolated and left to fend for themselves.

Despite the relatively high elevation on Senior Hill, the water rose so dramatically that two of the front-facing cabins, Hangover and Look Out, took on floodwater. Receiving no instructions from camp leadership, the counselors took the initiative to self-evacuate, successfully moving their campers to cabins located deeper back into the cliff.

One of the counselors broke into the cabinet containing the walkie-talkie. She radioed for help but got no response. Campers were upset and bawling. Two counselors with disabled phones tried calling 911. One phone worked, and that counselor was the first to reach 911 from Camp Mystic that morning at 3:56 a.m. She reported that they were cut off from the main camp, had no way to communicate, and they did not know what to do.

The Senior Hill counselors knew that there was a cabinet that was supposed to contain water, food, and first aid supplies. They went to the cabinet to get water, and they found that it was completely bare.

Around 8:00 a.m, some of the counselors discovered Francis, who was covered in mud and hysterical. They saw helicopters and tried to get someone's attention. They were unaware of the level of destruction on the Flats. They called 911 again to get help for Francis. They reported: "We have someone very hurt. Her injuries are broken ribs. She is 59 years old. We are at Senior Hill. The bridge is flooded. We have no way to talk to the camp director. We have no service."

Eventually, a helicopter picked up Francis, and another helicopter dropped food and supplies to them. Later, they were helped across the land bridge to the Flats.

### 4.17 Ranch House and Cypress Hollow

Ranch House (where Mary Liz, Edward and their four sons lived) and Cypress Hollow (the home of Dick and Tweety) are both situated between Edmunson Creek and Cypress Creek. Because of this location, they became separated from the Guadalupe River camp by the overflowing Edmunson Creek around 2:14 a.m.

Mary Liz, who had been communicating with Edward, received a call from him at 2:59 a.m., to let her know about Francis's plight at the gate house.

After this call, Mary Liz got up and started looking around their home. She saw water up to their deck outside. She texted Edward to ask if she should move, but got no response. She woke her sons and they went out to their carport.

Around 3:00 a.m., Tweety was awakened by the sound of the storm. She described the terrorizing sounds as "demonic" and "like bombs dropped." She saw a text from Dick telling her that four inches of rain had fallen and to stay put. She walked outside and saw a staff member walking toward her from the cabin next door.

Mary Liz spotted them outside, and she and her sons walked over to Cypress Hollow. After deciding it was too dangerous to stand outside on the carport, the group went inside Tweety's house. Mary Liz pulled down the stairs to the attic door so they could escape the rising water.

Just as her youngest son was climbing the ladder, water suddenly burst through the living room doors, flooding the first floor and sending furniture floating. The group was forced to smash a window to escape in the waist-high water.

Around 3:45 a.m., the group waded with flashlights toward the tennis courts. Britt and Catie Eastland, who were patrolling the Cypress Lake camp, spotted them and picked up Tweety. Mary Liz, her boys, and the staff member did not want to get into the car. They hiked up to Cypress Lake and a structure called Up Top, where they waited until the water receded.

### 4.18 Cypress Lake camp

The 1:45 a.m. radio call from Dick to Edward awakened Britt and Catie Eastland in their home at the Cypress Lake camp, where there were 171 campers for the July 2025 term. Britt and Catie heard the severe thunderstorm, and they began to patrol the Cypress Lake camp in their car. They drove slowly to check the lake and creek levels. Seeing no problems, they returned home.

Around 2:30 a.m., Britt and Catie's landline rang in their bedroom. The call was from the Cypress Lake camp nurses, who reported leaking in a cabin bathroom along an electrical conduit pipe. They went to the cabin and used towels to keep the water away from the campers' trunks. They determined the water was caused by the heavy rain and not water from the lake or creek. Catie stayed behind to monitor the situation, and Britt began patrolling.

When Britt returned to pick up Catie, she was afraid of being struck by lightning. They continued to monitor the Cypress Lake camp. It never flooded, and the Cypress Lake campers were unaware of what was happening at the Guadalupe River camp.

Around 3:45 a.m., while still patrolling, Britt and Catie heard car alarms. They saw headlights and moving cars in the counselors' parking lot. As they drove closer, they noticed flashlights coming toward them. It was Tweety, Mary Liz and her sons, and the staffer.

Britt monitored the radio transmissions from the Guadalupe River camp throughout the flood event, but he did not interact with or otherwise respond to any of them.

As soon as light broke, Britt and Catie drove to assist at the Guadalupe River camp.

### 4.19 Incident management and reunifications

Although the water largely receded early on the morning of July 4, the chaos and devastation continued.

Camp Mystic's emergency procedures binder kept in the main office included a one-page "Crisis Response Outline." Although there is no evidence that anyone responding to the

flood's aftermath was familiar with this outline or actually executed its plan, the contents are indicative of Camp Mystic's preparedness for a situation such as the one it faced beginning that day.

The crisis response outline contained seven main subject headings:

- **"FIND OUT."** The first section included a series of eight questions to guide information gathering in a crisis. Those basic questions were: What happened? Has the nurse been notified? Who was involved? Where are they now if not on site? What action has been taken so far? Do we need to call an ambulance? Who is in charge? When did the accident occur if off site?

- **"CALL EMERGENCY SERVICES – 911."** The second section listed four phone numbers for ambulance (911), insurance carrier, sheriff, and fire.

- **"STABILIZE THE SITUATION – First Priority!"** The third section included the following eight instructions:

  A. Tend to the victim(s). Clear the area. Get everyone out of the area that is not necessary to care for the victim.
  B. Send a full time person to main front gate and secure except for emergency personnel. (No Media!)
  C. Meet in Directors office to gather information. (All full time personnel)
  D. Disperse "greeters" with appropriate instructions.
  E. Meet with Secretaries who answer phones and outline response. (Dick or Tweety will do this)
  F. Account for individuals involved (count and gather in a centralized place) Front office staff will account for each cabin.
  G. Assign staff to focus on the rest of the camp community.
  H. Take pictures, secure the site, preserve everything involved in the accident.

- **"ESTABLISH CRISIS HEADQUARTERS (DICK'S OFFICE)."** This section instructed as follows:

  A. Dick Eastland will be the spokesperson for the camp.
  B. Put emergency equipment in place if needed.
  C. Prepare protocol for phone calls.
  D. Try to find support in areas where you might have to call parents – ministers, ex-staff, owners.
  E. Log all incoming and out going calls.
  F. Provide staffing for phone until the crisis is resolved.

- **"CONTACT PARENTS/GUARDIANS."** This section of the document had three parts:

  A. Compose a statement. Develop a simple, to the point, factual statement. This statement should be short and to the point. Do not defend or justify. Do not embellish. (Dick or Tweety)

  B. Call parents/guardians of person(s) involved in the incident. (Tweety). When this call is made have another person of authority such as a doctor, sheriff, camp nurse on the line with you. They will not be as emotionally involved as you are. **It is critical that parents receive the word from Camp Mystic before the media.**

     1. Make arrangements for their travel to camp or hospital and for their accommodations once they arrive. (Betsy or Catherine)

     2. Consider the feasibility of sending someone who can accompany them.

     3. Have someone at hospital to meet them. (Assign from full time staff)

  C. Establish a camp spokesperson! (Dick or Tweety) This person will primarily take calls from Media and set up the Press Conference. Have a written release that is factual, to the point.

- **"COMMUNICATION AND NOTIFICATION."** The sixth section included guidance for providing notification to staff, campers, parents, the insurance carrier, local authorities, and media. With respect to notifying parents, the plan stated:

  > Have a typed statement to read for whoever is calling. Call personally, the ones who had children who were closely involved, either in the cabin group, or on the program group. A letter to the rest of the parents as quick as possible. The letter needs to be factual, to the point, and reassuring that their campers are in good hands. Expect a few tough calls; encourage parents to leave their children at camp to work through their emotions with the rest of the group. It is important for the children to have the closure of the group working together.

- **"RECORDS."** Finally, the plan called for keeping "an accurate file of everything pertaining to the incident," including written statements from each involved staff member.

Notably, the crisis response strongly presumed the active involvement of Dick and Tweety Eastland. There was no written plan for what to do if Dick and Tweety were unavailable to perform their duties.

At daybreak, the campers and counselors from Rec Hall came outside. Glenn Juenke and the campers from Wiggle Inn made their way to Rec Hall. Glenn then sought higher ground to call 911. Others who weathered the storm at various locations around the camp also began to gather at Rec Hall. Many of them were hysterical, crying, and worried.

After returning to the Guadalupe River camp from Cypress Lake, Mary Liz Eastland obtained a camp roster from the infirmary, and she used it to quickly determine who was missing. But by the time Mary Liz had taken roll, around 7:00 a.m., news of the two campers found alive at the neighboring property already was being shared with other parents. Parents were caught off guard because they did not know about the flooding or that girls were missing.

As Camp Mystic received word about the three Twins campers rescued downriver, the list of the missing was quickly narrowed to 28—Dick Eastland, the counselors and campers of Bubble Inn, and 11 Twins campers.

At 7:11 a.m., Betsy Althaus again called 911, this time to report that Camp Mystic was missing about thirty people. Over the next few hours, camp staff helped to move the Guadalupe River campers to the Cypress Lake camp dining hall. Catie Eastland looked after the Guadalupe River campers, and the Cypress Lake campers shared dry clothes with them.

With Dick Eastland missing, there was no assigned spokesperson for the camp and no pre-planned protocol for phone calls (this was an action item in the crisis response outline under "Establish Crisis Headquarters (Dick's Office)"). Camp Mystic's resulting communication with the parents of campers was not planned, orderly, or consistent. As the news of the flood spread, family and friends struggled to understand what already had happened, and what was happening in response.

Around 9:00 a.m., Mary Liz began to call the families of the missing girls. She made her first two calls to families of missing campers, and she quickly concluded that she needed to delegate that responsibility to speed up the notification process. The task of calling parents of unaccounted-for campers was assigned to two off-site women with strong ties to Camp Mystic. Parents reported frustration at receiving those calls because they received no information other than that their daughter was missing.

Around 10:00 a.m., Texas Game Wardens arrived at Camp Mystic by helicopter to assist with search and rescue.

At 10:22 a.m., one Bubble Inn camper's mother forwarded a screenshot to other Bubble Inn parents of an investigative reporter's social media post stating that the Kerr County Judge had asserted that all campers were accounted for. That information about the campers was not

true, yet the misinformation spread quickly.[121] Once learning of this misinformation, Mary Liz sent a text to the Bubble Inn parents' group chat at 10:54 a.m. to confirm that the social media post was not true, and that Dick and the Bubble Inn campers were missing.

At 11:28 a.m., before all the parents of missing children had been contacted, Camp Mystic sent its first email to parents:


Camp Mystic

Camp Mystic Families,

We have sustained catastrophic level floods. We have no power, water, or wifi. All Cypress Lake campers are accounted for. All campers on senior hill are accounted for. If your daughter is not accounted for you have been notified. **If you have not been personally contacted then your daughter is accounted for.** We are working with search and rescue currently. The highway has washed away so we are struggling to get more help. Please continue to pray and send any help if you have contacts to do so.

Mystic office

This email provided false hope to the families who had not yet been called, only to be told later that their daughter was missing.

As families made their way to Kerr County to pick up their girls, they initially did not know where to go. Local officials sent parents to multiple locations. Over the course of the morning, they finally settled on Ingram Elementary School as the reunification center for Camp Mystic.

By 2:41 p.m., Camp Mystic sent a second email to parents letting them know that rescue helicopters were evacuating campers in small groups to Ingram Elementary. A second email sent at 2:52 p.m. clarified that parents should pick up campers at Ingram Elementary.

Although there were well-meaning volunteers and public officials at Ingram Elementary, no one person or agency took control there. The anxious parents of missing campers waited in the same area with parents who were joyfully reuniting with their children. Rather than

[121] The source of the information for this investigative reporter's post is unclear. According to a series of texts between and among Kerr County officials, a member of the Kerr County Sheriff's office texted at 9:45 a.m.: "Everyone at Camp Mystic is accounted for." By 10:09 a.m., the member of the sheriff's office corrected himself: "FYI the information that all are accounted for at Camp Mystic may not be reliable." Emily Foxhall, *Texts among Kerr County officials show confusion about missing campers during July 4 floods*, Tex. Trib. (Jan. 14, 2026), https://www.texastribune.org/2026/01/14/texas-july-4-flood-camp-mystic-kerr-county-text-messages/.

nervously waiting at Ingram Elementary, some families chose to wait at the funeral home without being called.

Around 4:30 p.m., Grimes Funeral Home in Kerrville began contacting Camp Mystic parents to come identify their daughters. One mother arrived there and was shown the wrong remains; however, she thought she recognized the child. After identifying her own child, the funeral home asked that mother to call the family of the other child and ask about the color of their daughter's braces. Upon learning that the color matched the child at the funeral home, a law enforcement officer took the phone and asked the family to come identify their daughter.

The parents of the first few of the campers to be recovered experienced a tragic lack of coordination and communication about the handling of their daughters' bodies. Several families were shocked to learn that after they identified their daughters and had given instructions about their chosen funeral homes, the bodies were sent to Bexar and Travis Counties for autopsies, without any notice and without their consent.

At 6:42 p.m., the families of the missing campers finally were given a private area at Ingram Elementary where they could wait and be spared the pain of watching other families' reunifications. These families then received an update from law enforcement personnel at 7:34 p.m. Remarkably, the officer providing the information was unaware some campers were still missing. In response, the parents made a list of their daughters and gave it to the officer.

The missing campers' parents then were sent to Trinity Baptist Church at 9:36 p.m., where they were received with kindness and compassion. Nevertheless, the parents continued to experience frustration over local officials' disorganization and the lack of information being provided to them.

A final update that day was provided by a patrol officer at 11:04 p.m. The officer verified that the families were waiting in the correct place. He told the parents that even though search and rescue continued through the night, there would be a pause on identification of bodies until the next morning. He told them that the Emergency Operations Center would provide a briefing the next morning at 8:00 a.m.

Because some campers had been found alive, and no guidance was provided to caution against it, parents of missing campers began circulating social media posts with their missing daughters' photos and the parents' phone numbers. No official warned the families not to post their phone numbers. Once the posts were made, the families began receiving prank calls about their daughters, including calls mimicking a child's voice. These devastating calls continued through the night—and shockingly they are still occurring as of the date of this report. Each time the phone rang, the families felt they had to answer in case the caller had real information about their daughters.

On the morning of July 5, 2025, at 5:50 a.m., the parents compiled a new list of the still-missing campers. Meanwhile, one father made his way to Camp Mystic. He was devastated to discover no search-and-rescue operations were underway. He walked toward the Guadalupe River to search for his daughter himself. He soon found a lifeless child's body under some debris. He knew immediately that it was not his daughter. Alone with this child and unsure of what to do, he eventually was able to alert emergency responders. He later returned to join the other families.[122]

At 8:00 a.m., a videorecorded briefing from the Kerr County Sheriff was played at Trinity Baptist Church. At the end, the families were told that they would be updated every two to four hours. The next briefing occurred at noon. Most of the day, the families waited in agony with no new information.

By the evening, the Texas Rangers had arrived at the Kerrville Youth Events Center. Around 5:00 p.m., Mary Liz notified some of the parents that she would be meeting there with the Texas Rangers. One family also went to the Kerrville Youth Events Center. They told the Rangers that they had been given very little information. This resulted in establishing a family liaison between Trinity Baptist Church and disaster-response leadership.

Around 7:30 p.m., families were instructed to return to Trinity Baptist Church the following morning for DNA collection. They then were told to return home, and that the Texas Rangers would contact them when a positive identification was made.

In the following days and weeks, search and rescue continued to find and identify those missing from Camp Mystic. From the time they were sent home on July 6, the remaining victims' families waited to receive confirmation that their daughters' remains were found. For all but one family, the calls eventually came.

As of the time of this report, and despite a still-ongoing search, [redacted]'s body has not yet been recovered.

---

[122] *See* Kerry Howley, *Could the Girls of Camp Mystic Have Been Saved?*, N.Y. Mag. (Mar. 23, 2026), https://nymag.com/intelligencer/article/camp-mystic-texas-flood-deaths.html.

# 5 Summary of Conclusions

The Committees set forth below their key conclusions. Each conclusion is numbered for ease of reference. The conclusions are grouped thematically and reflect the consensus of the Committees, supported by the evidentiary record developed during the investigation.

## 5.1 Camp Mystic did not have written emergency plans that complied with state requirements.

**C-1.** Camp Mystic **did not** have written emergency plans that specified how each occupied building would be evacuated in the event of the need to evacuate in response to a flood, as occurred on July 4, 2025.

**C-2.** Instead, the Camp's written emergency plan instructed campers to **shelter in place and to await further instruction**.

**C-3.** Procedures for actual evacuation of cabins in response to a flood **were not reviewed** with camp staff and counselors; specific assignments of responsibilities **were not made** to each staff member and counselor.

**C-4.** Campers **were not instructed** about how a flood evacuation would occur.

**C-5.** To the extent Camp Mystic had an evacuation plan for its Guadalupe Camp cabins based on the actual experience of past floods, that plan **was not documented in writing**, and it **was not communicated** to staff, counselors, or campers.

**C-6.** If there was any threshold of flooding at which sheltering in place would be abandoned and campers would be instructed how and where to evacuate to higher ground, that plan only would have been known to the camp's co-executive director, Dick Eastland.

## 5.2 Camp Mystic did not adequately prepare for the July 3-4, 2025 storm.

**C-7.** Camp Mystic staff had access to weather updates available to the general public. The National Weather Service issued a **series of weather alerts** of increasing severity on July 3 and into the morning of July 4.

**C-8.** In the early afternoon of July 3, a **Flood Watch** was in effect through the morning of July 4, which **specifically included Kerr County**, and warned of the possibility of "[l]ocally heavy rainfall" which "could cause flash flooding." Thus the general public—including Camp Mystic, which had assumed responsibility for the safety of 557 girls—

was on notice on the evening of July 3 of the risk of flash flooding in the area overnight.

**C-9.** Many of Camp Mystic's senior leaders went to bed on July 3 with **no awareness of the potential for extreme weather**. Only Dick Eastland and a security guard stayed awake at Camp Mystic to monitor the weather.

**C-10.** At 1:14 a.m. on July 4, the National Weather Service significantly upgraded its alert to a **Flash Flood Warning**, through 4:15 a.m. Flash flooding in the area was "ongoing or expected to begin shortly." The potential impact was identified to include "[l]ife threatening flash flooding of creeks and streams," and Hunt was specifically identified as a location "that will experience flash flooding." The 1:14 a.m. warning also stated: "Most flood deaths occur in vehicles."

**C-11.** As flooding events unfolded, adult camp staff in their residences became aware of rising water and the severity of the storm, and some eventually evacuated themselves to higher ground, but they had been **assigned no responsibility** to assist with evacuating the Guadalupe River Camp cabins, and they generally were unaware of the horrors experienced by the campers.

### 5.3 Camp Mystic did not timely evacuate in advance of the July 3-4, 2025 storm, despite ample opportunity to do so.

**C-12.** Shortly after 3:00 a.m., Dick Eastland summoned Edward Eastland and the security guard to meet him at the Bug House cabin to begin evacuating campers. At this time approximately one inch of water covered the road near the cabins, and water was beginning to enter Bug House. **If all campers had been instructed to evacuate their cabins by foot at this time or earlier, there was ample time and opportunity for them all to safely reach higher ground.**

**C-13.** Instead of using a PA system or going cabin-to-cabin to provide instruction to campers and to order immediate evacuation, Dick Eastland instructed the two other men to help evacuate the three cabins closest to the river by driving them in vehicles. At no time during the flood was the PA system used.

**C-14.** The same three adult staff then returned with their vehicles to evacuate the next cabins in sequence. By then water on the road covered their ankles, and **all campers still had the opportunity to evacuate by foot**.

**C-15.** Dozens of other adult staff members in close proximity to the Guadalupe Camp cabins never were tasked to assist with the evacuation of cabins.

**C-16.** Some self-evacuating counselors separated from their campers, who were directed to Rec Hall; as a result **some campers became separated from their counselors without adequate supervision for the remainder of the flood event**.

**C-17.** Counselors and campers sheltered in place in the Bubble Inn, Twins I, Twins II, and Wiggle Inn cabins, **as they were told**, awaiting further instruction.

**C-17A.** In all likelihood, Dick Eastland loaded all campers and both counselors from Bubble Inn into his vehicle. It was swept into the Guadalupe River, and **all 13 campers and both counselors perished**.

**C-17B.** Edward Eastland helped campers in the connected cabins Twins I and Twins II until the water rose too high for them to remain there. **One camper perished in her cabin. The others all were swept away in the flood.** Some, including Edward, survived, but **11 Twins campers did not survive**.

**C-17C.** Of the large number of inadequately supervised campers who had evacuated to Rec Hall, one decided to return to her cabin to retrieve an item. **That camper also was lost in the flood.**

**C-18.** Camp leadership did not attempt to call 911 during the flood or immediately afterward.

### 5.4 Re-unification efforts and incident management were chaotic, with traumatic effects for families.

**C-19.** Parents of campers were unnecessarily traumatized by the delivery of incomplete and conflicting information while they waited to learn whether their loved ones had survived.

**C-20.** In addition to concerns about Camp Mystic's emergency planning and response, parents were frustrated by the lack of meaningful communication and effective coordination in the flood's aftermath.

# 6 SUMMARY OF 2025 LEGISLATIVE REFORMS

The Texas Legislature swiftly took preliminary action to address the deficiencies exposed at Camp Mystic and other youth camps during the July 2025 flood. During the Second Called Session of the 89th Legislature, it enacted three statutes directed at youth-camp safety and the State's flood-warning capacity, each of which the Governor signed on September 5, 2025: the Youth CAMPER Act and the Heaven's 27 Camp Safety Act, companion measures amending the Texas Youth Camp Safety and Health Act, Chapter 141 of the Health and Safety Code; and Senate Bill 3, the flood-warning siren bill, which amended the Water Code and the Government Code.

The **Youth Camp Alert, Mitigation, Preparedness, and Emergency Response Act (Youth CAMPER Act)**, authored by Representative Drew Darby, enacted the operational centerpiece of the reforms. A youth camp now must:

- develop, implement, and annually update a written emergency plan;
- train each staff member and volunteer on that plan every year;
- orient campers on their roles at the beginning of each session;
- notify parents or guardians whenever any portion of the camp lies within a floodplain; and
- furnish the plan to local emergency-management personnel.[123]

The Act further:

- directs the Department of State Health Services (DSHS) to review camper-to-counselor ratios for overnight stays and the executive commissioner to set minimum ratios by rule;[124]
- requires a camp to file a renewal application within 30 days after it alters its boundaries, constructs new cabins, or renovates a cabin in a manner that changes its bed count or its means of ingress or egress; and

[123] Youth CAMPER Act, Tex. H.B. 1, 89th Leg., 2d C.S. (2025); *see* Tex. Health & Safety Code §§ 141.005(a), 141.0071, 141.008(c).
[124] Tex. Health & Safety Code § 141.008(c).

- authorizes the Attorney General to recover a civil penalty of up to $1,000 for each violation, with each day of a continuing violation treated separately and the penalties remitted to DSHS.[125]

The Act also created a Youth Camp Safety Multidisciplinary Team to recommend minimum standards, and it restructured the Youth Camp Advisory Committee.[126]

The **Heaven's 27 Camp Safety Act**, authored by Senator Charles Perry, complements the Youth CAMPER Act with requirements concerning the location of floodplains and mandatory camp communication capabilities.

Its signature provision bars DSHS from issuing or renewing a license for any youth camp that operates a cabin within a floodplain, subject to narrow exceptions for cabins that lie in a floodplain only because of their proximity to a dammed or otherwise isolated still body of water, or that sit at least 1,000 feet from a regulatory floodway.[127] A federal Letter of Map Amendment (LOMA) removing a cabin from a mapped flood-hazard area does not exempt a camp from these requirements.[128]

The Act also requires each camp:

- to maintain an operable radio capable of receiving real-time National Weather Service (NWS) alerts;
- to install an emergency warning system able to alert all occupants, including a public-address system that operates without an internet connection;
- to monitor alerts issued by the NWS and applicable local river authorities; and
- to submit its emergency plan to DSHS annually for approval, revising and resubmitting any plan DSHS finds deficient.[129]

---

[125] *See* Tex. H.B. 1, 89th Leg., 2d C.S. (2025) (civil penalty up to $1,000 per violation, each day a separate violation, remitted to the department).

[126] *See* Tex. Health & Safety Code § 141.0081 (Youth Camp Safety Multidisciplinary Team); *see also* 25 Tex. Admin. Code § 265.29 (Youth Camp Safety Multidisciplinary Team); 25 *id.* § 3.8 (Youth Camp Advisory Committee).

[127] Heaven's 27 Camp Safety Act, Tex. S.B. 1, 89th Leg., 2d C.S. (2025); *see* Tex. Health & Safety Code § 141.0052(a)–(b) (exceptions for still-water proximity or a cabin at least 1,000 feet from a regulatory floodway).

[128] *See* Hearing on C.S.S.B. 1 Before the S. Select Comm. on Disaster Preparedness & Flooding, 89th Leg., 2d C.S. 2 (Aug. 20, 2025) (statement of Sen. Charles Perry).

[129] Tex. Health & Safety Code § 141.0091(c)–(e); *see* 25 Tex. Admin. Code § 265.31(h).

It further directs DSHS to maintain a public online registry of licensed youth camps and requires rooftop-access ladders for floodplain cabins.[130] Finally, it requires each youth camp to maintain redundant internet connectivity—an end-to-end fiber-optic broadband connection together with a distinct secondary broadband connection meeting the State's statutory broadband standard.[131]

**Implementation and agency action.** DSHS implemented both camp statutes through amendments to Chapter 265 of Title 25 of the Texas Administrative Code, which it proposed in November 2025 and adopted in the January 30, 2026, *Texas Register*, effective February 2, 2026. As adopted, the rules place the weather-radio and emergency-warning-system requirements at Section 265.31(h), the counselor-ratio requirements at Section 265.32, and the complaint-portal website requirement at Section 265.34.[132] The new rule establishes age-tiered minimums—one counselor for every five campers ages four to five, one for every six ages six to eight, one for every eight ages nine to fourteen, and one for every ten ages fifteen to seventeen—to be enforced beginning with the 2026 camp season.[133] In carrying out the new statutes, DSHS held a public hearing on October 10, 2025, surveyed camp operators between October 23 and November 6, 2025, convened an Executive Council meeting on December 11, 2025, and received comments from 188 commenters before adopting the rules.[134] By statute, the implementing rules were to be adopted by March 1, 2026, and camps were not required to submit their emergency plans to the department until May 1, 2026.[135]

**Status for the 2026 camp season.** DSHS adopted the redundant-connectivity requirement at Section 265.37,[136] but after a group of camp operators sued—contending that an end-to-end fiber connection is unavailable or cost-prohibitive in much of rural Texas—DSHS announced on May 7, 2026, that, for the 2026 season, it would not deny or revoke a camp's license for lacking fiber so long as the camp maintains a redundant broadband connection,

---

[130] Tex. Health & Safety Code § 141.0056 (online registry); *see* 25 Tex. Admin. Code § 265.33 (registry); 25 *id.* § 265.36 (roof-access ladders for cabins within a floodplain); *see also* Tex. Health & Safety Code ch. 762 (campground safety).

[131] Tex. Health & Safety Code § 141.0092 (redundant internet connections: an end-to-end fiber-optic broadband connection and a distinct secondary broadband connection); *see* Tex. Gov't Code § 490I.0101(a) (defining broadband service as service of at least 100 Mbps download and 20 Mbps upload, with latency not exceeding 100 milliseconds).

[132] *See* 25 Tex. Admin. Code §§ 265.28, 265.31(h), 265.32, 265.34, 265.37.

[133] 25 *id.* § 265.32; *see* H. Gen. Investigating Comm. on the July 2025 Flooding Events and S. Gen. Investigating Comm. on the July 2025 Flooding Events, *Concurrent Public Hearing*, 89th Leg. (Apr. 28, 2026) (statement of Adam Buuck, Assoc. Deputy Comm'r, Tex. Dep't of State Health Servs.).

[134] *See* 51 Tex. Reg. at 580–84 (summarizing the Oct. 10, 2025 public hearing, the Oct. 23–Nov. 6, 2025 operator survey, the Dec. 11, 2025 Executive Council meeting, and the 188 comments received during the Nov. 28–Dec. 19, 2025 comment period).

[135] Tex. H.B. 1, 89th Leg., 2d C.S. (2025) (implementing rules to be adopted by Mar. 1, 2026; emergency plans not required until May 1, 2026).

[136] 25 Tex. Admin. Code § 265.37 (eff. Feb. 2, 2026); *see* 25 *id.* § 265.11(3) (broadband definition).

such as cellular, microwave, or satellite service, and satisfies all other safety requirements; the statute and rule were left unchanged, and the litigation was stayed until March 1, 2027.[137]

**Senate Bill 3**, relating to outdoor warning sirens in flash flood-prone areas and authored by Senator Paul Bettencourt, operates at the community level rather than the camp level. It directs the Texas Water Development Board to identify each flash flood-prone area that—given its history of flooding and related factors such as loss of human life and the presence of dwellings—warrants one or more outdoor warning sirens. The municipality or county in which an identified area lies then must install, maintain, operate, and regularly test sirens in accordance with the Board's rules, including a backup power source independent of the primary source.[138] To fund that mandate, the Act establishes a grant program administered by the Office of the Governor to help local governments defray the cost of installing the required sirens, and it authorizes the Board to withhold other financial assistance from a local government until it certifies compliance.[139]

The Texas Water Development Board began its implementation of the statute by publishing a Flash Flood Warning Siren Guide in January 2026. It approved provisional flash flood risk maps for the thirty disaster-declared counties in March 2026, while the grant program made funding of at least $1 million available to each eligible county. Kerr County was among the first to install and begin testing sirens along the Guadalupe River in May 2026.[140]

---

[137] *See* News Release, Tex. Dep't of State Health Servs., DSHS Reaches Agreement on Fiber Optic Requirement for Youth Camps (May 7, 2026). The agreement suspends enforcement of the fiber component for the 2026 season and stays the operators' suit until Mar. 1, 2027; it does not amend Tex. Health & Safety Code § 141.0092 or 25 Tex. Admin. Code § 265.37, which are not subject to waiver, *see id.* § 265.30(e).

[138] Tex. S.B. 3, 89th Leg., 2d C.S. (2025); Tex. Water Code §§ 16.501–.502.

[139] Tex. Gov't Code § 418.027; *see* Tex. Water Code § 16.502(j) (authorizing the Board to withhold other financial assistance pending certification of compliance).

[140] *See* Tex. Water Dev. Bd., Flash Flood Warning Siren Guide (Jan. 2026); Tex. Water Dev. Bd., Senate Bill 3 Implementation, https://www.twdb.texas.gov/about/sb3/ (provisional flash flood risk maps approved Mar. 3, 2026; grants of at least $1 million per eligible county).

# APPENDIX A SELECTED BUILDING ELEVATIONS AT CAMP MYSTIC

This appendix sets forth the elevations of selected buildings at Camp Mystic on the South Fork of the Guadalupe River. The table is followed by a map showing the location of each building.

| Structure | Latitude (DMS) | Longitude (DMS) | Lat (decimal) | Long (decimal) | LFE (ft) | Source |
|---|---|---|---|---|---|---|
| Bubble Inn | 30°00'32.8" N | 99°22'10.7" W | 30.00911 | -99.36964 | 1845.11 | CM_000299–CM_000302 |
| Bug House | 30°00'35.1" N | 99°22'05.1" W | 30.00975 | -99.36808 | 1841.52 | CM_000303–CM_000306 |
| Commissary / Polar Palace | 30°00'34.2" N | 99°22'10.3" W | 30.00950 | -99.36953 | 1841.98 | CM_000315–CM_000318 |
| Giggle Box | 30°00'32.3" N | 99°22'11.2" W | 30.00897 | -99.36978 | 1844.02 | CM_000331–CM_000334 |
| Hang Out | 30°00'34.5" N | 99°22'06.3" W | 30.00958 | -99.36842 | 1845.51 | CM_000343–CM_000346 |
| Jumble House | 30°00'33.2" N | 99°22'08.6" W | 30.00922 | -99.36906 | 1845.30 | CM_000359–CM_000362 |
| Look Inn | 30°00'35.1" N | 99°22'05.4" W | 30.00975 | -99.36817 | 1843.21 | CM_000371–CM_000374 |
| Nut Hut | 30°00'32.6" N | 99°22'09.6" W | 30.00906 | -99.36933 | 1846.06 | CM_000383–CM_000386 |
| Office | 30°00'32.1" N | 99°22'14.4" W | 30.00892 | -99.37067 | 1845.89 | CM_000387–CM_000390 |
| Rec Hall | 30°00'33.4" N | 99°22'14.4" W | 30.00928 | -99.37067 | 1846.24 | CM_000407–CM_000410 |
| Tumble Inn | 30°00'34.0" N | 99°22'07.3" W | 30.00944 | -99.36869 | 1844.03 | CM_000439–CM_000442 |
| Twins | 30°00'33.6" N | 99°22'11.2" W | 30.00933 | -99.36978 | 1844.23 | CM_000443–CM_000446 |

*Table A-1. Selected building elevations (lowest floor elevations) at Camp Mystic Guadalupe River. (Source: FEMA Form 81-31 Elevation Certificates provided by Camp Mystic.)*




*Figure A-2. Map of selected buildings at Camp Mystic Guadalupe River, with elevations.*

# APPENDIX B MATRIX AND MAPS OF DISTANCES BETWEEN SELECTED STRUCTURES

This appendix sets forth the distances between selected structures at Camp Mystic on the South Fork of the Guadalupe River, presented as a distance matrix and a series of maps. The data are relevant to the analysis of evacuation timing and walking distances under the conditions that prevailed in the pre-dawn hours of July 4, 2025.

| | Bubble | Bug | Comm. | Giggle | Hang | Jumble | Look | Nut | Office | RecHall | Tumble | Twins |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bubble** | — | 545 | 146 | 68 | 422 | 188 | 520 | 100 | 333 | 331 | 323 | 92 |
| **Bug** | 545 | — | 467 | 608 | 124 | 365 | 28 | 468 | 872 | 836 | 223 | 558 |
| **Comm.** | 146 | 467 | — | 209 | 352 | 180 | 439 | 173 | 418 | 369 | 266 | 100 |
| **Giggle** | 68 | 608 | 209 | — | 484 | 245 | 583 | 146 | 282 | 303 | 385 | 131 |
| **Hang** | 422 | 124 | 352 | 484 | — | 241 | 100 | 344 | 750 | 719 | 99 | 439 |
| **Jumble** | 188 | 365 | 180 | 245 | 241 | — | 341 | 103 | 520 | 509 | 142 | 231 |
| **Look** | 520 | 28 | 439 | 583 | 100 | 341 | — | 445 | 846 | 808 | 199 | 531 |
| **Nut** | 100 | 468 | 173 | 146 | 344 | 103 | 445 | — | 426 | 431 | 245 | 173 |
| **Office** | 333 | 872 | 418 | 282 | 750 | 520 | 846 | 426 | — | 131 | 654 | 318 |
| **RecHall** | 331 | 836 | 369 | 303 | 719 | 509 | 808 | 431 | 131 | — | 628 | 282 |
| **Tumble** | 323 | 223 | 266 | 385 | 99 | 142 | 199 | 245 | 654 | 628 | — | 347 |
| **Twins** | 92 | 558 | 100 | 131 | 439 | 231 | 531 | 173 | 318 | 282 | 347 | — |

*Table B-1. Distance matrix — selected structures at Camp Mystic, distances in feet.*




*Figure B-2. Map of distances between Bubble Inn and selected structures at Camp Mystic Guadalupe River.*




*Figure B-3. Map of distances between Twins Cabins and selected structures at Camp Mystic Guadalupe River.*